**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PALMER HEENAN, PAUL OSADEBE, JULIA DYKSTRA, ASHLEY VAZQUEZ, and HANNAH GORDON,[1] | Case No.: _____ |
| *Plaintiffs*, | |
| vs. | **COMPLAINT** |
| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, 451 Seventh Street SW Washington, DC 20410, | |
| SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development, 451 Seventh Street SW Washington, DC 20410, | |
| *Defendants*. | |

---

[1] Pursuant to Local Civil Rule 5.1.(c)(1), Plaintiffs' residential addresses are being filed under seal with the Court in a separate Notice.

## INTRODUCTION

1.      In a triumph of the Civil Rights Movement, Congress enacted the Fair Housing Act (FHA) in 1968 to outlaw discrimination in housing and help move our country towards a more equal society.  As part of that law, Congress adopted a broad anti-interference provision to protect people who exercise their fair housing rights or help others do so.

2.      Congress provided for robust judicial and administrative enforcement of the Fair Housing Act.  By statute, the U.S. Department of Housing and Urban Development (HUD) is vested with both the authority and responsibility to administer the FHA.  HUD is obligated by statute and regulation to process and investigate complaints of housing discrimination submitted by the public, charge cases where reasonable cause exists to believe discrimination has or will occur, conciliate cases in an attempt to reach agreement between the parties, and prosecute cases where they cannot be voluntarily resolved.  HUD's enforcement processes are thus a critical—and mandatory—component of the administrative scheme through which complainants vindicate their rights under the Fair Housing Act.

3.      Within HUD, the Office of Fair Housing (OFH) in the Office of General Counsel is the legal office responsible for enforcing fair housing and civil rights laws, including the Fair Housing Act.  Plaintiffs are attorneys who work (or used to work) in OFH on FHA matters.  Plaintiffs' work advising investigators, issuing investigatory subpoenas, drafting and issuing charges of discrimination, prosecuting charges before administrative law judges, and ensuring FHA compliance agency-wide was critical to HUD's enforcement efforts and advancing everyone's right to be free from housing discrimination.

4.      It is because of that work that Plaintiffs have been unlawfully targeted by HUD leadership and forced to leave OFH against their will.  Earlier this year, following the change in

presidential administration, agency leaders set out to eliminate the Office of Fair Housing out of open hostility towards civil rights enforcement generally and fair housing law specifically. Leadership initially sought to get rid of the entire office in one fell swoop through a Reduction in Force. When that was headed off by obvious legal concerns, HUD officials settled on a different strategy to cripple the office: targeting individual attorneys within OFH by involuntarily reassigning them to different divisions where they could no longer work to enforce the Fair Housing Act.

5.       But the Fair Housing Act does not allow Plaintiffs to be targeted for adverse action ***because of*** their work enforcing the FHA. Under the FHA's interference provision, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of" their fair housing rights. 42 U.S.C. § 3617.

6.       That is exactly what agency officials have done here. ***Because*** Plaintiffs assisted complainants and others in asserting and vindicating their rights under the FHA, HUD leadership involuntarily reassigned them from the jobs they were hired to do. Agency officials said more than once that "fair housing is not a priority" of the Administration, and that there was an "optics problem" with the size of OFH. But OFH's workload is statutorily obligated and driven by complaints filed by members of the public alleging claims of housing discrimination. While agency officials claim that the reassignments were necessary to address staffing shortages elsewhere in the agency, that justification was cover for the real motivation behind the adverse action: unlawful animus towards Fair Housing Act enforcement and the people who carry out that work. The agency's inconsistent explanations and shifting stories show that the proffered reasons were pretextual.

7.     Plaintiffs now find themselves in an unfamiliar position.  As attorneys at OFH, Plaintiffs helped other people vindicate their rights under the Fair Housing Act.  Today, though, Plaintiffs are the ones seeking to vindicate their own rights under that law.  Plaintiffs ask this Court to declare that their reassignments are unlawful and enter an injunction ordering HUD to cancel the reassignments and reinstate Plaintiffs to their positions in the Office of Fair Housing, so they can get back to work delivering on the promise of fair housing for all.

## PARTIES

8.     Plaintiff Palmer Heenan is an individual who resides in Arlington, VA.  He is employed by HUD in the Office of General Counsel.

9.     Plaintiff Paul Osadebe is an individual who resides in Washington, DC.  He is employed by HUD in the Office of General Counsel.

10.     Plaintiff Julia Dykstra is an individual who resides in Washington, DC.  She is employed by HUD in the Office of General Counsel.

11.     Plaintiff Ashley Vazquez is an individual who resides in Washington, DC.  She is employed by HUD in the Office of General Counsel.

12.     Plaintiff Hannah Gordon is an individual who resides in Washington, DC.  She is employed by HUD in the Office of General Counsel.

13.     Defendant U.S. Department of Housing and Urban Development (HUD) is an executive department of the United States government.  *See* 42 U.S.C. § 3532.

14.     Defendant Scott Turner is the Secretary of HUD, the highest-level official in the Department.  He is sued in his official capacity.

## JURISDICTION AND VENUE

15.    Jurisdiction in this Court is proper under 28 U.S.C. § 1343(a)(4), because this lawsuit is a "civil action authorized by law" to "secure equitable or other relief under any Act of Congress providing for the protection of civil rights," namely, the Fair Housing Act.

16.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Fair Housing Act.

17.    Venue is proper in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because the Defendants include an agency of the United States that resides in this District; and under 28 U.S.C. § 1391(e)(1)(C) because four of the Plaintiffs reside in this District (Mr. Osadebe, Ms. Dykstra, Ms. Vazquez, and Ms. Gordon), and no real property is involved in the action.

18.    Sovereign immunity is waived by 5 U.S.C. § 702.

## BACKGROUND

## I.    The Fair Housing Act and HUD's Office of Fair Housing

19.    Although *de jure* racial segregation was declared unconstitutional more than a century ago, "its vestiges remain today, intertwined with the country's economic and social life." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 528 (2015).    In 1968, President Johnson's Kerner Commission determined, after "extensive factfinding," that "residential segregation and unequal housing and economic conditions" continued to afflict families across American cities, so much so that the Commission feared our society was "moving toward two societies, one black, one white—separate and unequal."  *Id.* at 529 (citation omitted).  To address "this deepening racial division," the Commission recommended

"a comprehensive and enforceable open-occupancy law" to prohibit discrimination "in the sale or rental of any housing." *Id.* at 529–530 (citation and alteration omitted).

20.    In the days following the assassination of Dr. Martin Luther King, Jr., Congress responded by adopting the Fair Housing Act, which broadly declared that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Pub. L. No. 90-284, title VIII, § 801, 82 Stat. 81 (Apr. 11, 1968).  In the words of President Johnson, the law "proclaims that fair housing for all – all human beings who live in this country – is now a part of the American way of life."[2]

21.    To achieve that lofty goal, Congress outlawed discrimination in various aspects of housing on the basis of "race, color, religion, or national origin."  § 804, 82 Stat. at 83.

22.    Perhaps anticipating that some would oppose enforcement of the FHA's guarantees, Congress also included a broad anti-retaliation provision in that law.  In what is now Section 3617, Congress provided: "It shall be unlawful to coerce, intimidate, threaten, or interfere with ***any person*** in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or ***on account of his having aided or encouraged any other person*** in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617 (emphasis added).   In adopting this provision, one legislator explained: "We need legislation to prevent interference with those pursuing their own civil rights or attempting to educate others about their rights."  114 Cong. Rec. 9608 (Apr. 10, 1968) (Statement of Rep. Brown).

23.    As it reads today, the FHA prohibits, among other things, "refus[ing] to sell or rent after the making of a bona fide offer," "discriminat[ing] against any person in the terms, conditions,

---

[2] https://www.presidency.ucsb.edu/documents/remarks-upon-signing-the-civil-rights-act.

or privileges of sale or rental of a dwelling," and "discriminat[ing] against any person" in "making available" or "in the terms and conditions" of "residential real estate-related transactions." 42 U.S.C. §§ 3604, 3605. The FHA was amended in 1988 to include protections against discrimination based on sex, disability, and familial status. *See* 42 U.S.C. § 3604.

24.    Congress has provided for robust enforcement of the FHA through both administrative and judicial means. On the administrative side, Congress bestowed on HUD both the "authority" and the "responsibility" for "administering" the FHA. 42 U.S.C. § 3608. Congress also directed that HUD "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of" the Act. 42 U.S.C. § 3608(e)(5).

25.    In providing for administrative enforcement of the FHA, Congress laid out a detailed scheme by which HUD must abide. In particular, HUD "shall make an investigation" of complaints that allege discriminatory housing practices, "shall . . . determine based on the facts whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur," and, where reasonable cause is found to exist, "shall . . . immediately issue a charge on behalf of the aggrieved person, for further proceedings" before the agency. 42 U.S.C. § 3610. Once a charge has been filed, HUD "shall provide an opportunity for a hearing on the record" before an administrative law judge. 42 U.S.C. § 3612(b).

26.    HUD has adopted further regulations that govern how the agency discharges its statutory enforcement obligations. The Office of Fair Housing and Equal Opportunity (FHEO) is the investigatory body responsible for, among other things, enforcing the Fair Housing Act. *See* Consolidated Delegation of Authority for the Office of Fair Housing and Equal Opportunity, 76 Fed. Reg. 73984 (Nov. 29, 2011). FHEO does so by processing and investigating complaints of

housing discrimination, performing compliance reviews, reviewing and commenting on proposed rules, guidance, and policy documents related to fair housing, and working with Congress on potential fair housing legislation. *See* 24 C.F.R. subtitle B, Ch. 1, Pt. 103 (setting forth mandatory complaint and enforcement procedures that the agency must follow).

27.    HUD regulations and delegations of authority impose specific enforcement-related duties on the agency's General Counsel, such as approving subpoenas to be issued as part of the agency's investigations, concurring with reasonable-cause determinations, issuing formal charges of discrimination, and prosecuting charges of discrimination in administrative hearings. *See* 24 C.F.R. §§ 103.200(a)(3), 103.215(b), 103.400(a)(2)(i), 103.410(c), 180.305(a).

28.    Within the Office of General Counsel (OGC), the Office of Fair Housing (OFH) carries out work pursuant to the FHA. OFH is one of nine Divisions of OGC headquartered in Washington, DC, and OFH is the only office at HUD headquarters responsible for affirmative fair housing work.

29.    HUD OGC also includes Regional Counsel offices across the country. Regional staff are generalist attorneys who handle a wide variety of matters, including both affirmative and defensive litigation, as well as regulatory and advisory work. While FHA enforcement is included among regional counsel's various responsibilities, fair housing matters make up only a small portion of the work done by regional offices, and OFH is the only HUD headquarters office that enforces the FHA. As the agency's fair housing specialists, OFH is responsible for reviewing all novel and complex FHA cases handled by regional attorneys. Each region is also assigned an OFH attorney to advise on FHA-related matters.

30.    As part of its work, OFH advises and supports FHEO to enforce the FHA and to ensure that HUD and grantees comply with fair housing requirements. Attorneys in OFH also

serve as fair housing subject matter experts for others across the agency. In this role, OFH advises regional attorneys on their fair housing matters, trains investigators and regional attorneys, compiles toolkits, and drafts guidance documents and fair housing regulations. OFH also serves as fair housing counsel to all of HUD to ensure compliance with the FHA and other civil rights laws.

31.    Within OFH, the Enforcement Division is the legal office responsible for affirmative enforcement of the FHA. The Compliance Division is primarily responsible for enforcement of other civil rights laws that apply to HUD grantees; in recent years, however, the Compliance Division has become more involved in affirmative FHA enforcement because many complaints allege violations of multiple civil rights laws, including the FHA. The Compliance Division additionally works with and advises FHEO to develop and conduct civil rights-related investigations, including under the FHA, relating to grantees' programs and activities.

32.    Because of HUD's mandatory obligations under the FHA and governing regulations, OFH's enforcement workload is driven by the number of complaints that are filed with the agency, ***not*** by the varying priorities of different administrations.

## II.    Plaintiffs' Work at the Office of Fair Housing

33.    Plaintiffs—five attorneys who work or used to work in OFH—have spent most or all of their HUD careers enforcing the FHA. Several Plaintiffs also worked on fair housing matters prior to joining HUD.

34.    Plaintiff **Palmer Heenan** has worked in OFH's Enforcement Division since he joined HUD in October 2023. During his time at OFH, Mr. Heenan has been responsible for charging complaints of discrimination, assisting in the litigation of matters before HUD's administrative law judges, issuing investigatory subpoenas, issuing subpoenas for depositions,

assisting in the conciliation of cases, conducting dozens of witness interviews, providing legal advice to program offices throughout HUD with respect to their Fair Housing Act compliance obligations, and creating internal and external guidance documents to make sure both HUD and external parties, like housing providers, can accurately navigate their obligations under the FHA. Mr. Heenan's supervisors and senior OGC officials have been aware of his work enforcing the FHA.

35.     Plaintiff **Paul Osadebe** has worked in OFH's Enforcement Division since he joined HUD in March 2021.  During his time at OFH, Mr. Osadebe has investigated complaints of housing discrimination, drafted charges of discrimination, drafted and defended regulations and agency actions related to civil rights, and worked with Congress on new laws addressing civil rights.  He has also represented fair housing complainants at certain stages of proceedings.  Mr. Osadebe's supervisors and senior OGC officials have been aware of his work enforcing the FHA.

36.     Plaintiff **Julia Dykstra** joined OFH's Enforcement Division in May 2020.  During her time at HUD, she has, among other things, drafted a regulation interpreting the FHA and defended it in litigation, investigated claims of discrimination, issued charges of discrimination, assisted in conciliation of FHA complaints, drafted and issued investigatory subpoenas, advised FHEO on investigations under the FHA, drafted guidance under the FHA, and created toolkits for investigators for novel and complex cases.  Ms. Dykstra's supervisors and senior OGC officials are and have been aware of her work enforcing the FHA.

37.     Plaintiff **Ashley Vazquez** joined HUD through the legal honors program in 2022. She began working on FHA enforcement matters during her legal honors rotations to the litigation division of the Office of Regional Counsel for Region IV, to OFH's Enforcement division, and to OFH's compliance division.  Ms. Vazquez expressed strong interest in working exclusively on fair

housing matters and requested that one of the OGC officials involved in the challenged reassignments place Ms. Vazquez in OFH at the end of the honors program.  This request was granted, and Ms. Vazquez relocated from Georgia to Washington, D.C. to work in OFH.  During her time in OFH, Ms. Vazquez has worked on multijurisdictional cases that involve an FHA claim alongside a compliance authority, most frequently cases involving the Violence Against Women Act (VAWA) and FHA.  Ms. Vazquez's supervisors and senior OGC officials have been aware of her work enforcing the FHA.

38.    Plaintiff **Hannah Gordon** joined HUD through the legal honors program in 2015. She was originally assigned to the OGC Office of Litigation.  Because Ms. Gordon came to HUD to be a civil rights attorney, she negotiated for and successfully obtained a voluntary transfer to OFH.  She has worked in OFH's Compliance Division since 2016, first as an Attorney Advisor, and later as a Disability Law & Fair Housing Litigation Attorney.  In March 2024, Ms. Gordon was promoted to Deputy Assistant General Counsel of Compliance, which is a supervisory position.  During her time at OFH, Ms. Gordon worked on FHA enforcement matters, including advising FHEO on investigations that involve multiple civil rights authorities, including the FHA; drafting toolkits to assist FHEO with resolving multijurisdictional cases; reviewing Agency-wide rules, guidance, and policy documents for consistency with the FHA; and drafting guidance documents on specific areas of FHA compliance and enforcement.  Ms. Gordon's supervisors and senior OGC officials have been aware of her work enforcing the FHA.

39.    Supervisors and OGC officials were aware that, as OFH attorneys, Plaintiffs' workload primarily consisted of affirmative fair housing enforcement.  These officials were aware of Plaintiffs' FHA-related responsibilities based on, among other things: organization charts, office titles, job titles, position descriptions, direct interactions with OFH staff, delegations of authority,

briefings by the Associate General Counsel for Fair Housing, bi-weekly reporting shared with OGC leadership regarding ongoing casework, internal reporting systems, requests to recruit and retain law students and legal honors attorneys by promoting OFH work, and the annual performance review process, which included detailed descriptions of Plaintiffs' work, including on FHA enforcement matters.

## III.   Agency Leadership Targets OFH Attorneys

40.     Since shortly after January 20, 2025, OFH attorneys have been subject to a strict gag order that prohibits them from engaging in any "external communications" without political leadership approval for each individual matter.  That approval has been granted only rarely, and requests often linger for months without action.  The gag order was conveyed verbally by political leadership, with no written clarification or guidance.  OGC officials have interpreted this directive to mean that OFH is prohibited from communicating with any party to an investigation or any federal agency, including the Department of Justice.  As a result of this directive, OFH attorneys have been limited in their abilities to provide legal advice on matters for which they would typically consult in the regular course of business.

41.     Throughout February and March, Plaintiffs became aware of downsizing efforts and potential Reductions in Force (RIFs) at HUD and OGC.  Plaintiffs and other employees faced growing pressure to resign their jobs through OPM's "deferred resignation program."  Many probationary employees who did not accept deferred resignation were fired *en masse*, including three attorneys at OFH.  HUD employees received several emails from the agency's HR department that suggested or implied they could be impacted by upcoming layoffs.  One such email instructed employees to check the accuracy of their employee records in advance of impending RIFs.  Other concerning emails included offers to provide staff trainings about applying for other jobs.  Several emails and FAQ meetings discussed the possibility of impending RIFs.

42.    Even though this pressure campaign to force federal employees out of their jobs took place across federal agencies, Plaintiffs have reason to believe that OFH was especially targeted because of the office's work enforcing the FHA.  In mid-February, a spreadsheet that had been provided to senior agency leadership began circulating among HUD staff, which showed RIF targets for various agency offices as directed by the Trump Administration's newly-created Department of Government Efficiency (DOGE).  According to that spreadsheet, FHEO—the investigatory office responsible for FHA enforcement—would be cut by 77%.[3]

43.    On information and belief, agency leadership originally intended to separate everyone in OFH by implementing a RIF limited to OFH specifically, but those plans ran into roadblocks.  Agency officials were advised that any RIF would have to apply across all of OGC, rather than to OFH alone, that it would be unlawful to conduct a so-called "box RIF" for the purpose of removing OFH attorneys, and that, in any case, many OFH attorneys would have sufficient seniority to remain with the agency even after a RIF.

44.    On information and belief, having been advised that an OFH-specific RIF would not work, OGC officials looked for other ways to target OFH attorneys.  Unable to eliminate OFH altogether, OGC officials instead opted to use involuntary reassignments to achieve their goal— and the goal of political leadership and the Trump Administration more broadly—to significantly reduce the agency's capacity to enforce the Fair Housing Act.  Motivated by unlawful animus against FHA enforcement and the people who do it, OGC officials selected OFH attorneys, including Plaintiffs, for involuntary reassignments.

---

[3] https://apnews.com/article/doge-hud-trump-turner-affordable-housing-musk-0176c8539fa9b5959198c351c97b8652

45.     On or around May 20, 2025, an HR official in OGC sent a calendar invitation abruptly scheduling a meeting with OFH staff attorneys entitled "OGC Office Needs."  The attorneys invited to the meeting did not receive any additional notice or explanation about its purpose or agenda.  The next day, the same official canceled the meeting with no explanation.  An OFH attorney replied to ask when the meeting would be rescheduled but received no response.

46.     Based on informal conversations, Plaintiffs and other OFH attorneys suspected that the meeting had been scheduled to discuss downsizing OFH and/or potential reassignments to other offices.  Around the same time, OFH supervisors were informed that only staff attorneys were being considered for any potential transfers.

47.     On May 28, 2025, Plaintiff Ashley Vazquez met with an OGC official individually to discuss possible reassignments.  During that meeting, the OGC official stated that work-sharing to address OGC needs would not be approved because OFH was too big and needed to be "right-sized."  The OGC official also stated that there were new administration priorities.  The OGC official informed Ms. Vazquez that she was free to transfer to any other OGC office in the country if she was willing to move and pay for her own relocation costs.

48.     On or around May 29, 2025, an affected OFH attorney met with an OGC official individually to discuss possible reassignments.  During that meeting, the OGC official stated that OFH attorneys had been selected to address staffing needs across OGC because fair housing is not a priority of this administration, and OFH would not have as much work to do.  The OGC official further stated that leadership had directed that OGC fill the positions administratively rather than hiring new attorneys to replace those who had resigned or already been fired.  The OGC official provided the affected attorney with many options of OGC offices to volunteer to be reassigned to, beyond those that had initially been designated as needing staff.  At this meeting and in a follow-

up email, the affected attorney described their current workload to the OGC official, highlighting an increased caseload due to reduced capacity of FHEO and regional counsel, including losing all of their FHEO and regional counsel colleagues on two matters.  The attorney further explained the difficult position of having to choose between their dedication to HUD and federal employment and their civil rights career, and that if reassigned, they would feel obligated to leave HUD, which would not help solve the staffing needs of other OGC offices.  Instead, the attorney personally offered to volunteer for long-term work-sharing or a term-limited full time rotational assignment to another OGC office.  The OGC official said neither would be possible and acknowledged knowing that many people in OFH would leave HUD if reassigned.

49.    On May 29, 2025, an HR official in OGC scheduled a meeting for the next day entitled "OGC Skills Gap."  The meeting invitation included line attorneys from OFH and the Office of Program Enforcement (OPE).

50.    On June 4, 2025, the "OGC Skills Gap" meeting was held.  OFH attorneys were told that, to fill staffing needs, OGC was offering attorneys in OFH and OPE the opportunity to be voluntarily reassigned to a list of other divisions.  For each division on the list, OGC officials stated that there was a specific number of attorney slots that supposedly needed to be filled.  OFH supervisors had not previously been informed of these numbers or exactly how many staff attorneys agency leadership intended to reassign.  OFH attorneys were told that, if not enough people volunteered by June 13, OGC officials would conduct involuntary reassignments.

51.    On June 9, 2025, OFH attorneys, including Plaintiffs Mr. Heenan, Mr. Osadebe, Ms. Dykstra, and Ms. Vazquez, with the support of Plaintiff Ms. Gordon, emailed OGC officials to propose a work-sharing plan to meet what OGC officials had described as gaps in coverage, as an alternative to involuntary reassignments in the event there were not enough volunteers.  The

proposal suggested term-limited rotational assignments in addition to attorneys taking on certain matters for other offices while remaining in OFH. Both work-sharing agreements and temporary rotations are common arrangements throughout OGC to meet staffing needs as they arise.

52.     On June 12, 2025, an OGC official rejected the alternative proposal, stating that office leadership believed asking for volunteers was the best option at that time. The official did not respond to follow-up questions OFH attorneys had sent in writing about the voluntary reassignment process.

53.     Only one attorney from OFH volunteered to transfer, and his transfer was approved to an office that was not one of the original options definitively conveyed by OGC officials at the June 4 meeting. The office to which that attorney was transferred indicated they were unaware they would be receiving additional staff through the reassignments.

54.     On June 23, 2025, OGC officials verbally conveyed to the Associate General Counsel for Fair Housing that 10 line attorneys—including four of the Plaintiffs here—would be involuntarily transferred out of OFH. On June 23, 2025, OGC officials also conveyed that two supervisors in OFH (the Deputy Assistant General Counsel for Fair Housing Enforcement; and Plaintiff Hannah Gordon, Deputy Assistant General Counsel for Fair Housing Compliance) would be demoted to trial attorneys and transferred out of OFH. As far as Plaintiffs are aware, this was the first time that OGC officials ever suggested that supervisors were being considered for reassignment. The proposed reassignments (12 attorneys), along with the attorney who volunteered to transfer, would cut approximately 50% of OFH's staff at the time (13 out of 24).

55.     Later that day, in response to the proposed involuntary reassignments, one of the deputies slated for transfer sent emails to OGC leadership and other OGC managers outlining his legal, programmatic, and practical concerns regarding the proposal. In the email to OGC

leadership, the deputy explained his view that the attorneys selected for transfer had been targeted in retaliation for their work on fair housing matters, and that OFH had been specifically targeted for reduction because fair housing-related work is not in favor with current political leadership. Less than one week later, the deputy was placed on administrative leave, and he was subsequently terminated on the basis of those emails.

56.    Throughout this same time period, HUD officials sought to isolate OFH by cutting their roles with respect to other agency activities.  In May, OFH was removed from HUD's internal clearance process, through which OFH had served for decades as civil rights counsel to the agency and advised programs and other offices with respect to legal risk, including under the FHA. Throughout this same period, managers in other parts of HUD directed their staff on multiple occasions not to seek assistance from or consult with OFH or FHEO, despite many years of productive collaboration in the past.  In addition, an OGC official instructed overburdened counsel in regional offices to stop referring cases to OFH or asking OFH for assistance.

57.    Political leadership in FHEO also recently released new guidance regarding investigatory procedures and a retraction of dozens of existing guidance documents, all without consulting OFH.  This was done despite OFH normally taking a significant role in developing or retracting any guidance—indeed, some of the guidance FHEO purported to withdraw was developed over many years through careful collaboration between FHEO and OFH.

## IV.    Plaintiffs Were Targeted Because of Their Work Advancing Fair Housing Rights

58.    On information and belief, Plaintiffs were targeted for involuntary reassignment because of their work enforcing the FHA.  That work necessarily assisted, aided, and/or encouraged other people in the exercise or enjoyment of their fair housing rights.  The reassignments were motivated by an unlawful intent to interfere with Plaintiffs and their work advancing fair housing rights.

59.    Statements by OGC officials and the way the reassignments have been carried out show that the agency's proffered justification was not credible and the reasons given for the reassignments were pretext for decisionmakers' unlawful motivation.

60.    OGC officials have repeatedly stated that the reassignments were necessary because ***"fair housing is not a priority"*** of this Administration and current agency leadership. OGC officials also stated that, because fair housing is not a current priority, there would not be as much fair housing enforcement work to do going forward.  In explaining why reassignments were necessary, one OGC official stated that there was "***an optics problem***" with OFH being the largest office in OGC during this Administration.  Nothing was said about optics or priorities with respect to other offices in OGC.  Ms. Vazquez had also been told by an OGC official that alternatives to forced reassignments would not be approved because OFH was too big and should be "***right-sized***."

61.    Even before Plaintiffs' reassignments, OFH faced a significant backlog of statutorily mandated enforcement work.  Because OGC's regional offices have lost so many staff in recent months, especially on the litigation side, OFH has been receiving increased requests from regional counsel to assist on fair housing matters.  OFH has also been carrying increased workloads in light of significant staff shortages at FHEO.  Despite statements about administration priorities, the number of investigations and complaints that must be processed—which determines the workload for OFH—has not decreased.

62.    In addition, OFH has been managing new workstreams arising out of the new Administration's priorities, including implementation of Executive Orders and review of applications for fair housing assistance grants that were submitted after the Administration amended the solicitation for applications consistent with its priorities.  On information and belief,

none of the offices to which Plaintiffs and their colleagues have been or will be transferred have backlogs or capacity issues that are any more urgent or severe than at OFH. OFH attorneys have been told that, in executing the reassignments, OGC officials "were thinking of needs of all offices except OFH."

63.    Much of Plaintiffs' work as attorneys in OFH enforcing the Fair Housing Act is mandated by that statute. The job functions that Plaintiffs will perform once reassigned, by contrast, are either not statutorily required, as far as Plaintiffs are aware, or there are others in OGC who are already trained in these areas and could do this work.

64.    OGC officials have offered contradictory explanations about the unmet needs that supposedly justified the reassignments. At times, including when they requested volunteers, OGC officials expressed that reassignments were necessary to fill specific positions, providing a list of the number of slots in each division that needed attorneys. At other times, however, OGC officials suggested that the reassignments were necessary solely to move people *out of OFH*—regardless of the office they transfer *to*.

65.    Plaintiffs reasonably believed that they would be permitted to transfer to almost any other division in OGC, as long as they did not stay in OFH, due to OGC officials' having identified the size of OFH as an "optics problem," and as evidenced by OGC officials moving an OFH attorney who requested voluntary reassignment to a division other than those definitively identified in the June 4 meeting. Plaintiffs' reasonable belief was also based on conversations where OGC officials seemed open to transfers to other offices.

66.    OGC officials did not involuntarily reassign attorneys from any offices other than OFH and OPE, even though there were other divisions that also had lost relatively few staff in recent months.

67.    The number of staff that were ultimately reassigned is more than OGC officials initially indicated would be necessary to address staffing needs.  For example, the Office of Ethics and Appeals initially requested 2–3 attorneys, partially informed by the need to perform a function that has since been offloaded to another office.  2 OGC employees from outside OFH volunteered to be transferred to Ethics, yet 2 additional attorneys from OFH are still being transferred. Similarly, the Office of Litigation initially requested 4–5 attorneys, but that office is now receiving 8 additional staff, including 5 involuntary transfers from OFH.  OFH supervisors were shocked at the number of attorneys that OGC decided to reassign.

68.    The offices to which Plaintiffs and their colleagues in OFH have been reassigned are not a good match for their skills and experience, especially compared to regional attorneys at OGC who already do that work.  Plaintiffs and their colleagues in OFH are experts in fair housing and civil rights law, which is a unique and highly specialized field.  Individual OFH attorneys have expertise and historical knowledge in certain areas of fair housing and civil rights law that will be lost and cannot be replaced if they are removed from their OFH positions.  Their practice is also primarily comprised of affirmative enforcement, which is materially different work than the types of defensive litigation, ethics reviews, and personnel matters that Plaintiffs and their colleagues will be expected to carry out once reassigned.  OGC staff in HUD's regional offices, however, already work on and have expertise in defensive litigation, ethics, and personnel matters, and thus would be better suited to that work than Plaintiffs.  Because Plaintiffs and their colleagues have little to no experience in the areas and fields to which they are being transferred, they will require substantial training and supervision to match the expertise already held by regional attorneys. OGC officials nevertheless ordered that Plaintiffs and their colleagues in OFH be reassigned to

address needs in other OGC divisions, rather than redistribute that work among already-trained attorneys without regard to the needs of OFH.

69.     Despite OGC officials' insistence that Plaintiffs' reassignments were necessary to address significant staffing shortages at OGC, on information and belief, agency leadership never sought an exemption from the hiring freeze that would have allowed OGC to hire additional attorneys for these positions.  On information and belief, other parts of HUD and other federal agencies have requested and/or received permission to hire additional personnel.

70.     OGC officials acknowledged their belief that at least some OFH attorneys would probably quit their jobs at HUD if reassigned to other divisions because their priority is doing fair housing work.  This further attrition at OGC would exacerbate the staffing needs that OGC officials were supposedly trying to address.  When Ms. Gordon asked an OGC official about this contradiction, the OGC official told her they would just hire more people for the other offices if the reassigned OFH attorneys quit.

71.     OGC officials never tried to fill the positions to which Plaintiffs and their colleagues in OFH have been involuntarily reassigned by advertising those positions across OGC to solicit volunteers from other divisions.

72.     In the Office of Litigation, one of the divisions to which Plaintiffs will be transferred, former employees who had been fired in their probationary terms or accepted deferred resignation were willing to return and continue carrying out their work.  OGC leadership did not allow any of these attorneys to return to address the purported staff shortage, choosing to involuntarily reassign Plaintiffs instead.

73.     OGC officials rejected a detailed alternative proposal offered by Plaintiffs and their colleagues that would have allowed OFH staff to help other OGC divisions address critical needs,

while also continuing to carry out their fair housing work at the same time. The types of work-sharing and detail arrangements that OFH attorneys proposed are used within OGC and elsewhere in the agency. In the process of carrying out the reassignments, an OGC official told Ms. Gordon that she could start working in her reassigned position before her transfer date, acknowledging that the allegedly critical work needs that justified the reassignments can be done across OGC offices. Managers in some of the offices to which Plaintiffs have been reassigned have indicated that they would be open to work-sharing arrangements to address staff shortages. OGC officials did not offer any reasoned or concrete explanation as to why they rejected the proposal or did not believe it would be effective in meeting their purported needs.

74.    With respect to the supervisors whose reassignments outside of OFH have already taken effect, including Plaintiff Ms. Gordon, OGC officials have offered shifting and contradictory explanations for why those transfers were necessary and taking place on an expedited timeframe. Supervisors were not solicited to volunteer to leave OFH, like staff were. The day the involuntary reassignments were announced was the first time OFH attorneys became aware that supervisors were being considered for transfer. Around that time, one OGC official first represented that the supervisors were being moved because they were non-bargaining-unit employees, and bargaining unit employees could not be moved to some of the new positions. The official then acknowledged that bargaining unit employees *could* be moved, but it would take longer, so the supervisors were chosen because their lack of bargaining rights made it faster. OGC officials later said the supervisors were best positioned to do the work in other OGC offices, given their supervisory experience, even though OGC officials acknowledged the supervisors had no substantive knowledge in the relevant subject areas. At another point, the supervisors were told they were being transferred because of their seniority and skills.

75.     The reassignments have been plagued by paperwork and processing errors and delays.  On what was supposed to be Ms. Gordon's first day in her reassigned position, she reported to work for the new job, only to find that she had not in fact been reassigned.  She was not informed until the next day that her start date had been delayed by two weeks.  On the day her reassignment appears to have become effective, Ms. Gordon received no further notice or paperwork documenting her transfer; she was only aware that the reassignment had taken effect when she received an email from her new supervisor about a staff meeting that day.  It then took another week for Ms. Gordon's computer systems and electronic accounts to be transferred.  She is still listed as the first-line supervisor for attorneys in the Compliance Division in the agency's internal time-keeping system.

76.     On more than one occasion, OGC officials have suggested that the reassignments might only be temporary, and that affected attorneys may be able to return to OFH in the future. The week before OGC officials asked OFH attorneys to volunteer to be transferred, an OGC official told one of the attorneys that the official's goal was to keep as many OGC staff as possible "for three to four years," so that they could rebuild together.  On other occasions, OGC officials vaguely suggested that even though the reassignments were permanent for now, impacted attorneys would likely be able to move back to OFH at some point in the future.  These statements suggest that decisionmakers' animus was tied to current political leadership at the agency and across the federal government.

77.     On information and belief, OPE, the only other office subject to involuntary reassignments, was included in the reassignments primarily to deflect from decisionmakers' unlawful motivation under the FHA.

78.     Before the transition in presidential administration earlier this year, OFH was comprised of 31 staff members.  Following the termination of probationary employees, ongoing speculation about impending RIFs, and the offer of deferred resignation, OFH was left with 24 people.  As a result of the involuntary reassignments of Plaintiffs and their colleagues, OFH will be left with only 11 staff (including only 6 line attorneys)—representing a nearly 70% cut of fair housing staff from the beginning of the year.

V.     **Plaintiffs' Reassignments and Harms**

79.     Plaintiff **Palmer Heenan** was orally informed on or about June 24, 2025, that his management team had received notice he was being moved to the Office of Litigation.  Mr. Heenan did not receive written notice of his reassignment.

80.     On July 3, 2025, Mr. Heenan's union was notified—in a letter backdated to July 1, 2025—that management was proposing involuntary reassignments, with an effective date of July 28, 2025.  Mr. Heenan did not receive written notice of his proposed reassignment.

81.     On July 16, 2025, Mr. Heenan received an e-mail from an HR official that indicated the official had been tasked with assisting Mr. Heenan with a "voluntary reassignment" and requesting his resume.  Mr. Heenan had not volunteered to be reassigned and still had not received written notice of his reassignment.

82.     Mr. Heenan received written notice that he was being reassigned on September 15, 2025, with an effective date of October 5, 2025.  In the formal written notification, Mr. Heenan was told that he must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

83.     On information and belief, Defendants took this adverse action against Mr. Heenan because of his work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

84.    Mr. Heenan has been irreparably harmed by his reassignment. The new position to which Mr. Heenan will be assigned is a new and different job from his current role in OFH's Enforcement Division. Mr. Heenan does not possess knowledge about the substance of the new position, which may impact his ability to obtain positive performance reviews and any benefits associated with such reviews.

85.    Mr. Heenan has dedicated the majority of his legal career to advocacy for and on behalf of those whose civil rights have been violated. He has spent years acquiring both the necessary knowledge and skill to be an effective civil rights attorney. He has taught numerous Continuing Legal Education Courses on civil rights enforcement. He has also lectured law school classes on civil rights and, in particular, the governmental role in the enforcement of civil rights laws. As a result of this reassignment, Mr. Heenan will no longer be able to do the civil rights work to which he has committed his professional career. Losing the opportunity to do that work materially disadvantages Mr. Heenan, his career, and his professional opportunities

86.    Plaintiff **Paul Osadebe** was orally informed on or about June 24, 2025, that his management team had received notice he was being moved to the Office of Litigation. Mr. Osadebe did not receive written notice of his reassignment.

87.    On July 3, 2025, Mr. Osadebe's union was notified—in a letter backdated to July 1, 2025—that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Mr. Osadebe did not receive written notice of his proposed reassignment.

88.    On July 16, 2025, Mr. Osadebe received an e-mail from an HR official that indicated the official had been tasked with assisting Mr. Osadebe with a "voluntary reassignment" and requesting his resume. Mr. Osadebe had not volunteered to be reassigned and still had not received written notice of his reassignment.

89.     Mr. Osadebe received written notice that he was being reassigned on September 15, 2025, with an effective date of October 5, 2025.  In the formal written notification, Mr. Osadebe was told that he must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

90.     On information and belief, Defendants took this adverse action against Mr. Osadebe because of his work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

91.     Mr. Osadebe has been irreparably harmed by his reassignment.  Due to values Mr. Osadebe has held dear since before even entering college, Mr. Osadebe's career goal and reason for becoming a lawyer was to work on impactful civil rights litigation.  Mr. Osadebe left his family and friends in Texas to move across the country to Washington D.C. to pursue opportunities to engage in affirmative civil rights litigation.  All of Mr. Osadebe's legal experience has been focused on affirmative public interest litigation on behalf of individuals and communities.  Mr. Osadebe has avoided any job with significant defensive litigation responsibilities because such work would conflict with his values.  Mr. Osadebe would not have become a lawyer to perform civil rights work and would have chosen a different career entirely if he knew he would be asked to perform defensive litigation against vulnerable individuals and communities.  The new position to which Mr. Osadebe will be assigned is a new and different job from his current role in OFH's Enforcement Division.  As a result of his reassignment, Mr. Osadebe will no longer be able to do the civil rights work to which he has committed his professional career.  Losing the opportunity to do that work is an adverse action that materially disadvantages Mr. Osadebe, his career, and his professional opportunities.

92.     Mr. Osadebe has also suffered and will continue to suffer fear about how he will be evaluated doing work he is unfamiliar with in a new office, the type of training he will receive to perform this unfamiliar work, concern about being forced to restart his career with a different and unwanted focus several years in, and internal conflict about being expected to perform defensive litigation work that conflicts with his values. Due to the stress surrounding his impending reassignment, Mr. Osadebe has sought increased mental health treatment and has even sought treatment from an urgent care facility and the emergency room for likely symptoms of panic attacks caused by the stress.

93.     Plaintiff **Julia Dykstra** was orally informed on or about June 24, 2025, that her management team had received notice she was being moved to the Office of Litigation.

94.     On July 3, 2025, Ms. Dykstra's union—in a letter backdated to July 1, 2025—that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Ms. Dykstra did not receive written notice of her proposed reassignment.

95.     On July 16, 2025, Ms. Dykstra received an e-mail from an HR official that indicated the official had been tasked with assisting Ms. Dykstra with a "voluntary reassignment" and requesting her resume.  Ms. Dykstra had not volunteered to be reassigned and still had not received written notice of her reassignment.

96.     Ms. Dykstra received written notice of her reassignment on September 16, 2025,[4] with an effective date of October 5, 2025.  In the formal written notification, Ms. Dykstra was told that she must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

---

[4] The email was sent on September 15, 2025, but Ms. Dykstra's tour of duty had ended for the day, so she did not receive it until September 16, 2025.

97.    On information and belief, Defendants took this adverse action against Ms. Dykstra because of her work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

98.    Ms. Dykstra has been irreparably harmed by this reassignment.  Ms. Dykstra went to law school specifically to pursue a career doing affirmative civil rights work, having been inspired by her undergraduate coursework where she studied, among other things, inequality in access to housing.  Virtually all of Ms. Dykstra's internships in law school and post-graduate positions prior to joining HUD were positions doing affirmative civil rights work.  She has dedicated years acquiring the necessary skills and knowledge to be an effective affirmative civil rights lawyer.  As a result of this reassignment, Ms. Dykstra has been irreparably harmed because she will no longer be able to perform the work that she spent years training to do and will instead be placed in a position where she is effectively a beginner.  Losing this opportunity materially disadvantages her in her career and she is concerned that her performance reviews, and any associated benefits, will be lower because she does not have experience in her new role.  Finally, she also has experienced increased anxiety about being forced to conduct work that conflicts with her values.

99.    Plaintiff **Ashley Vazquez** was informed on or about June 24, 2025, that her management team had received notice she was being moved to the Office of Ethics and Appeals.

100.    On July 3, 2025, Ms. Vazquez's union—in a letter backdated to July 1, 2025—was notified that management was proposing involuntary reassignments, with an effective date of July 28, 2025.  Ms. Vazquez did not receive written notice of her proposed reassignment.

101.    On July 16, 2025, Ms. Vazquez received an e-mail from an HR official that indicated the official had been tasked with assisting Ms. Vazquez with a "voluntary reassignment"

and requesting her resume.  Ms. Vazquez had not volunteered to be reassigned and still had not received written notice of her reassignment.

102.    Ms. Vazquez received written notice of her reassignment on September 15, 2025, with an effective date of October 5, 2025.  In the formal written notification, Ms. Vazquez was told that she must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

103.    On information and belief, Defendants took this adverse action against Ms. Vazquez because of her work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

104.    Ms. Vazquez will be irreparably harmed by this reassignment.  Ms. Vazquez is a dues-paying member of the union AFGE Council 222, Local 476.  As result of this reassignment, she will lose her status in the bargaining unit.  She will lose the benefits of her union membership, which include numerous procedural rights, substantive protections, and financial benefits.

105.    Ms. Vazquez's career will be irreparably damaged by this reassignment.  Ms. Vazquez chose to attend a particular law school in order to gain tangible experience related to systemic discrimination associated with historic patterns of segregation.  Based on her extensive civil rights enforcement experience, Ms. Vazquez believes that the federal government has a unique ability and responsibility to address systemic discrimination through civil rights laws, and that HUD's tools for enforcing civil rights are stronger than any other agency due to the strength of the Fair Housing Act.  Ms. Vazquez's intent when applying to HUD's legal honors program was to work on FHA and other civil rights enforcement.  She moved twice in two years to new cities that she had no connection to in order to do this work, leaving behind family and friends and incurring significant financial costs.

106.    During her time in OFH, Ms. Vazquez has worked on multijurisdictional cases involving the intersection of the FHA with VAWA, Title VI, and Section 504.  In these cases, she has drafted FHA charges, negotiated with parties to encourage fair settlements, issued subpoenas, and drafted settlement agreements.    Ms. Vazquez's Compliance role afforded additional opportunities to investigate widespread discrimination and issue letters of finding, and to advise on program compliance with civil rights laws, resulting in HUD programs being less likely to discriminate.  This reassignment will prevent her from continuing to build upon those experiences, stunt her career growth, and prevent her from becoming a subject matter expert in the type of law she went to law school to pursue.  The Office of Ethics and Appeals is a completely different type of law than what Ms. Vazquez has been practicing.  Cutting short Ms. Vazquez's opportunity to continue building litigation skills will also adversely affect her opportunities to find meaningful civil rights work outside the government.

107.    Ms. Vazquez has suffered significant anguish over having to abandon her cases. Under significant stress, Ms. Vazquez has lost sleep and worked additional hours to maximize her impact on her cases before she is reassigned.  Ms. Vazquez's religious beliefs require her to engage in the type of work she has been doing at OFH.  As such, she has had to seek religious counsel and devote significant personal time to reflecting on the teaching of her faith and trying to stop her reassignment from proceeding.

108.    Plaintiff **Hannah Gordon** was first informed on June 23, 2025, that she would be demoted from her supervisory position and involuntarily reassigned to the Personnel Law Division in the Office of Ethics and Personnel Law.  Ms. Gordon received official written notice of her transfer on June 30, 2025.  On information and belief, agency officials took this action against Ms.

29

Gordon because of her work at OFH enforcing civil rights laws including the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

109.    Ms. Gordon has been working in her reassigned position since July 27, 2025.  In her new position, Ms. Gordon was not assigned any work until August 6.  Now that she has been assigned work, most of it does not have pressing deadlines.  She was also told that a regional office had capacity to help her with any of her assigned cases.  She has, however, been permitted to continue doing some of her prior work from OFH that is unrelated to enforcing the Fair Housing Act.  Specifically, after she was moved, she was directed to continue her prior workstreams providing legal advice on reasonable accommodation requests from HUD employees, for which she is still supervised by her OFH supervisors.  But she has not been permitted to continue working on any FHA-specific enforcement matters.

110.    Ms. Gordon has been irreparably harmed by her reassignment.  Ms. Gordon's new supervisor has acknowledged that the work she will be assigned in the Personnel Office is "a complete 180" from the affirmative enforcement work she was doing before in OFH.  Ms. Gordon joined HUD and OFH to work on civil rights matters, including enforcement of the Fair Housing Act, that align with her values and make her work meaningful and fulfilling.  Losing the opportunity to do that work due to her reassignment is an adverse action that materially disadvantages Ms. Gordon, her career, and her professional opportunities.

111.    Ms. Gordon has devoted her entire career, even before becoming a lawyer, to civil rights advocacy and equal rights.  In law school, she was chosen for a selective public interest scholars and scholarship program based on her vow to devote her career to this type of work.

112.    This is the second time since being at HUD that Ms. Gordon has had to advocate to be assigned to OFH.  Ms. Gordon thought she was being assigned to the civil rights office when

she first joined HUD, only to learn when she started that the work would be defensive civil rights work. After months of lobbying then-HUD leadership, Ms. Gordon was finally voluntarily transferred to OFH, in large part thanks to the intervention of a senior OGC official who has since passed away. It is distressing for Ms. Gordon to have to relive that prior experience.

113. Ms. Gordon has also suffered and will continue to suffer severe emotional distress and anxiety from this reassignment. She has expressed this to OGC leadership and her new supervisor, and their response was to tell her to "keep an open mind." She is afraid of being forced to take positions that will violate her personal morals and her professional responsibilities. Ms. Gordon has not received formal training in her new role, and she is greatly concerned about violating a professional responsibility by practicing in an area of law she is unfamiliar with without proper training. She is also fearful of the lost opportunities and knowledge she will suffer from working in an area of law that is completely unrelated to her career.

114. Ms. Gordon's career is also damaged by the demotion from her supervisor position. Already on multiple occasions, Ms. Gordon has been forced to explain that she was demoted and has tried to explain that it was not for performance or conduct-related reasons.

115. Plaintiffs' unlawful reassignments have also caused and continue to cause additional harm by chilling the advancement of fair housing rights. Victims of housing discrimination will suffer when their complaints are not timely and properly addressed by HUD. If agency officials are permitted to take adverse action against Plaintiffs based on their work enforcing the FHA, then employees across the country—both public and private—will be more reluctant to accept positions or assignments that advance fair housing, for fear that they could be punished for doing so. Moreover, victims of housing discrimination under the FHA will be less

likely to file claims if they believe the agency charged with reviewing those claims is free to interfere with fair housing enforcement and itself violate the FHA.

## VI.    The Trump Administration's Hostility Towards Fair Housing and Civil Rights

116.    The Trump Administration and senior HUD officials have long harbored animus toward fair housing work and the civil rights attorneys who do it.  This animus informed and motivated Defendants' targeting of Plaintiffs based on their work enforcing the FHA.

117.    Since President Trump was inaugurated earlier this year, the Administration has eliminated or dramatically cut civil rights offices in other agencies, including the Social Security Administration, the Labor Department, the Federal Trade Commission, the Department of Homeland Security, and the Department of Education.[5]

118.    At HUD, the Administration has sought to weaken the enforcement of fair housing laws in various ways.  HUD officials have withheld meritorious discrimination charges, and "at least 115 federal fair housing cases have been halted or closed entirely since Trump took office."[6] In addition, multiple channels for reporting housing discrimination have been shut down.[7]  And it was reported in July that HUD was ending at least seven major investigations where HUD had "already found civil rights violations."[8]

119.    Recent reporting documents ongoing efforts by the Trump Administration to limit enforcement of the FHA.[9]

---

[5] https://www.washingtonpost.com/nation/2025/02/28/doge-trump-civil-rights-office-closing-eeoc/; https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs; https://www.npr.org/2025/03/21/nx-s1-5336738/homeland-security-rif-cuts-dhs
[6] https://www.propublica.org/article/trump-hud-weakening-enforcement-fair-housing-laws.
[7] *Id.*
[8] https://www.propublica.org/article/trump-hud-drop-housing-discrimination-cases-housing-pollution.
[9] https://www.nytimes.com/2025/09/22/realestate/trump-fair-housing-laws.html.

120.     Also notable was the effort by DOGE to purge references to protected classes from government websites, even though race and other disfavored words are closely associated with statutory anti-discrimination mandates.[10]   At HUD, the Administration directed that everything about fair housing be removed except for what a statute specifically said must be included.

121.     This scrutiny also fell on fair housing grantees.   For example, one attorney was made aware that HUD offices had been instructed to search grantee websites and LinkedIn profiles for commonly used civil rights terms like "race" and "segregation."   On information and belief, these efforts were used to cancel grants worth millions of dollars.[11]

122.     Recent agency memoranda issued by political leadership in FHEO appear designed to undermine FHA enforcement by limiting the types of evidence investigators may consider, eliminating long-standing legal theories under which they can investigate cases, and imposing additional bureaucratic requirements on an office that is already understaffed.

123.     Project 2025—which has informed many of the Trump Administration's policies and initiatives—criticized HUD's prior fair housing enforcement efforts as misguided and ineffective.[12]

124.     Even as far back as the 2020 presidential election, President Trump campaigned on a promise to roll back programs under the Fair Housing Act aimed at reducing racial segregation in suburban housing.[13]

---

[10] https://www.npr.org/2025/03/19/nx-s1-5317567/federal-websites-lgbtq-diversity-erased.
[11] https://oag.ca.gov/news/press-releases/attorney-general-bonta-trump-administration-unlawfully-cancelled-grants-intended.
[12] https://www.documentcloud.org/documents/24088042-project-2025s-mandate-for-leadership-the-conservative-promise/, at 510–511.
[13] https://www.nytimes.com/2020/07/29/us/politics/trump-suburbs-housing-white-voters.html.

125.    The Administration is of course entitled to its own policy preferences. But government officials may not pursue those objectives through the unlawful targeting of fair housing attorneys.

## CLAIMS

### COUNT 1: VIOLATION OF THE FAIR HOUSING ACT – 42 U.S.C. § 3617
### (ON BEHALF OF EACH PLAINTIFF; AS TO ALL DEFENDANTS)

126.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

127.    Plaintiffs bring this claim pursuant to 42 U.S.C. § 3613(a)(1)(A).

128.    42 U.S.C. § 3617 provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." As HUD regulations recognize, this provision of the FHA prohibits "[t]hreatening an employee . . . with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of" certain protected characteristics. 24 C.F.R. § 100.400(c)(3).

129.    Defendants, through OGC officials, coerced, intimidated, threatened and/or interfered with Plaintiffs' employment at OGC because of Plaintiffs' work aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA.

130.    Plaintiffs reviewed, processed, investigated, conciliated, charged, managed, and/or resolved complainants' claims of housing discrimination under the Fair Housing Act. Plaintiffs also were responsible for participating in administrative proceedings at HUD under the Fair Housing Act to resolve charges of discrimination. In addition, Plaintiffs consulted with other

offices at HUD and drafted and reviewed guidance, policy proposals, and other agency materials to ensure that the agency did not violate people's fair housing rights under the FHA.

131.    Defendants, through OGC officials, were aware of Plaintiffs' activities aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA.

132.    As a result of Plaintiffs' work aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA, Defendants, through OGC officials, coerced, intimidated, threatened, and/or interfered with Plaintiffs' employment at OGC by pressuring them to resign, coercing them to transfer to other offices, and when none of that worked, involuntarily reassigning Plaintiffs to offices outside of OFH and requiring them to accept the reassignments under threat of removal from federal service.

133.    Plaintiffs' involuntary reassignments are an adverse action because they require Plaintiffs to transfer offices and do work that is meaningfully different from the civil rights-related work that they joined HUD to do.  The reassignments would dissuade a reasonable person from joining OFH or working on fair housing enforcement matters, for fear that they likewise will be targeted for involuntary reassignment or other adverse action.

134.    Plaintiffs have suffered and will continue to suffer irreparable harm absent an injunction.

135.    Plaintiffs have attempted to address their concerns with management and other OGC officials, but Defendants have nevertheless proceeded with the involuntary reassignments. Plaintiffs fear further retaliation as a result of their efforts to oppose Defendants' unlawful actions.

## COUNT 2: DECLARATORY JUDGMENT ACT
### (ON BEHALF OF EACH PLAINTIFF; AS TO ALL DEFENDANTS)

136.    Plaintiffs reincorporate by reference the allegations in paragraphs 1–125.

137.    Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.  There is an actual controversy within this Court's jurisdiction, and a declaration of rights is necessary to remedy continuing harm resulting from Plaintiffs' unlawful reassignments.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs request that the Court award the following relief:

a.    Grant injunctive relief, pursuant to 42 U.S.C. § 3613(c)(1), ordering Defendants to cancel Plaintiffs' reassignments, or in the event that the reassignments have been effected, to reinstate Plaintiffs to the positions, titles, and job descriptions they held in the Office of Fair Housing as of June 15, 2025;

b.    Grant a declaratory judgment and any further necessary or proper relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 that Plaintiffs' involuntary reassignments were and are unlawful;

c.    Award Plaintiffs reasonable attorney's fees and costs as provided in 42 U.S.C. § 3613(c)(2);

d.    Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

e.    Grant such other relief as the Court may deem just and proper.


Dated: September 22, 2025                 Respectfully submitted,

 _/s/ Jessica Merry Samuels_
Jessica Merry Samuels (DC Bar No. 1552258)
Clayton L. Bailey (DC Bar No. 1644867)
**Civil Service Law Center LLP**
1325 G Street NW, Suite 500, PMB 801
Washington, DC 20005
(202) 571-7840
jsamuels@civilservicellp.com