## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PALMER HEENAN,
PAUL OSADEBE, JULIA
DYKSTRA, ASHLEY VAZQUEZ,
and HANNAH GORDON,

     *Plaintiffs*,

   vs.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, *et al.*,

     *Defendants*.

Case No.: 1:25-cv-03343

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.   Legal Background ...................................................................................................... 2

        A.   The Fair Housing Act ....................................................................................... 2

        B.   The Civil Service Reform Act of 1978 ............................................................ 5

    II.  Factual Background .................................................................................................. 6

LEGAL STANDARDS ......................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    I.   Defendants' jurisdictional arguments fail. .............................................................. 8

        A.   A statute-specific analysis of the FHA does not support preclusion. ............................. 8

        B.   To the extent relevant, the *Thunder Basin* framework favors Plaintiffs. ..................... 14

    II.  Defendants' Rule 12(b)(6) arguments fail. ............................................................ 16

        A.   Plaintiffs adequately plead protected activity. ............................................... 17

        B.   Plaintiffs adequately plead adverse action. ................................................... 20

        C.   Plaintiffs adequately plead causation. ........................................................... 22

CONCLUSION ................................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES**                                                                                            **PAGE**

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ................................................................ 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ 8

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ............................................................... 14

*Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017) ............................................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 8

*Bloomberg v. New York City Dep't of Educ.*, 119 F.4th 209 (2d Cir. 2024) ................... 16

*Bush v. Lucas*, 462 U.S. 367 (1983) .................................................................................. 11

*Cass v. Am. Props., Inc.*, 1995 WL 132166 (N.D. Ill. Feb. 27, 1995) ....................... 18-19

*Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc) ............... 21

*City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995) .................................... 4, 17

*Davis v. Fenton*, 2016 WL 1529899 (N.D. Ill. Apr. 13, 2016) ................................... 17-18

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ............................................................... 13

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ............................................................... 12

*Esparraguera v. Dep't of the Army*, 981 F.3d 1328 (Fed. Cir. 2020) ....................... 5, 16

*Evans v. United States*, 18 F. Supp. 2d 1217 (D. Kan. 1998) ....................................... 14

*Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ......................... 22

*Forest v. MSPB*, 47 F.3d 409 (Cir. 1995) ......................................................................... 5

*Gerlich v. DOJ*, 659 F. Supp. 2d 1 (D.D.C. 2009) ............................................... 14-15, 18

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93 (2d Cir. 2024) ............. 23

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979) ....................................... 10

*Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290 (11th Cir. 1998) ........................... 20

**CASES (continued)** **PAGE**

*Grp. Home on Gibson Island, LLC v. Gibson Island Corp.*,
144 F.4th 522 (4th Cir. 2025) ................................................................. 18, 20, 21

*Hall v. Lowder Realty Co.*, 160 F. Supp. 2d 1299 (M.D. Ala. 2001) ........................................... 19

*Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*,
388 F.3d 327 (7th Cir. 2004) ........................................... 17

*Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025) ................................................... 5

*Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65 (D.C. Cir. 2015) ................................ 26

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................ 4

*Henley v. Dep't of Agric.*, 2016 WL 1399666 (M.S.P.B. Apr. 11, 2016) ....................... 13

*Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022) ....................... 22

*Jackson v. Kennedy*, 2026 WL 172440 (D.D.C. Jan. 22, 2026) ................................. 9, 11

*Kris v. Dusseault Fam. Revocable Tr.*, 594 F. Supp. 3d 333 (D.N.H. 2022) ................ 22

*Lacson v. DHS*, 726 F.3d 170 (D.C. Cir. 2013) ..............................................9, 10, 12-14

*Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632 (6th Cir. 2017) ....................... 15

*Lucas v. AFGE*, 151 F.4th 370 (D.C. Cir. 2025) ........................................... 9-16

*Maddox v. MSPB*, 759 F.2d 9 (Fed. Cir. 1985) ........................................... 13

*Meadows v. Edgewood Mgmt., Co.,* 432 F. Supp. 334 (W.D. Va. 1977) ....................... 19

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ....................................... 12

*Morris v. Dearborne*, 181 F.3d 657 (5th Cir. 1999) ................................. 22

*Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*,
104 F.4th 1128 (9th Cir. 2024) ................................. 23

*N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020) ........................7-8

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) ............... 11

*Ohio House, LLC v. City of Costa Mesa*, 135 F.4th 645 (9th Cir. 2025) ................... 17

**CASES (continued)**                                                  **PAGE**

*Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013).................... 24

*Palmer v. MSPB*, 550 F.3d 1380 (Fed. Cir. 2008).......................................................... 5

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014).................................... 12

*Proctor v. United States*, 177 Fed. Cl. 360, 369 (2025)..................................... 15

*Reese v. Park Place Condo. Homeowners Ass'n I*, 2023 WL 5833678 (D.D.C. Sep. 8, 2023).... 17

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006) .......................................... 20, 22

*San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470 (9th Cir. 1998) ...................... 3, 17, 20

*Savidge v. Fincannon*, 836 F.2d 898 (5th Cir. 1988) .................................................. 22

*Smith v. Stechel*, 510 F.2d 1162 (9th Cir. 1975)....................................................17-19

*Spagnola v. Mathis*, 809 F.2d 16 (D.C. Cir. 1986)...................................................... 10

*Strosnider v. City of Nampa*, 196 F. Supp. 3d 1159 (D. Idaho 2016)............................. 18

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ................................................ 8, 17

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) ... 2, 10

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)............................................14-15

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) ................................. 4, 10, 17, 20

*United States v. Fausto*, 484 U.S. 439 (1988)..................................................5, 11-12

*VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097 (D.C. Cir. 2021) ........... 8, 24

*Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001) ...................................... 19

*Watson v. HUD*, 576 F. Supp. 580 (N.D. Ill. 1983)...................................................... 14

*Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856 (7th Cir. 2018)................................ 17

**STATUTES**                                                                      **PAGE**

5 U.S.C. § 552A(g)(1) ........................................................................................ 11

5 U.S.C. § 2302(d) ............................................................................................. 12

5 U.S.C. § 7701(a) ............................................................................................... 5

5 U.S.C. § 1204 ................................................................................................... 5

5 U.S.C. § 1211 ................................................................................................... 5

28 U.S.C. § 1295(a)(9) ......................................................................................... 5

28 U.S.C. § 1343(a)(4) ....................................................................................... 11

34 U.S.C. § 12495(d) ........................................................................................... 2

42 U.S.C. § 3601 ................................................................................................. 2

42 U.S.C. § 3602(i) ............................................................................................ 11

42 U.S.C. § 3610(a)(1)(B)(iv) .............................................................................. 6

42 U.S.C. § 3613(a)(1)(A) ..................................................................... 4, 10-11, 13

42 U.S.C. § 3613(a)(2) ....................................................................................... 10

42 U.S.C. § 3617 ........................................................................................ *passim*

42 U.S.C. § 3604 ..................................................................................... 2, 4, 10

42 U.S.C. § 3610 ............................................................................................... 18

Title VIII of the Civil Rights Act of 1968,
    Pub. L. No. 95-454, § 3(1), 92 Stat. 1111 (1968) ...................................... 5, 16

Fair Housing Act Amendments of 1988,
    Pub. L. No. 100-430, 102 Stat. 1619 ............................................................ 2

**REGULATIONS**                                                        **PAGE**

24 C.F.R. subtitle B, Ch. 1, Pt. 103 (1989) ................................................. 18

24 C.F.R. § 100.400(c)(5) (2016) ................................................................ 17

24 C.F.R. § 103.200(a)(3) ........................................................................... 24

24 C.F.R. § 103.215(b) ............................................................................... 24

24 C.F.R. § 103.400(a)(2)(i) ....................................................................... 24

24 C.F.R. § 103.410(c) ............................................................................... 24

24 C.F.R. § 180.305(a) ............................................................................... 18

**LEGISLATIVE HISTORY**

112 Cong. Rec. 18118 (Aug. 3, 1996) ........................................................... 2

114 Cong. Rec. 2275 (Feb. 6, 1968) ............................................................. 3

114 Cong. Rec. 9608 (Apr. 10, 1968) ........................................................... 3

134 Cong. Rec. 19711 (Aug. 1, 1988) ........................................................... 3

134 Cong. Rec. 19724 (Aug. 1, 1988) ........................................................... 3

H.R. Rep. No. 100-711, *as reprinted in* 1988 U.S.C.C.A.N. 2173 ................. 3

## INTRODUCTION

Plaintiffs, a group of five fair housing attorneys who worked in the Department of Housing and Development (HUD) Office of Fair Housing (OFH), have dedicated their careers to advocating on behalf of those whose civil rights have been violated. But those careers have been interrupted by Defendants' decision to reassign them to new offices. These reassignments are contrary to Plaintiffs' education and experience, and make it more difficult for HUD to carry out its statutory fair housing obligations. The focus of this lawsuit, however, is Defendants' decision to target these Plaintiffs specifically because of the work they have done defending civil rights in housing. Under the plain language of the Fair Housing Act (FHA), that is unlawful.

Defendants moved to dismiss, arguing that Plaintiffs' claims are precluded by the Civil Service Reform Act (CSRA). But Defendants apply the wrong law, insisting that the analysis begins and ends with Plaintiffs' status as federal employees. In fact, the D.C. Circuit has directed courts in this district to conduct a "statute-specific analysis" when considering the reach of the CSRA. Under that analysis, discriminatory housing practice claims are properly brought in federal court by any aggrieved person—including federal workers like Plaintiffs. The FHA, and the interference provision specifically, was designed to allow litigants immediate redress in federal court. Indeed, there is no CSRA channel through which Plaintiffs could bring their FHA claims. If this Court cannot hear Plaintiffs' claims, no one can.

Defendants' Rule 12(b)(6) arguments are similarly unconvincing. It is well established that the requirements of the FHA are interpreted broadly, and at this stage Plaintiffs are entitled to the truth of their allegations. Defendants' efforts run headlong into these two basic premises. Against that backdrop, the complaint adequately pleads the protected nature of Plaintiffs' fair housing

1

work, the adverse nature of Plaintiffs' forced reassignments, and the causal connection between the two.  Plaintiffs have thus plausibly alleged a claim under 42 U.S.C. § 3617.

Defendants ask this Court to cast aside the text, history, and precedent surrounding the FHA, in contravention of circuit precedent on the CSRA.  The Court should deny that request—and Defendants' motion in full—and allow Plaintiffs' claims to proceed.

## BACKGROUND

### I.    Legal Background

#### A.    The Fair Housing Act

Recognizing that unequal access to housing was a central cause of the unrest after the assassination of the Reverend Martin Luther King Jr., Congress declared its intent to eradicate housing discrimination.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 529–30 (2015) (citing *Report of the National Advisory Commission on Civil Disorders* 91 (1968)).  Through the Fair Housing Act of 1968, Congress proclaimed that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601; *see* 34 U.S.C. § 12495(d).  Toward this end, the Act prohibits discriminatory practices that make housing unavailable or inaccessible based on protected status, which has come to include race, color, religion, sex, national origin, disability, and familial status.  *See* Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73, 81-84 (1968) (codified as amended at 42 U.S.C. §§ 3604-06); Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619.  Since 1968, these prohibitions have protected both individuals experiencing direct discrimination and third parties involved in vindicating fair housing rights.  *See* Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73, 89 (1968) (codified as amended at 42 U.S.C. § 3617); 112 Cong. Rec. 18118 (Aug. 3, 1966) (Statement of Rep. Whitener) ("This section is intended to protect . . . from threats, etc., not only

by parties to any negotiation or prospective transaction but from any third parties who seek to forestall the same." (citation omitted)); 114 Cong. Rec. 9608 (Apr. 10, 1968) (Statement of Rep. Brown) ("We need legislation to prevent interference with those pursuing their own civil rights or attempting to educate others about their rights."); *see also San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998) (holding that Section 3617 claims are viable "even where no housing has actually been denied to persons protected under the Act"); *Cass v. Am. Props., Inc.*, 1995 WL 132166, at *8 (N.D. Ill. Feb. 27, 1995) ("[T]he broad protection afforded by the Fair Housing Act would be thwarted if protection were not also extended to those people who aid and encourage others. Without such people, many members of the protected class might never learn of discrimination and may not ever have the ability or means to challenge discriminatory housing practices.").

As Congress intended to pass "measures that have teeth and meaning, in the eyes of every American, black or white," 114 Cong. Rec. 2275 (Feb. 6, 1968) (Statement of Sen. Mondale), the FHA opened the courthouse doors to private litigants with its 1968 passage, *see* § 812, 82 Stat. at 88 ("The rights granted by [the sale or rental, brokerage, and financing provisions] may be enforced by civil actions in appropriate United States district courts[.]"); § 818, formerly § 817, 82 Stat. at 89 (original interference provision) ("This section may be enforced by appropriate civil action."). And in 1988, in response to calls to reinforce the law's effectiveness, Congress further strengthened this private right of action. *See* H.R. Rep. No. 100-711, at 13, 15–16 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2174, 2176–77 (noting the "lack[] [of] an effective enforcement mechanism"); 134 Cong. Rec. 19711 (Aug. 1, 1988) (Statement of Sen. Kennedy) (referring to the original FHA as "a law without its teeth" that "would-be violators ha[d] little

incentive to obey"); 134 Cong. Rec. 19724 (Aug. 1, 1988) (Statement of Sen. Dole) (calling the FHA a "toothless tiger").

As amended, the FHA allows aggrieved individuals to file a suit in federal district court or in state court:

> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

42 U.S.C. § 3613(a)(1)(A). The law further allows litigants to pursue their claims immediately in court irrespective of their exhaustion of the HUD administrative process. *Id.* at § 3613(a)(2). A "discriminatory housing practice" is an umbrella term for the same conduct covered by the FHA's original grants of federal court jurisdiction, including three categories of first-party discrimination. *See id.* at § 3604 (the sale or rental of housing); *id.* at § 3605 "residential real estate-related transactions"); *id.* at § 3606 "the provision of brokerage services"). Most relevant for this lawsuit, the cause of action also includes § 3617, under which it is "unlawful to coerce, intimidate, threaten, or interfere with *any person* in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of" their right to be free from housing discrimination. *Id.* at § 3617 (emphasis added). Under the plain text of the statute, then, "any person" includes federal workers like Plaintiffs.

The Supreme Court has repeatedly directed courts to interpret the FHA broadly. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) ("We also note precedent recognizing the FHA's 'broad and inclusive' compass, and therefore according a 'generous construction' to the Act's complaint-filing provision." (quoting *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972)); *see also Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 197 (2017) ("This Court has repeatedly written that the FHA's definition of person 'aggrieved' reflects a

4

congressional intent to confer standing broadly."); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (recognizing "the broad remedial intent of Congress embodied in the [FHA]").

    B.    *The Civil Service Reform Act of 1978*

      Passed between the original FHA and its 1988 amendments, the CSRA was designed "to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service." Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (1978). Among other things, the CSRA "provide[d] greater protection of individual Federal employee rights" and "provide[d] greater protection of the career civil service system from political abuses." U.S. General Accounting Office, *Report to the Congress* (May 13, 1980), https://www.gao.gov/assets/fpcd-80-38.pdf. The statute also replaced a "patchwork system" of outdated civil service laws with an "integrated scheme of administrative and judicial review." *United States v. Fausto*, 484 U.S. 439, 445 (1988).

      The CSRA also created the Merit Systems Protection Board (MSPB). *See* 5 U.S.C. §§ 1204, 1211. The "primary function" of the MSPB is to adjudicate certain "federal employee appeals of adverse actions." *Harris v. Bessent*, 775 F. Supp. 3d 164, 170 (D.D.C. 2025). The MSPB is a body of limited jurisdiction and may only hear "actions made appealable to it by law, rule or regulation." *Palmer v. MSPB*, 550 F.3d 1380, 1382 (Fed. Cir. 2008) (quoting *Forest v. MSPB*, 47 F.3d 409, 410 (Cir. 1995)); *see also* 5 U.S.C. § 7701(a). Adverse MSPB decisions may be appealed to the Federal Circuit, which has exclusive jurisdiction over those appeals. 28 U.S.C. § 1295(a)(9). For the Federal Circuit to review a decision by the MSPB, the MSPB must have had jurisdiction over the matter in the first place. *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1337 (Fed. Cir. 2020).

      The CSRA does not mention the Fair Housing Act. *See* 92 Stat. 1111 *et seq.*

## II.    Factual Background

As pleaded in the complaint, shortly following President Trump's inauguration, HUD began a campaign to hobble fair housing enforcement work.  Complaint, Dkt. No. 1, ¶ 40.  Almost immediately, OFH attorneys were subject to a strict gag order prohibiting them from any "external communications" without political leadership approval, which remained in place as of the filing of Plaintiffs' complaint.  *Id.*  As early as last February, Plaintiffs became aware of targeted downsizing efforts and potential Reductions in Force (RIFs) at HUD and its Office of General Counsel (OGC), including deferred resignation incentives, *en masse* probationary worker terminations, and warnings—overt or otherwise—of upcoming layoffs.  *Id.* ¶ 41.

This pressure campaign targeted fair housing offices from the start.  *Id.* ¶ 42.  OGC officials first attempted an OFH-specific RIF.  *Id.* ¶ 43.  OFH, housed within OGC, is the legal office responsible for enforcing fair housing and civil rights laws, including the FHA.  *Id.* ¶¶ 27–32.  The FHA imposed on HUD a series of statutorily required enforcement obligations, so OFH's workload is driven primarily by the number of complaints filed with HUD.  *Id.* ¶ 32; *see. e.g.*, 42 U.S.C. § 3610(a)(1)(B)(iv) ("Upon filing of such a complaint . . . the Secretary shall make an investigation[.]"); *id.* § 3610(g)(2)(A) ("If the Secretary determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary shall . . . immediately issue a charge on behalf of the aggrieved person[.]").

After learning that such an overt attack on fair housing staff would likely be unlawful, OGC officials switched tactics, deciding instead to involuntarily reassign OFH attorneys, including Plaintiffs.  *Id.* ¶¶ 43–44, 48, 64, 65.  OGC officials communicated that Plaintiffs could transfer to any other OGC office, so long as they were moved out of OFH.  *Id.* ¶¶ 43–44, 48, 64, 65.  Over the next few months, Plaintiffs and other fair housing attorneys and staff sought to persuade OGC

officials to consider options other than forcible reassignments, such as work-sharing arrangements or otherwise backfilling the intended positions. *Id.* ¶¶ 47–52, 69, 71–73. Despite Defendants' failure to articulate a cogent, more pressing need in these other OGC offices—let alone a statutorily mandated need, like OFH's enforcement obligations—Plaintiffs' attempts to block or mitigate the brunt of their reassignments were unsuccessful. *Id.* ¶¶ 47, 52, 60–64, 69, 74. Plaintiffs' forced transfers were neither desired, *id.* ¶¶ 51–52, 68, nor smooth, *id.* ¶¶ 68, 74–75. Nor were they expected by the rest of OGC: some receiving offices were unaware they would be receiving new staff and were shocked by the number of reassignments, which exceeded the alleged staffing needs. *Id.* ¶¶ 50, 53, 67.

OFH has experienced a nearly 70% cut in its fair housing staff since Trump's inauguration. *Id.* ¶ 78. No other office faced similar involuntary cuts; indeed, OGC officials involuntarily reassigned a limited number of attorneys from only one other OGC office, compared to the double-digit transfers out of OFH. *Id.* ¶¶ 54, 66, 77. HUD officials simultaneously isolated and cut off OFH, reducing the office's capacity and effectiveness beyond its staffing. *Id.* ¶¶ 56, 57. In addition to these systemic harms, Plaintiffs themselves have suffered extensively, working jobs they are ill-equipped for, facing diminished future job opportunities, and experiencing exacerbated mental and physical health conditions as a result of job-related stress. *Id.* ¶¶ 79–114.

Plaintiffs filed this action on September 22, 2025, contending that Defendants interfered with Plaintiffs' ability to aid and encourage others in the exercise and advancement of their fair housing rights, in violation of 42 U.S.C. § 3617. *Id.* ¶¶ 126–35. Plaintiffs seek injunctive and declaratory relief reversing their unlawful reassignments. *Id.* ¶¶ 136–37.

## LEGAL STANDARDS

In considering Defendants' facial Rule 12(b)(1) and 12(b)(6) arguments, the Court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable

inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a complaint need not include "detailed factual allegations," but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Further, a "complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (cleaned up). Indeed, a plaintiff need not even plead specific facts establishing a prima facie case of discrimination to survive a motion to dismiss. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–11 (2002) ("This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.").

## ARGUMENT

### I. Defendants' jurisdictional arguments fail.

#### A. A statute-specific analysis of the FHA does not support preclusion.

Defendants argue that this Court lacks jurisdiction because Plaintiffs' FHA claim boils down to "an employment-based disagreement," which must be brought, if at all, through CSRA administrative channels. Mem. 1. Plaintiffs dispute that characterization as a factual matter; the only employment-related aspect of this case is manner in which Plaintiffs were targeted for their fair housing work. *See, e.g.*, Compl. ¶¶ 6, 59–78; *see also N. Am. Butterfly Ass'n*, 977 F.3d at 1249

(holding that courts must "draw all reasonable inferences in the [plaintiffs'] favor"). But regardless, Defendants apply the wrong law. In the D.C. Circuit, courts considering their jurisdiction to hear statutory claims that may overlap with the CSRA must apply a "statute-specific analysis" rather than a "categorical preclusion rule." *Lucas v. AFGE*, 151 F.4th 370, 385 (D.C. Cir. 2025); *see also Jackson v. Kennedy*, 2026 WL 172440, at *10 (D.D.C. Jan. 22, 2026). Although the question of whether the FHA is foreclosed as to federal workers is a matter of first impression in this district, the reasoning of *Lucas* strongly supports jurisdiction here.

In *Lucas v. AFGE*, the plaintiff brought Title VII and ADA claims against her union, and the district court dismissed those claims as precluded by the Federal Service Labor-Management Relations Statute, part of the CSRA. 151 F.4th at 374–75. On appeal, the court reversed. *Id.* at 391. After considering decades of Supreme Court and D.C. Circuit precedent, the court explained that "a variety of statute-specific considerations inform our analysis of the CSRA's preclusive effect, including the breadth of the statute under which the employee seeks relief, the statute's text, and the timing of its enactment." *Id.* at 385. Chief among these considerations were (1) the "norm of overlapping remedies for discrimination" statutes, *id.* at 379, and (2) a distinction between "general, catchall statutes" that "could cover a vast number of cases that Congress intended to funnel through the CSRA's process," *id.* at 384 (cleaned up), and more "specific" statutes that did not suffer from such a "defect of generality," *id.* at 385 (quoting *Lacson v. DHS*, 726 F.3d 170, 176 (D.C. Cir. 2013)). Following this roadmap, this Court should reject Defendants' jurisdictional arguments as to the FHA.

*First*, the norm of overlapping remedies for anti-discrimination statutes weighs against CSRA preclusion of Plaintiffs' housing claim. This norm, which the D.C. Circuit applied to Title VII and the ADA, *id.* at 378–79, applies with full force to the FHA. Notably, the FHA is often

9

interpreted in concert with Title VII. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533 (2015); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). And like Title VII and the ADA, the FHA is among the "most significant legislative enactments of our time." *Lucas*, 151 F.4th at 378 (cleaned up); *see Inclusive Communities Project*, 576 U.S. at 546–47 ("The Court acknowledges the Fair Housing Act's continuing role in moving the Nation toward a more integrated society."). Further, like those laws, the FHA allows for overlapping judicial remedies in other contexts, including its own administrative process. *See* 42 U.S.C. § 3613(a)(2) ("An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint," where Section 3610(a) enables individuals to "file a complaint with the Secretary[.]"). As the Supreme Court held long ago, "the history suggests that all [FHA] complainants were to have available immediate judicial review." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 106 (1979).

*Second*, the FHA does not suffer from the "defect of generality" that would support preclusion by the CSRA. *Lucas*, 151 F.4th at 385 (quoting *Lacson*, 726 F.3d at 176). Far from "the more general APA" or the "general grant of federal-question jurisdiction," the FHA "address[es] the specific evils of invidious discrimination" in housing, *id.* (cleaned up). Not only is the FHA as a whole a "precisely drawn, detailed statute," *id.* (quoting *Spagnola v. Mathis*, 809 F.2d 16, 30 (D.C. Cir. 1986)), but the FHA's cause of action is even more tailored. Section 3613 opens the door to federal court only for allegations of a "discriminatory housing practice[.]" 42 U.S.C. § 3613(a)(1)(A). A discriminatory housing practice is limited to a defined subset of FHA provisions, *id.* at § 3602(f), covering only prohibitions on discrimination in "the sale or rental of housing," *id.* at § 3604; "residential real estate-related transactions," *id.* at § 3605; and "the

10

provision of brokerage services," *id.* at § 3606, and, relevant here, the prohibition on "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of" their right to be free from housing discrimination, *id.* at § 3617. Neither the FHA nor its private enforcement mechanism, then, present a "fear that allowing claims like [Plaintiffs'] would swallow the CSRA . . . whole." *Lucas*, 151 F.4th at 385.

*Third*, the FHA contains its own express grant of jurisdiction, "which also weighs strongly against the applicability of CSRA preclusion." *Jackson*, 2026 WL 172440, at *10 (relying on *Lacson*, 726 F.3d at 176–77). Congress specifically provided that "an[y] aggrieved person" could "commence a civil action in an appropriate United States district court or State court[.]" *See* 42 U.S.C. § 3613(a)(1)(A)[1]; *see also supra* at 4 ("This section may be enforced by appropriate civil action."). And Congress also provided that "district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights[.]" 28 U.S.C. § 1343(a)(4). "When Congress wants to preserve remedies outside the CSRA, it does so expressly." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009). That is what Congress did here.

These explicit grants of jurisdiction present a very different question than *Bush v. Lucas* or *United States v. Fausto*. *See* Mem. 7. *Bush* was a *Bivens* case that decided not to extend "a new *nonstatutory* damages remedy for federal employees." 462 U.S. 367, 368 (1983) (emphasis added). And in *Fausto*, as the D.C. Circuit has recognized, "the Supreme Court refused to

---

[1] An "aggrieved person" is defined as "any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i).

recognize independent federal court jurisdiction to hear employee claims under the Back Pay Act in part because that statute said nothing about jurisdiction." *Lacson*, 726 F.3d at 176 (citing *Fausto*, 484 U.S. at 453–54). Because the text of the FHA explicitly provides for district court jurisdiction, this case looks more like *Epic Systems* or *POM Wonderful*. Those cases emphasized that courts should "aim[] for harmony over conflict" when construing potentially overlapping statutes, out of recognition that "it's the job of Congress by legislation, not th[e] [courts] by supposition, both to write the laws and to repeal them." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018); *see also POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115 (2014) ("When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute nonetheless to preclude the operation of the other.").

*Fourth*, the statutes' timing supports Plaintiffs' argument. "Since the CSRA's 1978 enactment, Congress has either created or enhanced remedies for discrimination claims without ever hinting that federal employees suing their unions were excluded in any respect from the statutes' protections." *Lucas*, 151 F.4th at 379. Section 3617 is one such remedy. Congress empowered district courts to hear a host of direct and third-party discrimination claims in 1968, and reaffirmed this jurisdictional grant in the 1988 amendments. *Supra* at 2. The CSRA—passed after the FHA—is entirely silent on the earlier law.[2] This failure to act evidences Congress's intent to maintain the status quo, in which interference claims, like Plaintiffs', can be brought in federal court. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is

---

[2] As the court made clear in *Lucas*, the carve-outs included in the CSRA (Mem. 7) should not be over-read. The four laws that were explicitly carved out by 5 U.S.C. § 2302(d) were explicitly included in the CSRA scheme by § 2303(b). Congress needed to include the carve-out to avoid "the obvious implication that Congress intended to funnel those statutory claims exclusively through the CSRA scheme." *Lucas*, 151 F.4th at 383. Section 2303(d) should not be read to mean that all other statutory claims must be routed through the CSRA scheme by default.

aware of existing law when it passes legislation."). And when Congress chose to amend the FHA *after* the CSRA, Congress centralized the various preexisting remedies, including for an interference claim, into what is now Section 3613. *Supra* at 2. Indeed, the animating purpose of the statute's amendments was to give the law "teeth" and strengthen enforcement mechanisms for people experiencing housing discrimination, including third parties facing retaliation for advancing the fair housing rights of others. *Supra* at 2. Because Congress did not reference the CSRA in 1988, even if the CSRA had altered the rights available under the FHA for a time,[3] it is "reasonable to assume Congress knew that this later grant of jurisdiction would affect those earlier authorities." *Lacson*, 726 F.3d at 176–77.

And *fifth*, Defendants' argument would not simply channel Plaintiffs' FHA claims to administrative channels; it would extinguish them altogether. *See Lucas*, 151 F.4th at 386–87. This also weighs strongly against preclusion. *Id.* Defendants' argument relies on the presence of a CSRA-provided administrative channel for Plaintiffs' FHA claims. Mem. 7 (describing the CSRA as "an alternate provision under which Plaintiff could seek redress"). But no channel exists. The MSPB has disclaimed any "independent basis for exercising jurisdiction over [a Fair Housing Act] claim[.]" *Henley v. Dep't of Agric.*, 2016 WL 1399666, ¶ 16 (M.S.P.B. Apr. 11, 2016). As the Federal Circuit has explained, the MSPB's "jurisdiction . . . is limited to those actions which are made appealable to it by law, rule, or regulation." *Maddox v. MSPB,* 759 F.2d 9, 10 (Fed. Cir. 1985). But as we have seen, the text of the FHA gives jurisdiction to federal district courts and state courts, not the MSPB or any other CSRA-created entity. *See* 42 U.S.C. § 3613(a)(1)(A).

---

[3] For the reasons described in this section, Plaintiffs believe the best reading of the statutes is that federal courts have always had jurisdiction to hear FHA claims by federal workers.

Nor can the government fall back on Plaintiffs' supposed ability to challenge their reassignments more broadly. Courts analyze whether plaintiffs can obtain judicial review of their specific claims, not *any* claim related to the adverse action. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 17 (2012) (analyzing the review channels available for plaintiff's constitutional claims as opposed to termination challenges in general). Under any legal framework, Plaintiffs' inability to seek recourse for the *FHA violations* against them should be the end of the inquiry. *Lucas*, 151 F.4th at 387.

For these reasons, a statute-specific analysis allows Plaintiffs' claims to move forward.

\* \* \*

Rather than conduct a statute-specific analysis, Defendants rely heavily on two out-of-circuit cases applying out-of-circuit legal standards. Mem. 8–9 (citing *Watson v. HUD*, 576 F. Supp. 580 (N.D. Ill. 1983), and *Evans v. United States*, 18 F. Supp. 2d 1217 (D. Kan. 1998)). These cases are unpersuasive principally because those courts were not bound by *Lucas*, 151 F.4th at 378, or the other D.C. Circuit cases that have allowed statutory claims to move forward in the realm of federal employment. *See, e.g.*, *Lacson*, 726 F.3d at 175 (TSA review statute); *Gerlich v. DOJ*, 659 F. Supp. 2d 1, 14 (D.D.C. 2009) ("The D.C. Circuit has . . . taken a rather narrow view of CSRA preemption in Privacy Act cases."). *Watson* also predated the 1988 amendments to the FHA that strengthened the cause of action. *See* 576 F. Supp. at 580.

**B.    To the extent relevant, the *Thunder Basin* framework favors Plaintiffs.**

Although Plaintiffs do not believe it applies here, the framework articulated by the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), would also allow their claims to proceed. The *Thunder Basin* test is a framework to evaluate whether a particular claim "fit[s] within a statutory review scheme" like the CSRA. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). "That framework is typically applied to determine where a claim should first be brought,"

not whether "a statutory review scheme completely extinguishes a plaintiff's rights under another federal statute," as is the case here. *Lucas*, 151 F.4th at 386–87; *supra* at 13. "[I]nsofar as *Thunder Basin* is instructive, it supports [Plaintiffs]" at both steps. *Id.* at 387.[4]

At step one, Congress's intent to preclude district court review is not "fairly discernible" in the CSRA's "statutory scheme," *Thunder Basin*, 510 U.S. at 207, given the harmony between the two statutes. *See supra* at 8–12. And at the second step, "[t]hree factors guide [a court's] thinking: first, whether 'a finding of preclusion could foreclose all meaningful judicial review'; second, whether the claim is 'wholly collateral' to the statutory scheme; and, third, whether 'agency expertise could be brought to bear' to resolve the claim." *Lucas*, 151 F.4th at 387 (quoting *Thunder Basin*, 510 U.S. at 212–15) (cleaned up). As in *Lucas*, "[t]he first of these three factors is all but dispositive here," and "the second factor (collateralism) can be 'analyzed together' with the first." *Id.* at 387 (quoting *AFGE v. Trump*, 929 F.3d 748, 759 (D.C. Cir. 2019)).

As explained *supra*, it is immaterial whether Plaintiffs could challenge their reassignments generally under CSRA, because this case is not a challenge to their reassignments; it is a challenge to a discriminatory housing practice effectuated by meddling with Plaintiffs' employment. *See Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 635 (6th Cir. 2017) (evaluating Section 3617 and finding that "the defendants' rescission of their employment agreement constitutes an 'interference' with [fair housing rights] encouragement"). Because the MSPB lacks jurisdiction over such claims at the outset, *supra* at 13, Plaintiffs cannot obtain *any* review of these claims under the CSRA, let alone "meaningful judicial review." *See Lucas*, 151 F.4th at 387 ("Unless Lucas can proceed with her Title VII and ADA lawsuit, she will have no meaningful opportunity

---

[4] The *Thunder Basin* framework is also unhelpful in this case because the FHA creates its own remedial scheme that can preclude other statutes where it applies, *see Proctor v. United States*, 177 Fed. Cl. 360, 369 (2025), so it is not clear which remedial scheme should preclude the other.

for judicial review of her discrimination allegations[.]").  Nor can the Federal Circuit review cases in the first instance where the MSPB lacked jurisdiction.  *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1338 (Fed. Cir. 2020) ("[T]he CSRA channels judicial review of an adverse action exclusively through the Federal Circuit only if it first channels review through the Board.").

Second, Plaintiffs' allegations of Defendants' interference with their ability to ensure others are free from housing discrimination are "wholly collateral" to the CSRA's review provisions, which are focused on maintaining merits-based principles for the civil service.  *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3(1), 92 Stat. 1111, 1112 (1978).  And third, even if Plaintiffs could raise their FHA claims in administrative proceedings, the MSPB "claims no particular expertise in the generally applicable antidiscrimination laws at issue in this case[.]" *Lucas*, 151 F.4th at 387.  While some variations of "unlawful workplace discrimination" may fall into the MSPB's orbit, retaliation based on protected activity that is *unrelated* to an employment practice does not.  *Cf. Bloomberg v. New York City Dep't of Educ.*, 119 F.4th 209, 216 (2d Cir. 2024).  Plaintiffs challenge Defendants' interference with statutory fair housing rights; that Defendants happened to effectuate this interference through employment-based retaliation does not trump the fundamentally housing-discrimination-related nature of their claims.

Accordingly, even if *Thunder Basin* were the right "frame of analysis in this case," Plaintiffs' claims would not be precluded.  *Lucas*, 151 F.4th at 386.

## II.    Defendants' Rule 12(b)(6) arguments fail.

Defendants' Rule 12(b)(6) arguments fare no better, as Plaintiffs adequately pleaded that their reassignments constitute unlawful interference with their "aid[ing] or encourag[ing]" of others "in the exercise or enjoyment of" their rights to be free from housing discrimination.  42 U.S.C. § 3617.  While the D.C. Circuit has not clearly stated the elements of an FHA interference claim in a published opinion, courts in this district generally require a plaintiff to demonstrate that:

(1) they were engaged in protected activity; (2) they suffered an adverse action; and (3) there was a causal link between the two.  *See Reese v. Park Place Condo. Homeowners Ass'n I*, 2023 WL 5833678, at *4 (D.D.C. Sep. 8, 2023) (citing *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 868 (7th Cir. 2018) (other citations omitted)); *see also Ohio House, LLC v. City of Costa Mesa*, 135 F.4th 645, 670 (9th Cir. 2025) ("We apply the *McDonnell Douglas* burden-shifting framework to Ohio House's FHA-interference claim[.]").  Even if required to plead a prima facie case—which they are not, *see Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–12 (2002)—Plaintiffs easily defeat Defendants' challenges at each turn.

### A.    Plaintiffs adequately plead protected activity.

To effectuate the "'generous construction' of the [FHA]'s complaint-filing provision[s]," *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)), protected activity is broadly defined.  Congress purposefully "'cut Section 3617 loose from' underlying FHA claims."  *Davis v. Fenton*, 2016 WL 1529899 (N.D. Ill. Apr. 13, 2016) (quoting *Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004)), *aff'd*, 857 F.3d 961 (7th Cir. 2017).  As a result, interference claims are cognizable "even where no housing has actually been denied to persons protected under the Act."  *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998).  Section 3617, then, "does not necessarily deal with a discriminatory housing practice, or with the landlord, financer or brokerage service guilty of such practice."  *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975).  Rather, it applies to all "situations in which the fundamental inequity of a discriminatory housing practice is compounded by coercion, intimidation, threat or interference."  *Id.*  Indeed, even HUD's own interpretation of Section 3617 prohibits retaliation against anyone for "testif[ying], assist[ing], or participat[ing] *in any manner* in a proceeding under the Fair Housing Act."  24 C.F.R. § 100.400(c)(5) (2016) (emphasis added).

17

Unsurprisingly, courts have interpreted protected activity to include, as relevant here, legal proceedings in furtherance of fair housing rights, *Davis*, 2016 WL 1529899, at *6 (collecting cases); aiding in a fair housing investigation, *Strosnider v. City of Nampa*, 196 F. Supp. 3d 1159, 1164 (D. Idaho 2016); and educating others about potentially discriminatory housing practices, *Cass v. Am. Props., Inc.*, 1995 WL 132166, at *6, *8, (N.D. Ill. Feb. 27, 1995) (acknowledging that Congress's intent behind the FHA's "broad protection . . . would be thwarted" without third parties, as "many members of the protected class might never learn of discrimination"). As the cases cited by Defendants make clear, responsibilities "performed within the scope of [plaintiffs'] employment" are routinely deemed protected activities. Mem. 10; *see, e.g.*, *Grp. Home on Gibson Island, LLC v. Gibson Island Corp.*, 144 F.4th 522, 536 (4th Cir. 2025) (vacating grant of summary judgment against assisted living developer's efforts to open a new group home); *Smith*, 510 F.2d at 1163–64 (allowing apartment managers' interference claims against building owner).

Accordingly, Plaintiffs' day-to-day responsibilities at OFH constitute protected activity in furtherance of fair housing rights. Within HUD, OFH is the legal office responsible for enforcing fair housing and civil rights laws, including the Fair Housing Act. *Supra* at 2. These fair housing obligations are not just encouraged, but mandatory. *See, e.g.*, 42 U.S.C. §§ 3610 (post-complaint requirements), 3612(b) (hearing requirements); *see also* 24 C.F.R. subtitle B, Ch. 1, Pt. 103 (1989) (setting forth mandatory complaint and enforcement procedures that the agency must follow); 24 C.F.R. §§ 103.200(a)(3), 103.215(b), 103.400(a)(2)(i), 103.410(c), 180.305(a) (imposing enforcement-related duties on HUD fair housing enforcement attorneys).

To comply with these obligations, Plaintiffs were tasked with, among other things, advising housing discrimination investigators, issuing investigatory subpoenas, drafting and issuing charges of discrimination, prosecuting charges before administrative law judges, and serving as fair

housing counsel to all of HUD to ensure compliance with the FHA and other civil rights laws. *See* Compl. ¶¶ 33–39. Not only do Plaintiffs *themselves* directly vindicate individuals' fair housing rights, they also equip and educate other offices within HUD to do the same, *id.* at 30–31—both of which constitute protected activity. *See, e.g.*, *Meadows v. Edgewood Mgmt. Co.*, 432 F. Supp. 334, 335 (W.D. Va. 1977) (holding that "section 3617 provides a remedy in a situation where a resident manager and maintenance technician are dismissed by their employers because of their aid or encouragement to tenants in asserting their right to fair housing"); *Smith*, 510 F.2d at 1164 (allowing a section 3617 claim by an apartment manager against the management company, alleging that he was fired for renting to black and Mexican-American tenants).

As Defendants acknowledge, "[s]ection 3617 has been interpreted to prohibit retaliation against employees who advocate for the fair-housing rights of others." *Hall v. Lowder Realty Co.*, 160 F. Supp. 2d 1299, 1321 (M.D. Ala. 2001); *see also Walker v. City of Lakewood*, 272 F.3d 1114, 1126 (9th Cir. 2001). Defendants nevertheless parse the reasons that Plaintiffs were advocating for fair-housing rights, arguing that because they did so as part of their work for the United States, rather than as "personal attorneys of the individuals lodging FHA complaints," it does not count. Mem. 11. But that is a distinction without a difference. There is no reason to draw that conclusion from the text of the statute, nor do Defendants cite any authority for the idea that federal fair housing attorneys are stripped of protection. And as discussed, Plaintiffs did have responsibilities to FHA complainants, separate and apart from a formal attorney-client relationship.

Lastly, Defendants offhandedly ask this Court to reject Plaintiffs' claims because they did not "complain[] to their management that the agency was failing to respond to the complaints of housing violations that it received." Mem. 11. This fails for two reasons. First, Defendants provide no source for this requirement. Nor could they. Courts have rejected similar approaches,

wherein "the discharged employee who fortuitously is unable to take any action directly contrary to the employer's policy prior to discharge has no cause of action under § 3617." *Cass*, 1995 WL 132166 at *5. And second, the claim is contradicted by the allegations of the complaint. Plaintiffs and their colleagues repeatedly raised the alarm to management and even offered alternative solutions to concerns about capacity. *See, e.g.*, Compl. ¶ 73. Indeed, even sticking to the facts of the complaint, one person was fired for raising concern. *Id.* ¶ 55. And OGC officials already knew that the agency was already behind on its FHA work, as OFH faced a significant backlog in its statutorily mandated enforcement work even prior to the reassignments. *Id.* ¶ 61. Plaintiffs went above and well beyond attempting to "complain to their management."

## B. Plaintiffs adequately plead adverse action.

Defendants make the puzzling claim—tellingly, without citation—that the focus for the "adverse action" element must be held exclusively on individuals suffering direct discrimination, rather than on Plaintiffs themselves. Mem. 12. But an aggrieved person can bring a Section 3617 claim "even where no housing has actually been denied to persons protected under the Act." *San Pedro Hotel Co.*, 159 F.3d at 475. To effectuate the FHA's "broad and inclusive" protections, *Trafficante*, 409 U.S. at 209, the FHA seeks to prevent retaliation against individuals seeking to vindicate others' fair housing rights, *supra* at 2. The question, therefore, is whether the person advocating on another's behalf—not the person seeking to exercise or enjoy their fair housing rights—was adversely affected. *See Grp. Home on Gibson Island*, 144 F.4th at 536 (analyzing the impact of a homeowner's association's actions on a developer seeking to build an assisted living facility); *see also Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1301–03 (11th Cir. 1998) (addressing the adverse impact on an employee terminated "for refusing to discriminate against tenants on the basis of race").

On that score, Plaintiffs have adequately pleaded that their forced transfers qualify as adverse action. "[A]n action is sufficiently 'adverse' if it could dissuade a reasonable person from the exercise of their rights," *Grp. Home on Gibson Island*, 144 F.4th at 536, including deterrence "from engaging in protected activity," *Rochon v. Gonzales*, 438 F.3d 1211, 1218 (D.C. Cir. 2006). This is not a high bar. For example, in *Group Home on Gibson Island*, the Fourth Circuit credited both the delay in opening an assisted living home and a homeowner's association's failure to grant a reasonable housing regulation accommodation as sufficiently adverse to the property developer. *Id.* at 536–37. In so doing, the court noted that "[t]here is no real dispute that these actions rise to the level of 'adverse' under the relevant standard." *Id.* at 536.

Defendants' own authority makes plain that Plaintiffs' transfers should count as adverse action. Mem. 12 (citing *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc)). In that Title VII case, the D.C. Circuit held that "[a]lthough the phrase [terms, conditions, and privileges of employment] is not without limits[,] . . . the transfer of an employee to a new role, unit, or location . . . undoubtedly is included." *Chambers*, 35 F.4th 870, 874. The court continued, "it is difficult to imagine a more fundamental term or condition of employment than the position itself." *Id.* (citation omitted). This is strong evidence that a transfer out of a preferred position counts as adverse action.

Plaintiffs clearly pleaded the "adverseness" of this change. As a result of the reassignments, Plaintiffs are no longer practicing the type of law they went to law school for and have dedicated their careers to. Compl. ¶¶ 85, 91, 98, 105, 111. Moving away from affirmative civil rights litigation will have longer term career impacts for each of them. *Id.* ¶¶ 84–85, 91, 106, 110. And Plaintiffs are concerned about their performance in their reassigned positions, as Plaintiffs entered without proper—or any—training, many of which are completely new roles,

skills, and types of litigation compared to Plaintiffs' experiences. *Id.* ¶¶ 84, 91, 92, 98, 106, 110, 113. One Plaintiff also lost their union bargaining unit status and the benefits of their union membership. *Id.* ¶ 104. As a result of their reassignments and the related stress, Plaintiffs have suffered significant mental health struggles. *Id.* ¶¶ 92, 98, 107, 112.

In sum, Defendants changed the fundamental nature of Plaintiffs' careers and their day-to-day lives. Because of Defendants' actions, a reasonable fair housing attorney well might be dissuaded from engaging in activity protected by the FHA—either by choosing not to work at OFH at all or by less vigorously advocating for their fair housing clients—given this risk of retaliation. *See Rochon*, 438 F.3d at 1220 (holding that "a reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so" would open him up to retaliation without protection).

## C.    Plaintiffs adequately plead causation.

Finally, Plaintiffs sufficiently allege that they suffered adverse action because of their protected activity. As an initial matter, "the question of causation is 'intensely factual.'" *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999) (quoting *Savidge v. Fincannon*, 836 F.2d 898, 905 (5th Cir. 1988)). And "[f]act-specific questions cannot be resolved on the pleadings." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (citation omitted); *cf. Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *7 (C.D. Cal. Mar. 5, 2013) ("Because of the 'fact-intensive' nature of a causation analysis, it usually must be established in summary judgment or trial, not a motion to dismiss.") (citation omitted)).

Defendants nevertheless move for dismissal based largely on an outdated understanding of Section 3617's causation requirement. Defendants argue that Plaintiffs fail at this step because they do not "overcome their burden of plausibly pleading but-for causation," which one court noted had been adopted by "a clear majority of courts[.]" Mem. 12, 13 (quoting *Kris v. Dusseault Fam.*

*Revocable Tr.*, 594 F. Supp. 3d 333, 340 (D.N.H. 2022)).  But since that out-of-circuit district court decision, multiple circuit courts have instead set a lower causation threshold, explaining that "[u]nder the FHA, the evidence need not prove that the discriminatory purpose was the sole purpose of the challenged action, *but only that it was a motivating factor*."  *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1140 (9th Cir. 2024) (cleaned up) (emphasis added).  Put differently, "a plaintiff alleging retaliation . . . must show that . . . a causal connection exists between the protected activity and the adverse action, which is satisfied when retaliatory motive *played a part* in causing the adverse action."  *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 99 (2d Cir. 2024) (cleaned up) (emphasis added) ("[B]inding Circuit precedent establishes that motivating-factor, rather than but-for, causation applies to disparate treatment and retaliation claims under the FHA.").  In fact, most, though not all, circuits that have considered the question have adopted the motivating factor test.[5]  In this absence of binding circuit precedent, this Court should adopt the motivating factor test, which Plaintiffs readily satisfy.

As pleaded in their complaint, Plaintiffs plausibly allege that their fair housing advocacy was *at least* a motivating factor in Defendants' targeted restructuring efforts.[6]  Plaintiffs explain that OGC officials first evaluated an OFH-specific RIF, and then landed on the use of involuntary transfers to achieve their goal—and the goal of political leadership and the Trump Administration more broadly—to significantly reduce the agency's capacity to enforce the Fair Housing Act.

---

[5] Only one appellate court appears to have endorsed but-for causation in this context.  *See Cano as next friend of Morejon v. 245 C&C, LLC*, 2025 WL 3727880, at *4 (11th Cir. Dec. 23, 2025).  But in that unpublished opinion, the court defined this test as requiring a showing "that the decisionmaker was aware of the plaintiff engaging in protected conduct and that the protected conduct and the adverse action were not wholly unrelated," *id.*, which is also a lesser burden than establishing the adverse action was "on account of" the protected activity, *see* Mem. 13.

[6] To be sure, Plaintiffs similarly meet their burden even if this Court opts to apply but-for causation.  Plaintiffs' allegations adequately establish that, but for Plaintiffs' fair housing work, they would not have been forcibly reassigned, for the reasons set forth *infra*.

Compl. ¶¶ 41–44.  OGC officials have provided, at best, contradictory explanations for the supposedly justified reassignments, one of which confirms Plaintiffs' theory: OGC officials justified the OFH reassignments as necessary because "fair housing is not a priority" such that there would be less fair housing work for Plaintiffs to do, and because the size of OFH—and no other office—was "an optics problem" for the administration.  *See id.* ¶¶ 48, 60, 64, 65.  Indeed, OGC officials emphasized that the reassignments were necessary solely to move people out of OFH—regardless of the office they transferred to.  *Id.* ¶¶ 60, 64, 65.

Defendants attempt to rebut this causation chain by pointing to the negligible number of transfers from other HUD offices, explaining that all reassignments resulted from "the agency's determin[ation that] there was a greater need" elsewhere such that "the agency was not targeting [Plaintiffs] specifically."  Mem. 13.  This fails on two fronts.  First, OFH was objectively disproportionately impacted compared to other HUD offices.  The proposed reassignments alone cut approximately 50% of OFH's staff at the time, including 12 attorneys, Compl. ¶ 54, totaling a loss of 70% of OFH staff since the start of the second Trump administration, *id.* ¶ 78.  Meanwhile, Plaintiffs allege that the other reassignments occurred as a mere distraction from Defendants' unlawful fair housing motivation.  *Id.* ¶ 77.  Nor can Defendants simply over-discriminate to avoid scrutiny for one pocket of discrimination.  *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 (9th Cir. 2013).  And second, Defendants do not even attempt to articulate what "need" justified cutting this level of fair housing staff.  *See* Mem. 13.  Nor did Defendants reasonably consider *OFH*'s needs, and how those would be hamstrung with only 30% of its staff.  Compl. ¶ 62.  In the face of HUD's unmet statutory fair housing obligations, a vague reference to an unidentified alternative priority is insufficient to overcome Plaintiffs' well-pleaded causation

allegations.  *See VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021).

To be sure, Plaintiffs do not seek to imply that the government is forbidden from reallocating fair housing staff.  But the government's discretion in so doing is bound by external constraints.  For example, the agency would violate Title VII if it decided its priority was that fair housing work be done only by men, and therefore reassigned all the women out of OFH.  The government's priorities—articulated or otherwise—can similarly run afoul of the FHA.  HUD does not merely have *authority* to investigate and prosecute certain instances of housing discrimination; HUD—through its fair housing staff—is *required* to do so.  *Supra* at 6, 18.  The government's actions, instead, strip the agency's fair housing office in a way that limits the office's ability to carry out this statutorily mandated work—in turn, harming the people the FHA sought to protect. *See* Compl. ¶¶ 61–63, 115.

Certainly, some of the FHA's enforcement mechanisms are discretionary.  But Plaintiffs established that HUD attorneys had already fallen behind on the work required by the FHA prior to the reassignments, *see id.* ¶¶ 61–63, so it was illogical to further hobble this work.  Defendants also fail to explain why, if this hypothetical need were so great, Plaintiffs could not enter into work-sharing or detail arrangements—commonly used within OGC and HUD more broadly—while continuing to work to satisfy HUD's statutorily required fair housing obligations.  *See id.* ¶ 73. Nor can Defendants rest on their assertion that the regional offices are taking the baton on OFH's fair housing enforcement.  Mem. 12.  While FHA enforcement is included among regional counsel's various responsibilities, regional counsel are not fair housing experts, so fair housing matters make up only a small portion of the work done by regional offices.  Compl. ¶¶ 29, 30.  In fact, regional offices recently increased their requests for OFH assistance on their fair housing

matters. *Id.* ¶ 61. And some novel and complex fair housing matters are handled exclusively by OFH. *Id.* ¶ 29. This, therefore, is not a substitute for OFH's role in effectuating the FHA's statutory mandates. Setting this aside, regional attorneys already do the work of the offices that Plaintiffs were transferred into, and thus are already fully trained for those roles. Consistent with Defendants' logic, regional attorneys could have taken on the allegedly higher priority defensive litigation and ethics work instead of increased fair housing work, rather than moving fair housing experts to do this other work without training or expertise. *Id.* ¶ 68.

All of this supports nudging Plaintiffs over the line of plausibility for causation at the motion-to-dismiss stage. Because the government's actions do not appear to be motivated by normal allocation-of-resources concerns, it is more likely that the motivating cause of Plaintiffs' reassignments was Defendants' desire to punish them for or otherwise interfere with their civil rights work.

\* \* \*

Properly understood, Plaintiffs have plausibly alleged each element of a claim under 42 U.S.C. § 3617. Defendants may well dispute some of those facts, but a motion to dismiss may not be used "to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss. Plaintiffs respectfully request oral argument.

Dated: February 24, 2026                         Respectfully submitted,

                                                 */s/ Clayton L. Bailey*
                                                 Clayton L. Bailey (DC Bar No. 1644867)
                                                 Margaret (Emmy) Wydman (DC Bar No. 90007646)

**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7836
cbailey@civilservicellp.com
ewydman@civilservicellp.com