**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PALMER HEENAN, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-3343 (RC) |
| | : | | |
| v. | : | Re Document No.: | 10 |
| | : | | |
| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

# MEMORANDUM OPINION

## GRANTING DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

Plaintiffs are federal employee attorneys who formerly worked in the Office of Fair Housing within the Office of General Counsel at the U.S. Department of Housing and Urban Development. Following a change in presidential administration, the Department of Housing and Urban Development reassigned Plaintiffs to positions outside the Office of Fair Housing. Plaintiffs contend that the reassignments were unlawful retaliation under the Fair Housing Act for their work enforcing the Act. They ask the Court to declare the reassignments unlawful and to enjoin the Department of Housing and Urban Development to reinstate them to their former positions in the Office of Fair Housing, "so they can get back to work delivering on the promise of fair housing for all."

Defendants (collectively, the "Government") have moved to dismiss, asserting that the Civil Service Reform Act provides the exclusive remedial scheme governing the challenged reassignments. In the alternative, the Government contends that Plaintiffs have failed to state a retaliation claim under § 3617 of the Fair Housing Act. While the Court disagrees with the

Government's contention that the Civil Service Reform Act precludes Plaintiffs' Fair Housing Act claim, it nevertheless agrees that Plaintiffs have failed to plausibly allege a claim for retaliation under the Act. The Court therefore grants the Government's motion to dismiss.

## II. BACKGROUND

### A. Legal Background

This action implicates two federal statutory schemes: the Civil Service Reform Act ("CSRA") and the Fair Housing Act ("FHA"). The CSRA establishes a comprehensive framework for regulating federal employment and addressing prohibited personnel practices. *United States v. Fausto*, 484 U.S. 439, 455 (1988). Among other things, the CSRA identifies specific personnel practices that federal agencies may not take against employees and establishes administrative procedures for challenging those practices. *Bloom v. McHugh*, 828 F. Supp. 2d 43, 51 (D.D.C. 2011) (citing 5 U.S.C. §§ 2301–2302). The CSRA generally channels challenges to covered personnel actions through the administrative and remedial mechanisms it provides. *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 69–70 (D.D.C. 2009). For actions within its purview, the CSRA "removes the jurisdiction given to the federal courts" by the federal-question statute. *See Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006) (per curiam).

The FHA, by contrast, is a federal anti-discrimination statute that prohibits discrimination in housing and protects individuals who assist others in exercising their fair-housing rights. *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 639 (6th Cir. 2017). As relevant here, the FHA's retaliation provision makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" rights protected by the Act, or to retaliate against a person for having aided or encouraged another in exercising such rights. 42 U.S.C. § 3617. The

FHA provides an independent private right of action for persons aggrieved by a discriminatory housing practice and expressly authorizes suit in federal district court. *Id.* § 3613(a)(1)(A).

### B. Factual Background

#### 1. Plaintiffs

Plaintiffs are five attorneys who, until July 2025, worked in the Department of Housing and Urban Development's ("HUD") Office of Fair Housing ("OFH"), a division of the Office of General Counsel ("OGC") responsible for affirmative fair-housing work. Compl. ¶¶ 28, 33, ECF No. 1. Plaintiffs Palmer Heenan, Paul Osadebe, Julia Dykstra, and Ashley Vazquez worked in OFH's Enforcement Division, where their responsibilities included investigating and prosecuting housing-discrimination complaints, issuing charges and subpoenas, assisting with litigation and conciliation, and providing legal advice concerning compliance with the FHA. *Id.* ¶¶ 34–37. Plaintiff Hannah Gordon worked in OFH's Compliance Division and served as Deputy Assistant General Counsel of Compliance. *Id.* ¶ 38. Her responsibilities included advising on FHA investigations, developing guidance and investigative tools, and reviewing agency policies for compliance with the FHA. *Id.* All five Plaintiffs allege that their work primarily involved affirmative fair-housing enforcement and that their supervisors and senior OGC officials were aware of the nature of that work. *Id.* ¶ 39.

#### 2. Facts

In early 2025, with the change in presidential administration, OGC began considering changes to OFH's staffing and structure. *Id.* ¶ 41. In May, OGC officials told OFH employees that the office was too large and needed to be "right sized," citing changes in the administration's priorities. *Id.* ¶ 47. On May 29, an OGC official told an OFH attorney "that OFH attorneys had been selected to address staffing needs across OGC because "fair housing is not a priority of this

administration and OFH would not have as much work to do." *Id.* ¶ 48. OGC subsequently began identifying staffing needs in other divisions and seeking volunteers from OFH to transfer to those offices. *Id.* ¶ 50.

On June 4, 2025, OGC held a meeting at which officials identified staffing needs in other OGC divisions and sought volunteers from OFH to transfer to those offices. *Id.* OGC identified a specific number of positions it sought to fill in each division and advised that involuntary reassignments would follow if there were insufficient volunteers. *Id.* Meanwhile, OFH attorneys proposed an alternative under which attorneys could temporarily rotate to other divisions or assist those divisions while remaining in OFH. *Id.* ¶ 51. OGC rejected that proposal, however. *Id.* ¶ 52. Only one OFH attorney volunteered to transfer. *Id.* ¶ 53.

As the staffing process continued, OGC determined which OFH employees would be reassigned to other divisions. *Id.* ¶¶ 54, 64. On June 23, OGC informed OFH leadership that ten line attorneys, including Plaintiffs Heenan, Osadebe, Dykstra, and Vazquez, would be involuntarily transferred out of OFH, and that two OFH supervisors, including Plaintiff Gordon, would be transferred. *Id.* ¶ 54. OGC subsequently provided the affected employees with reassignment notices identifying their new positions and duties. *Id.* ¶¶ 82, 89, 96, 102, 108. The reassignments took effect in July 2025 and October 2025. *Id.* ¶ 79.

The staffing changes occurred against the backdrop of changes in the administration's priorities concerning fair housing. OGC officials repeatedly stated that "fair housing is not a priority" of the administration and that OFH would have less fair-housing enforcement work as a result. *Id.* ¶ 60. OGC officials also referred to "an optics problem" with OFH being OGC's largest office and stated that OFH should be "right sized." *Id.* At the same time, Plaintiffs allege that OFH continued to have a significant backlog of statutorily mandated enforcement work,

received increased requests for assistance from regional counsel, and experienced increased workloads resulting from staffing shortages elsewhere in the agency. *Id.* ¶ 61. The Complaint further alleges that the number of investigations and complaints requiring processing had not decreased and that OFH had assumed new responsibilities associated with administration priorities, including implementing Executive Orders and reviewing applications for fair-housing assistance grants. *Id.* ¶ 62.

The Complaint alleges that, as OGC assessed staffing needs across its offices, the number and allocation of positions continued to develop during the reassignment process. *Id.* ¶¶ 64, 67. OGC identified particular positions in other divisions that needed to be filled, while also determining which OFH employees would fill those positions. *Id.* ¶ 64. For example, the Office of Ethics and Appeals initially requested two to three attorneys, while the Office of Litigation initially requested four to five attorneys. *Id.* ¶ 67. The Complaint alleges that the number of attorneys ultimately transferred to those offices differed from those initial requests. *Id.*

The Complaint further alleges that OFH's staffing declined substantially during this period. According to the Complaint, OFH had 31 employees before the change in presidential administration and 24 employees before the challenged reassignments. *Id.* ¶ 78. After the reassignments, OFH had 11 employees, including six line attorneys. *Id.*

Plaintiffs allege that OGC targeted them because of their work enforcing the FHA and that the reassignments were intended to retaliate against them and interfere with that work. *Id.* ¶¶ 58–60. The Complaint alleges that OGC's stated reasons for reducing OFH were pretextual and that the decision to reassign Plaintiffs was motivated by their FHA enforcement activities. *Id.* ¶¶ 59–60.

**C. Procedural Background**

Plaintiffs filed this action in September 2025, shortly after their reassignments. *See* Compl. The Complaint asserts a retaliation claim under § 3617 of the FHA, alleging that the Government retaliated against Plaintiffs for their work "aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA." *Id.* ¶¶ 126–135. Plaintiffs seek declaratory and injunctive relief, including an order directing the Government to cancel their reassignments and reinstate them to their former positions in the OFH, as well as a declaration that the reassignments violated the FHA. *Id.* at 136–37. The Government moves to dismiss, contending that the CSRA precludes Plaintiffs' FHA claim and, alternatively, that Plaintiffs have failed to state a claim for retaliation under the FHA. Defs.' Mot. Dismiss at 6–13, ECF No. 10. On August 21, 2026, the Court ordered supplemental briefing on the issue of whether the FHA provides a private right of action against the United States or its agencies. *See* Min. Order (Aug. 21, 2026). The parties timely submitted their supplemental briefing. Defs.' Suppl. Mem. ("Defs.' Suppl."), ECF No. 14; Pls.' Suppl. Mem. ("Pls.' Suppl."), ECF No. 15. The Government's motion is thus fully briefed and ripe for the Court's consideration.

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

Under Federal Rule of Civil Procedure Rule 12(b)(1), a claim must be dismissed if a district court lacks subject-matter jurisdiction to entertain the claim. Fed. R. Civ. P. 12(b)(1). Rule 12(b)(6), on the other hand, requires a court to dismiss "a claim upon which relief can[not] be granted." Fed. R. Civ. P. 12(b)(6). When a defendant files a motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6), a court must first examine the Rule 12(b)(1) challenges, *U.S. ex rel.*

*Settlemire v. District of Columbia*, 198 F.3d 913, 920 (D.C. Cir. 1999), because "if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined," *Epps v. U.S. Capitol Police Bd.*, 719 F. Supp. 2d 7, 12 (D.D.C. 2010) (quoting *Rhulen Agency, Inc. v. Ala.Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) (holding that a motion to dismiss for failure to state a claim may be decided only after finding subject-matter jurisdiction).

Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under Rule 12(b)(6). *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Epps*, 719 F. Supp. 2d at 11–12; *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). In deciding a motion to dismiss under Rule 12(b)(1), a court must "accept as true all of the factual allegations contained in the complaint" and draw all reasonable inferences in favor of the plaintiff, *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008), but courts are "not required . . . to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations," *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001). Ultimately, the plaintiff bears the burden of establishing the Court's jurisdiction, *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936), and where subject-matter jurisdiction does not exist, "the court cannot proceed at all in any cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex Parte McCardle*, 74 U.S. 506, 514 (1868).

**B. Rule 12(b)(6)**

A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and while "detailed factual allegations" are not necessary, the plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562–63 (2007). Thus, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *see Twombly*, 550 U.S. at 562–63. Courts "must treat the complaint's factual allegations as true[,] . . . and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation modified). A claim is considered plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Plausibility "is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## IV. ANALYSIS

Plaintiffs principally challenge the Government's decision to reassign them from the OFH to positions outside that office. They contend that they were "targeted" because of the nature of their work—"helping other people vindicate their rights under the Fair Housing Act"—and that their reassignments constituted retaliation under § 3617 of the FHA. Section 3617 prohibits "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person . . . on

account of his having aided or encouraged any other person in the exercise or enjoyment of[] any right granted or protected by" the FHA. 42 U.S.C. § 3617.

The parties disagree over whether the FHA's private right of action at § 3613 applies to the federal government and whether Plaintiffs' claims are barred by sovereign immunity. The Court concludes the FHA's private right of enforcement contains no limitation that it may not apply to the federal government or its agencies and that sovereign immunity does not bar Plaintiffs' claims for non-monetary relief and reasonable attorney's fees and costs.

The Government also objects that the Court lacks subject-matter jurisdiction because the CSRA provides the exclusive remedial scheme governing Plaintiffs' allegations. The Court disagrees. Although this case arises in the federal employment context, the D.C. Circuit has repeatedly declined to apply a categorical jurisdiction rule to federal employee claims brought under other federal statutory schemes. Instead, where the CSRA and another statutory scheme overlap, courts must determine whether both schemes can be accommodated without eviscerating the rights conferred by the non-CSRA statute.

Applying that framework, the Court concludes that the CSRA does not preclude Plaintiffs' FHA retaliation claim. The Court therefore assesses the sufficiency of Plaintiffs' Complaint. Through that analysis, the Court finds that Plaintiffs fail to plausibly allege the requisite causal connection between their alleged protected activity and the challenged reassignments, even under the more forgiving motivating-factor standard. Therefore, Plaintiffs' FHA claim must be dismissed.

**A. The FHA's Private Right of Action Applies Against the United States and Its Agencies.**

Plaintiffs do not contend that the FHA contains an implied right of action under § 3617.[1] Pls.' Suppl. at 1. Rather, they claim that the FHA's express private right of enforcement by civil suit at § 3613(a)(1)(A), which encompasses violations of § 3617, applies against the federal government. *Id.* at 1, 4–6. The Government argues the federal government is not an intended defendant of a § 3613 action. Defs.' Suppl. at 2–4. The Court agrees with Plaintiffs that the text and structure of the FHA do not preclude a § 3613 action from applying to the federal government.

[1] Courts have been reluctant to find in the FHA implied rights of action against the federal government for failing in its duties under § 3608 "affirmatively to further the purposes" of the FHA because courts can typically hear such claims under the Administrative Procedure Act ("APA"). *NAACP. v. Sec'y of HUD*, 817 F.2d 149, 152 (1st Cir. 1987) (finding no implied right of action and noting "[A federal] statute typically provides that the federal government will enforce the obligations against the nonfederal person. The 'private right of action' issue is whether Congress meant to give an injured person a right himself to enforce the federal statute directly against the nonfederal person or whether the injured person can do no more than ask the federal government to enforce the statute."); *Latinos Unidos De Chelsea En Accion (Lucha) v. Sec'y of HUD.*, 799 F.2d 774, 793 (1st Cir. 1986) ("We therefore hold that a remedy against HUD for failure to comply with section 3608(d) is available only pursuant to the APA."). *Jones v. Off. of Comptroller of Currency*, 983 F. Supp. 197, 203 (D.D.C. 1997), *aff'd sub nom. Jones v. Off. of the Comptroller of the Currency*, No. 97-5341, 1998 WL 315581 (D.C. Cir. May 12, 1998) ("This Court also concludes that plaintiff may not assert jurisdiction under 42 U.S.C. § 3608(d) through an implied private right of action.").

Following the logic of *NAACP v. HUD*, the D.C. Circuit has found there is no implied private right of action under § 3610 for review of the HUD Secretary's decision to dismiss a complaint filed with HUD. *Godwin v. Sec'y of Hous. & Urb. Dev.*, 356 F.3d 310, 312 (D.C. Cir. 2004) ("Given Congress's presumed awareness of the APA's provisions, we believe-in accordance with the holdings of other circuits-that Congress would make explicit any intent to create a cause of action in these circumstances.").

But Plaintiffs' claim is not brought under § 3608 or § 3610 or any implied right to review the Government's actions in carrying out its duties under the FHA, but rather as a discriminatory housing practice claim under § 3617 for which the FHA provides an express right of action at § 3613(a)(1)(A). Pls.' Suppl. at 1–2; *see id.* at 6 (contrasting Plaintiff's claim with those brought under implied rights of action).

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citation omitted). "The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 15 (1979) (citations omitted).

In matters of statutory interpretation, "we begin with the text." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024) (citation omitted). Section 3613(a)(1)(A) of the FHA provides a private right of action for an alleged "discriminatory housing practice":

> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

42 U.S.C. § 3613(a)(1)(A).

A "[d]iscriminatory housing practice" is defined as "an act that is unlawful under section 3604, 3605, 3606, of 3617 of this title." *Id.* § 3602(f). And an "'[a]ggrieved person' includes any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i).

Thus, a § 3617 interference or retaliation claim—as alleged here—is included as a discriminatory housing practice claim alongside claims of discriminatory sales and rentals (§ 3604), residential real estate-related transactions (§ 3605), and brokerage services (§ 3606) as grounds for a private civil action. *See, e.g.*, *Webb v. U.S. Veterans Initiative*, 993 F.3d 970, 972 (D.C. Cir. 2021) ("Any person who claims to have been injured by conduct prohibited by section 3604 is an aggrieved person who may commence a civil action." (simplified)).

Notably, the text of § 3613(a)(1)(A) does not explicitly say whether the federal government is or is not an intended defendant in a private action, and in fact, does not itself mention defendants at all. Plaintiffs argue that, absent an express limitation in the text, they "may use § 3613 to sue *any defendant* that has plausibly violated § 3617, including the United States." Pls.' Suppl. at 6 (emphasis in original). Plaintiffs contrast the FHA's silence on the status of federal government defendants with § 3607 which exempts "religious organizations and certain private clubs" from certain FHA requirements. Pls.' Suppl. at 6. They argue that the absence of a similar exemption for the federal government indicates that no such limitation on defendants should be read into the statute. *Id.* at 7 (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 20 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.")).

The Government concedes this basic point that § 3613(a) "does not specify the defendants whom the action may be brought against." Defs.' Suppl. at 2. The Government looks to other sections of the FHA to argue the federal government is not an intended defendant of a § 3613 action. It argues that the FHA does not contemplate the federal government as a "respondent." *Id.* at 2–3. Unlike the private person enforcement section (§ 3613), the HUD Secretary enforcement section (§ 3612) and the Attorney General enforcement section (§ 3614) both mention a "respondent." 42 U.S.C. §§ 3612–3614. As relevant here, a respondent is defined as "the person or other entity accused in a complaint of an unfair housing practice." *Id.* § 3602(n)(1). A "[p]erson' includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." *Id.* § 3602(d). The Government argues that neither "person" nor

"other entity" in the definition of "respondent" refers to the federal government. Defs.' Suppl. at 2–3. First, it notes a "person" generally does not include the sovereign. *Id.* at 3 (citing *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 766 (2000) (noting the "[Supreme] Court's longstanding interpretive presumption that 'person' does not include the sovereign"). Then, they correctly point out that typically, when Congress uses a catchall term (like "other entity") after a list of terms (like entities listed in the definition of "person"), the catchall term is read to include terms similar to those listed. Defs.' Suppl. at 3; *Castaneira v. Noem*, 138 F.4th 540, 547 (D.C. Cir. 2025) ("Generally, when Congress defines a broad, final category preceded by an enumerated list of categories, that catchall clause is to be read as bringing within a statute categories similar in type to those specifically enumerated." (simplified)). Thus, they conclude, the federal government is not an "other entity" contemplated as a respondent because the entities in the definition of "person" are "entirely . . . private and nonfederal actors." Defs.' Suppl. at 3.

Even assuming the Government's interpretation of respondent is correct, the argument does not have much force. As previously noted, the term "respondent" is perhaps conspicuously absent from the private enforcement section at issue, though it appears in both public enforcement sections. *See* 42 U.S.C. §§ 3612–3614. In fact, the remedies subsection of § 3613 provides for injunctive relief, not as to a "respondent," but as to an undefined "defendant." 42 U.S.C. § 3613(c)(1) ("[T]he court . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the *defendant* from engaging in such practice or ordering such affirmative action as may be appropriate).") (emphasis added).[2] The term "defendant" does not appear in either of

[2] Section 3613(b) which provides for court appointment of an attorney refers to "a person against whom such a [discriminatory housing] practice is alleged." Even if "person" in this

the public enforcement sections. *Id.* §§ 3612, 3614. Thus, even if the definition of respondent were a limitation on defendants, in order for it to bar the federal government as a § 3613 defendant, the Court would have to read that limitation into the public enforcement section where it does not appear—and where the statute uses another term instead. *See Orozco v. Garland*, 60 F.4th 684, 689 (D.C. Cir. 2023) (finding incorporation of "remedies, procedures, and rights" in the Rehabilitation Act did not tacitly incorporate a limitation found elsewhere). The Court sees no reason to do so.

For their part, Plaintiffs rely on a memorandum produced by the Office of Legal Counsel ("OLC") to make two additional textual arguments that the FHA contemplates the federal government as an intended defendant of a § 3613 action. First, they note that one of the discriminatory housing practice sections actionable under § 3613, § 3604 (discriminatory sales and rentals), applies "to dwellings owned or operated by the Federal Government" under § 3603(a)(1)(A). *See Authority of USDA to Award Monetary Relief for Discrimination*, 18 U.S. Op. O.L.C. 52, 57 (1994) ("It is possible to infer from the fact that § 3603 expressly subjects the United States to the discrimination provisions of § 3604 that Congress intended that the cause of action established by § 3613 would also apply to the United States.").

Second, Plaintiffs argue that the federal government is an intended defendant of a § 3613 action because § 3613(c)(2), which allows a court to award attorney fees and costs, provides that "The United States shall be liable for such fees and costs to the same extent as a private person." *See id.* at 58 ("The presence, in a provision authorizing the bringing of suits by private parties, of language indicating that the United States may be liable for attorneys' fees and costs certainly

---

instance excludes the federal government, that only indicates that the federal government is not entitled to court appointed counsel.

indicates a recognition that the United States may be subject to suits under the provision."). Not necessarily. Section 3613's provision for attorney fees and costs against the United States does clearly indicate that the federal government is an intended *defendant* in a § 3613 action. Those attorney fees and costs against the United States could as easily arise from the government's role as *intervenor*, a role which § 3613 expressly contemplates for the federal government. *See* 42 U.S.C. § 3613(e) ("Upon timely application, the Attorney General may intervene in such civil action, if the Attorney General certifies that the case is of general public importance."); *Gregory v. S.C. Dep't of Transp.*, 289 F. Supp. 2d 721, 726 (D.S.C. 2003), *aff'd*, 114 F. App'x 87 (4th Cir. 2004) ("Section 3613(c)(2) only relates to attorney's fees and court costs, not liability costs. These fees and costs could be awarded when the United States intervenes as a plaintiff, as the FHA allows, not necessarily implying that the United States could be a defendant."); *Phifer v. Sec'y of HUD*, No. CIV S-08-0299 LKK, 2009 WL 8706810, at *4 (E.D. Cal. Feb. 2, 2009), *report and recommendation adopted*, No. CIV S-08-0299 LKK, 2009 WL 8706811 (E.D. Cal. Mar. 19, 2009) ("Section 3613 does not include an unequivocal waiver of sovereign immunity except as to liability for attorney's fees and costs in the event that the United States Attorney General intervenes and is not a prevailing party."). The fact that the provision for the United States's liability appears only in the attorney fees and costs remedies (§ 3613(c)(2)), but not in the monetary and injunctive remedies (§ 3613(c)(1)), tends to support the view that § 3613 envisions the federal government as intervenor, not as defendant. Either way, the provision for attorney's fees is not a clear indicator of the federal government's role. And an equivocal indicator is less than a clear limitation, which the plain text does not include. *See Orozco*, 60 F.4th at 368 ("If Congress had meant also to incorporate Section 794a's limits on who may sue, Congress would have said so.").

The Government also advances the structural argument that the FHA treats the federal government as "the enforcer of fair-housing rights" under the FHA, "not as . . . subject to suit under it." Defs.' Suppl. at 3–4. It notes the FHA "charges the Secretary with receiving, investigation, and prosecuting complaints of discriminatory housing practices . . . and a related provision authorizes the Attorney General to bring civil actions to enforce the Act." *Id.* at 4. In that vein, the Government points out that the filing period for a § 3613 action is "largely centered around the status of an administrative proceeding" which an aggrieved person may file with the Secretary under § 3610(a). Defs.' Suppl. at 2; 42 U.S.C. § 3613(a)(1)(B). No doubt the FHA treats the Secretary and Attorney General as enforcers. 42 U.S.C. §§ 3612, 3614. But it also creates a private right of enforcement which may operate independently of federal government enforcement: an aggrieved person may file a § 3613 action with or without also filing a complaint with the Secretary under certain circumstances. 42 U.S.C. § 3613(a)(3) ("An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint. . . ."). Even assuming the FHA treats the federal government primarily as enforcer, the statute's inclusion of an independent private right of action and silence on the intended defendants of that action tend to indicate that the government's role is not exclusively enforcer.

Ultimately, neither the Government's structural nor textual arguments overcome the fact that the plain text of § 3613(a) includes no limitation on defendants. The D.C. Circuit confronted a similar situation in *Orozco*, where it found that no "structural or textual feature confine[d] [a Rehabilitation Act] cause of action" to exclude federal employees as plaintiffs. 60 F.4th at 692. It found the statute's "own definition of qualifying plaintiff"—a definition which did not exclude federal employees—"controls," meaning federal employees could sue the government as

employer. *Id.* at 689.[3] Likewise here, nothing in the plain text of § 3613 or the defined statutory terms it employs excludes suits against the federal government.

Plaintiffs' position that a § 3613 discriminatory housing practice claim may be brought against the federal government also finds modest support in other courts' handling of similar FHA claims. A few courts have at least analyzed discriminatory housing practice claims against the federal government that were not viable for other reasons. *See, e.g.*, *Sandpiper Residents Ass'n v. HUD*, No. CV 20-1783 (RDM), 2022 WL 1604717, at *14–*16 (D.D.C. May 21, 2022), *aff'd on other grounds*, 106 F.4th 1134 (D.C. Cir. 2024) (finding § 3604-based claim against HUD for injunctive relief for failing to provide housing vouchers was not barred by sovereign immunity, but dismissing as moot); *Jones v. Off. of Comptroller of Currency*, 983 F. Supp. 197, 202 (D.D.C. 1997), *aff'd summarily sub nom. Jones v. Off. of the Comptroller of the Currency*, No. 97-5341, 1998 WL 315581 (D.C. Cir. May 12, 1998) (finding the Office of the Comptroller of the Currency was not a provisioner of housing subject to § 3604 such that "plaintiff [could] not proceed against the OCC under 42. U.S.C. § 3613"); *Peet v. Sidney*, No. 17-CV-1870 (ECT/TNL), 2019 WL 542939, at *3–*4 (D. Minn. Jan. 24, 2019), *report and recommendation adopted sub nom. Peet v. Smith*, No. 17-CV-1870 (ECT/TNL), 2019 WL 699962 (D. Minn. Feb. 20, 2019) (recommending § 3604- and § 3617-based monetary claims against HUD defendants be dismissed on sovereign immunity grounds, but recommending that injunctive claims against HUD defendants, though not barred by sovereign immunity, be dismissed as untimely).

[3] In so holding, the D.C. Circuit rejected the argument that such a cause of action would be foreclosed because "any ambiguity" must be construed "against waiver" of sovereign immunity. 60 F.4th at 691–92. First, it noted that the there was no ambiguity because the plain text of the statute did not incorporate the government's suggested limitation on plaintiffs. And second, it found that the APA supplied the necessary unambiguous waiver of sovereign immunity even though the claim was not brought under the APA.

Relatedly, Plaintiffs' sovereign immunity does not bar Plaintiffs' particular claims. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted). "A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity." *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (citations omitted). Plaintiffs have met that burden for the relief they request.

Plaintiffs seek injunctive and declaratory relief as well as "reasonable attorney's fees and costs." Compl. at 36. First, as to the injunctive and declaratory relief, the FHA does not contain a blanket waiver of sovereign immunity. *See Boyd v. Browner*, 897 F. Supp. 590, 595 (D.D.C. 1995), *aff'd,* 107 F.3d 922 (D.C. Cir. 1996) ("Because the Fair Housing Act does not 'unambiguously waive' the government's sovereign immunity defense, plaintiffs may not have a monetary recovery."). However, Plaintiffs do not rely on the FHA for waiver of sovereign immunity for the non-monetary relief they seek, nor do they need to. Section 702 of the APA waives sovereign immunity in "[a]n action in a court of the United States seeking relief other than money damages" when the claim is against "an agency or an officer or employee" of the United States for "act[ing] or fail[ing] to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. This waiver applies regardless of whether the claim is made under the APA or another statute. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("We have previously, and repeatedly . . . expressly h[eld] that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not. . . . There is nothing in the language of the second sentence of § 702 that restricts its waiver to suits brought under the APA. The

sentence waives sovereign immunity for an action in a court of the United States seeking relief other than money damages, not for an action brought under the APA." (simplified)). Therefore, sovereign immunity is waived as to Plaintiffs' non-monetary claims.

Second, § 3613 of the FHA, under which Plaintiffs bring this action, provides an express waiver of immunity for reasonable attorney's fees and costs. 42 U.S.C. § 3613(c)(2) ("In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person."). The Court therefore concludes that sovereign immunity does not bar Plaintiffs' claims.

**B. The CSRA Does Not Preclude Plaintiffs' FHA Claim.**

Although no court in this Circuit has addressed whether the CSRA precludes a retaliation claim under the FHA, the D.C. Circuit has repeatedly rejected the proposition that the CSRA categorically displaces other federal statutory schemes. Instead, where another federal statute confers substantive rights independent of the CSRA, the D.C. Circuit has recognized an "obvious need to accommodate the two statutory schemes" so as not to eviscerate rights guaranteed by the non-CSRA statute. *See Hubbard v. EPA*, 809 F.2d 1, 5 (D.C. Cir. 1986); *see also Kleiman v. Dep't of Energy*, 956 F.2d 335, 338 (D.C. Cir. 1992); *Jackson v. Kennedy*, No. CV 25-1750 (BAH), 2026 WL 172440, at *7–*9 (D.D.C. Jan. 22, 2026) (discussing D.C. Circuit precedent concerning the CSRA).

The D.C. Circuit first articulated that approach in *Hubbard*. There, an unsuccessful federal job applicant alleged that an agency violated the Privacy Act by maintaining an inaccurate record concerning the reason for his non-selection. *Hubbard*, 809 F.2d at 5–6. Although the Government argued that the claim was barred because it arose from a federal

personnel dispute governed by the CSRA, the court rejected a categorical jurisdictional bar. *Id.* The court acknowledged the concern that federal employees might invoke the Privacy Act "to circumvent the administrative remedies provided by [the CSRA] for alleged prohibited personnel practices." *Id.* at 5 (citation modified). But it nevertheless concluded that there remained an "obvious need to accommodate the two statutory schemes" rather than construe the CSRA in a manner that would defeat rights guaranteed by the Privacy Act. *Id.*

Instead of foreclosing the Privacy Act claim altogether, the court harmonized the two statutory schemes by carefully applying the substantive elements of the Privacy Act. *See id.* ("[T]he obvious need to accommodate the two statutory schemes requires the district courts to carefully analyze the asserted causation link to be certain they are not exceeding their jurisdiction."); *see also Jackson*, 2026 WL 172440 at *8. The court explained that the Privacy Act permits recovery only where an adverse personnel action was "actually caused" by an inaccurate or incomplete record; it does not otherwise "shield [federal] employees from the vicissitudes of federal personnel management decisions" not caused by an erroneous record. *Hubbard*, F.2d at 5. Accordingly, the plaintiff was required to demonstrate that the agency relied upon inaccuracies in the challenged record when making the adverse personnel decision. *Id.* at 6. Because the plaintiff failed to establish that the agency would have reached a different decision absent the alleged inaccuracies, the court affirmed dismissal on the merits rather than holding that the court lacked jurisdiction. *Id.*

The D.C. Circuit reaffirmed that approach in *Kleiman*. 956 F.2d at 335. Rejecting the Government's CSRA-preclusion argument once again, the court explained that the proper means of reconciling the Privacy Act and the CSRA was "not by finding a lack of subject matter jurisdiction," but by carefully applying the elements of the Privacy Act claim. *Id.* at 338; *see also*

*Jackson*, 2026 WL 172440, at *8. Although the plaintiff claimed that his personnel records were "inaccurate" because they reflected his official job title rather than the title he believed his duties warranted, the court held that the records accurately reflected his official position and that the Privacy Act was "not . . . a vehicle for amending the judgments of federal officials." *Kleiman*, 956 F.3d at 337–38 (citation modified) (explaining that the Privacy Act only "allows for amendment of factual or historical errors"). Therefore, "to read the Privacy Act without doing violence to the [CSRA]," dismissal was appropriate under Rule 12(b)(6), not for lack of subject-matter jurisdiction. *Id.* at 338–39.

*Hubbard* and *Kleiman* thus indicate that where the CSRA overlaps with another federal statute conferring substantive rights, the D.C. Circuit tends to favor harmonizing the two statutory schemes rather than holding that the CSRA categorically precludes the non-CSRA claim. *See Jackson*, 2026 WL 172440, at *7–9. Notably, the court accomplished that reconciliation not by eliminating the non-CSRA cause of action, but by carefully applying its elements to ensure that the statute did not become a vehicle for challenging ordinary federal personnel decisions. *See id.*

The same approach is warranted here. Like the Privacy Act, the FHA creates substantive rights independent of the CSRA. *See* 42 U.S.C. § 3617 (protecting from "coercion, intimidation, threats, or interference" "any person" who tries to exercise her rights to fair housing or who "aided or encouraged any other person" to exercise her rights to fair housing). At the same time, the concern identified in *Hubbard* and *Kleiman* is equally present. Plaintiffs may not invoke the FHA merely to challenge routine federal personnel decisions that Congress committed to the CSRA's comprehensive remedial scheme. Thus, there is an "obvious need to accommodate the two statutory schemes" in this case. *See Hubbard*, 809 F.2d at 5. The proper course, therefore, is

not to foreclose Plaintiffs' FHA claim altogether, but to harmonize the FHA with the CSRA by carefully applying the FHA claim's elements so that only retaliation claims proscribed by the FHA—not ordinary personnel disputes—may proceed.

The D.C. Circuit's more recent decisions reinforce that conclusion. Since *Hubbard* and *Kleiman*, the court has continued to employ a "statute-specific analysis," rather than a "categorical preclusion rule." *See Lucas v. Am. Fed'n of Gov't Emps.*, 151 F.4th 370, 385 (D.C. Cir. 2025). Whether the CSRA precludes another federal statute depends upon the particular statute at issue and the context in which it operates. *Id.* at 385–86. Relevant considerations include whether the statute "suffer[s] from the defect of generality," *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 176 (D.C. Cir. 2013), whether Congress created an express cause of action and independent jurisdictional grant, *id.* at 175–76, and the broader statutory context in which Congress enacted the statute, *Lucas*, 151 F.4th at 385–86.

Those considerations further support harmonizing the FHA with the CSRA here. The FHA does not "suffer from the defect of generality" as it is not a "catchall" statute. *See Lacson*, 725 F.3d at 176. Rather, it is a targeted anti-discrimination statute enacted to eradicate a specific form of unlawful discrimination. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 521 (2015) ("[T]he FHA . . . like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of the Nation's economy."); *Lucas*, 151 F.4th at 385 (finding that Title VII and the ADA are not "catchall" statutes because they "address the specific evils of invidious discrimination"); *EEOC v. Miss. Coll.*, 626 F.2d 477, 482 (5th Cir. 1980) (noting the "strong similarities between the language, design, and purposes of Title VII and the Fair Housing Act"). Congress also created an express private right of action under the FHA and vested federal district courts with jurisdiction over FHA claims. *See* 42

U.S.C. § 3613(a)(1)(A). Moreover, as *Lucas* recognized, Congress has long afforded claimants overlapping avenues for obtaining relief under federal anti-discrimination statutes. 151 F.4th at 378–80 (finding that "the norm of overlapping remedies for discrimination" to be "compelling evidence" weighing against CSRA preclusion). The FHA itself illustrates that principle; the Supreme Court has recognized that Congress provided alternative administrative and judicial avenues for enforcing the FHA. *See Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103–04 (1979)[4]. The FHA therefore possesses the very characteristics the D.C. Circuit has identified as weighing against CSRA preclusion.

The Government's contrary arguments are unavailing. The Government first relies on two decisions from outside this Circuit holding that the CSRA precluded federal employees from pursuing FHA claims. *See* Defs.' Mot. Dismiss at 8–9 (first citing *Watson v. U.S. Dep't of Hous. & Urb. Dev.*, 576 F. Supp. 580 (N.D. Ill. 1983); then *Evans v. United States*, 18 F. Supp. 2d 1217 (D. Kan. 1998)). Neither decision is persuasive. *Watson* applied a broad, categorical approach to CSRA preclusion, and *Evans* was bound by 10th Circuit precedent, which at that time also appeared to apply a categorical approach. *See Watson*, 576 F. Supp. at 587; *Evans*, 18 F. Supp. 2d at 1219. That approach is inconsistent with the D.C. Circuit's subsequent instruction that

[4] *Gladstone* addressed the relationship between §§ 810 and 812 of the original FHA and held that the two provisions supplied alternative avenues for enforcement. Section 810 authorized a "person aggrieved" to seek HUD conciliation and, if conciliation failed, to bring suit in federal court, while § 812 separately authorized civil actions in federal district court to enforce the rights protected by § 804. *Gladstone*, 441 U.S. at 103–04. The Court explained that § 810 did not require a complainant to complete the administrative process before resorting to federal court and that §§ 810 and 812 provided "alternative remedies" available to the same class of plaintiffs. *Id.* Congress subsequently amended the FHA in 1988 to clarify and expand its enforcement provisions, including by expressly providing that an aggrieved person may commence a civil action in federal district court. *See* Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 8, 102 Stat. 1619, 1628–29 (codified at 42 U.S.C. § 3613). The FHA thus has long contained an independent federal judicial remedy, which Congress later reaffirmed and expanded.

courts employ a "statute-specific analysis," rather than a "categorical preclusion rule." *See Lucas*, 151 F.4th at 385. The fact that other courts once applied a broader approach does not overcome the D.C. Circuit's intervening guidance.

The Government next places undue weight on the fact that the FHA predates the CSRA and that the CSRA does not expressly identify the FHA among the statutes whose remedies may overlap with the CSRA. *See* Defs.' Reply at 7, ECF No. 13 (citing 5 U.S.C. § 2302(d)). That argument appears to draw in part from *Lacson*, in which the D.C. Circuit noted that the jurisdictional provision at issue there had been enacted "a full 25 years after the CSRA was enacted." 726 F.3d at 176–77. But *Lacson* expressly cautioned against reading that observation as establishing a temporal rule, explaining that its decision was not meant "to suggest that a jurisdictional grant . . . must have been enacted post-CSRA to avoid its scope." *Id.* at 177 n.5. Although the FHA's omission from the CSRA's express references is certainly relevant, it does not outweigh the other statute-specific considerations discussed above, which favor harmonizing the FHA and the CSRA. As noted, the FHA is a targeted anti-discrimination statute, contains an express private right of action, provides an independent grant of federal jurisdiction, and reflects Congress's longstanding recognition of judicial enforcement remedies alongside other remedial mechanisms. These features support giving effect to the FHA alongside the CSRA. The Court therefore concludes that the CSRA does not preclude Plaintiffs' FHA retaliation claim. [5]

**C. Plaintiffs Have Failed to State a Retaliation Claim Under the FHA.**

Having concluded that the FHA and CSRA are to be harmonized, the Court turns to whether Plaintiffs have stated a claim for FHA retaliation. Harmonizing the FHA with the

[5] Because the parties appear to all agree that the *Thunder Basin* framework does not apply, the Court need not decide which party that framework favors. *See* Pls.' Opp'n at 14, ECF No. 11; Defs.' Reply at 9.

CSRA, however, requires more than recognizing Plaintiffs' cause of action. As *Hubbard* and *Kleiman* instruct, harmonizing the two statutes requires the Court to carefully apply the elements of the FHA claim in a manner that preserves the CSRA's role as the exclusive mechanism for reviewing ordinary federal personnel disputes. The Court therefore analyzes the sufficiency of Plaintiffs' FHA retaliation claim with that directive in mind.

As noted, § 3617 prohibits "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the FHA]." 42 U.S.C. § 3617. To prevail on a retaliation claim under the FHA, Plaintiffs must establish that "(1) [they] engaged in protected activity, (2) the defendant took an adverse action against [them], and (3) a causal link exists between the protected activity and the adverse action." *Reese v. Park Place Condo. Homeowners Ass'n I*, No. 22-cv-2660, 2023 WL 5833678, at *4 (D.D.C. Sept. 8, 2023).

The parties, however, disagree on the degree of causation necessary to establish that connection. Some courts permit a plaintiff to satisfy § 3617's causation requirement by showing that retaliatory animus was a motivating factor in the defendant's adverse decision. *See, e.g.*, *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 99 (2d Cir. 2024) ("[A] causal connection . . . between the protected activity and the adverse action [can be] satisfied when retaliatory motive played *a part* in causing the adverse action." (citation modified) (emphasis in original)). Others require but-for causation, that is, a showing that the adverse action would not have occurred absent the protected activity. *See, e.g.*, *Cano as next friend of Morejon v. 245 C&C, LLC*, No. 23-12413, 2025 WL 3727880, at *4 (11th Cir. Dec. 23, 2025) (stating that the causation element for a § 3617 claim "requires a showing of but-for causation"). The D.C. Circuit has not yet resolved the issue. *See Reese*, 2023 WL 5833678, at *4 (noting that the "D.C.

Circuit courts have not had much occasion to interpret § 3617”). But the Court need not do so here. Even if the more forgiving motivating-factor standard applies, Plaintiffs have not plausibly alleged that retaliatory motive played a part in causing their reassignments.

Plaintiffs allege that their protected activity consisted of enforcing the FHA as part of their official duties.[6] Thus, the alleged protected activity is not conduct separate from Plaintiffs' employment; it is the very work Plaintiffs were employed to perform. The challenged adverse actions—Plaintiffs' reassignments outside OFH—involved agency decisions concerning the staffing, assignment, and allocation of resources associated with that work.

That overlap matters to the causation inquiry. Section 3617 prohibits retaliation against a person “on account of” that person having aided or encouraged another in exercising a right protected by the FHA. 42 U.S.C. § 3617. Circumstances that may ordinarily support an inference of retaliation do not necessarily support the same inference when the alleged protected activity is also the federal employee's official work. For example, in an ordinary retaliation case, temporal proximity between protected activity and an adverse action may support an inference of causation. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (“For purposes of establishing a prima facie case of retaliation, temporal proximity can indeed support an inference of causation . . . .” (citation modified)). But when the protected activity is the employee's official work, the fact that an agency decision follows or affects that work does not, without more, support the same inference. As Plaintiffs appear to acknowledge, an agency necessarily must make decisions concerning the staffing, assignment, and allocation of resources associated with the work its employees perform. *See Flyers Rts. Educ. Fund, Inc. v. Fed.*

---

[6] The Court assumes, but does not decide, that Plaintiffs' FHA enforcement work constituted protected activity.

*Aviation Admin.*, 864 F.3d 738, 743 (D.C. Cir. 2017) (explaining that agencies have "broad discretion to choose how best to marshal [their] limited resources and personnel to carry out [their] delegated responsibilities"); *see also* Pls.' Opp'n at 25, ("To be sure, Plaintiffs do not seek to imply that the government is forbidden from reallocating fair housing staff."). Thus, a decision made because of the nature, scope, or organization of that work alone does not necessarily support an inference that the decision was made to retaliate against the employee for engaging in protected activity. Otherwise, virtually any agency decision affecting an employee who administers or enforces the FHA could be recast as a retaliation claim simply because it concerned or affected the work that constituted the employee's alleged protected activity. It would risk turning the FHA into a vehicle for challenging the "vicissitudes of federal personnel management decisions," *Hubbard*, 809 F.2d at 5 (quotation omitted), rather than a remedy for action taken because of protected activity.

Then, consistent with *Hubbard*'s instruction that courts "carefully analyze the asserted causation link," 809 F.2d at 5, the Court must therefore examine whether Plaintiffs have alleged facts supporting an inference that their reassignments were motivated, at least in part, by a desire to retaliate against Plaintiffs for engaging in protected activity, rather than simply reflecting agency decisions concerning the reallocation or reorganization of its FHA enforcement work.

Plaintiffs have not done so. The Complaint alleges that the Government reassigned OFH personnel and reallocated FHA responsibilities in response to changing administrative priorities. *See, e.g.*, Compl. ¶ 6 ("Agency officials said more than once that 'fair housing is not a priority' of the Administration . . . ."); ¶ 48 ("[T]he OGC official stated that OFH attorneys had been selected to address staffing needs across OGC because fair housing is not a priority of this administration, and OFH would not have as much work to do."); ¶ 60 (same). The Complaint

likewise acknowledges that the agency's decisions were "tied to current political leadership at the agency and across the federal government." *Id.* ¶ 76; *see also id.* ¶ 124 ("Even as far back as the 2020 presidential election, President Trump campaigned on a promise to roll back programs under the Fair Housing Act aimed at reducing racial segregation in suburban housing."). And the Complaint alleges that OFH was not the only office affected: the Office of Program Enforcement also was subject to involuntary reassignments, and other agencies likewise experienced changes to their civil-rights operations. *Id.* ¶¶ 49, 77; *see also id.* ¶ 117 ("[T]he Administration has eliminated or dramatically cut civil rights offices in other agencies, including the Social Security Administration, the Labor Department, the Federal Trade Commission, the Department of Homeland Security, and the Department of Education."). These allegations fail to raise a plausible inference of retaliatory animus. Instead, they describe personnel and resource-allocation decisions made in response to changing administrative priorities.

Nor do Plaintiffs' allegations that the Government acted with retaliatory animus "nudge[] [their] claims across the line from conceivable to plausible." *See Twombly*, 550 at 570. For instance, the Complaint alleges that "[t]he Trump Administration and senior HUD officials have long harbored animus toward fair housing work and the civil rights attorneys who do it" and that "[t]his animus informed and motivated Defendants' targeting of Plaintiffs based on their work enforcing the FHA." Compl. ¶ 116; *see also id.* ¶ 44 ("Motivated by unlawful animus against FHA enforcement and the people who do it, OGC officials selected OFH attorneys, including Plaintiffs, for involuntary reassignments."). Such allegations merely characterize the agency's actions as retaliatory; they do not provide a factual basis from which retaliatory motive can reasonably be inferred. *See Holmes v. Washington Metro. Area Transit Auth.*, 723 F. Supp. 3d 1, 25 (D.D.C. 2024) ("[Plaintiff]'s belief that her supervisors were acting with retaliatory motive —

however forceful and frequently expressed — is insufficient."); *see also Melkumyan v. Power*, No. 21-CV-02700, 2024 WL 1299366, at *11 (D.D.C. Mar. 26, 2024) (same). They therefore do not support a plausible inference of retaliatory intent.

Therefore, as in *Hubbard*, Plaintiffs here "strain[] to fit" their challenge to what ultimately are federal personnel decisions "within the boundaries of the [FHA]." 809 F.2d at 5. The remainder of the Complaint makes this particularly apparent. Plaintiffs allege that "[t]he reassignments have been plagued by paperwork and processing errors and delays," Compl. ¶ 75, "[Plaintiffs] will require substantial training and supervision" because they "have little to no experience in the areas and fields to which they are being transferred," *id.* ¶ 68, and they devote substantial attention to their disagreement with how the administration is now enforcing the FHA. They allege that "HUD officials have withheld meritorious discrimination charges" and that "at least 115 federal fair housing cases have been halted or closed entirely since Trump took office." *Id.* ¶ 118. They further allege that multiple channels for reporting housing discrimination have been shut down and that HUD was ending several major investigations where it had "already found civil rights violations." *Id.* Such allegations underscore that Plaintiffs' challenge concerns the consequences and vicissitudes of federal agency personnel, resource-allocation, and enforcement decisions. Notably, such allegations do not plausibly indicate that Plaintiffs' reassignments were motivated by a desire to retaliate against them.

The Court does not minimize the significance of the reassignments to Plaintiffs. As the Complaint makes clear, Plaintiffs' new reassigned positions no longer align with the work to which they had devoted their professional careers. *See, e.g.*, *id.* at ¶ 85 ("As a result of this reassignment, Mr. Heenan will no longer be able to do the civil rights work to which he has committed his professional career. Losing the opportunity to do that work materially

disadvantages Mr. Heenan, his career, and his professional opportunities."). Agencies, however, generally have "broad discretion to choose how best to marshal [their] limited resources and personnel to carry out [their] delegated responsibilities." *Flyers Rts. Educ. Fund, Inc.*, 864 F.3d at 743. And federal courts are not vested with "some amorphous general supervision of the operations of government." *Raines v. Byrd*, 521 U.S. 811, 829 (1997) (citation modified).

In sum, the Complaint does not plausibly allege that the Government reassigned Plaintiffs to retaliate, in part, against them for engaging in protected activity, as § 3617 requires at a minimum. Rather, Plaintiffs' challenge is ultimately to their reassignments and the Government's allocation of personnel and resources in response to changed administrative priorities—the sort of federal personnel-management dispute that *Hubbard* and *Kleiman* caution against converting into an actionable claim. Plaintiffs' claim must therefore be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 10) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 28, 2026

RUDOLPH CONTRERAS
United States District Judge