**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PALMER HEENAN, PAUL OSADEBE, JULIA DYKSTRA, ASHLEY VAZQUEZ, and IRIS MAUTE-GIBSON,[1]

*Plaintiffs*,

vs.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development,

*Defendants*.

Case No.: 1:25-cv-03343-RC

**FIRST AMENDED COMPLAINT**

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiff Iris Maute-Gibson's address is being filed under seal with the Court in a separate Notice.

## INTRODUCTION

1. In a triumph of the Civil Rights Movement, Congress enacted the Fair Housing Act (FHA) in 1968 to outlaw discrimination in housing and help move our country towards a more equal society. As part of that law, Congress adopted a broad anti-interference provision to protect both people who exercise their fair housing rights and people who help others do so.

2. Congress provided for robust judicial and administrative enforcement of the Fair Housing Act. By statute, the U.S. Department of Housing and Urban Development (HUD) is vested with both the authority and responsibility to administer the FHA. HUD is obligated by statute and regulation to process and investigate complaints of housing discrimination submitted by the public, charge cases where reasonable cause exists to believe discrimination has or will occur, conciliate cases in an attempt to reach agreement between the parties, and prosecute cases where they cannot be voluntarily resolved. HUD's enforcement processes are thus a critical—and mandatory—component of the administrative scheme through which complainants vindicate their rights under the Fair Housing Act.

3. Within HUD, the Office of Fair Housing (OFH) in the Office of General Counsel (OGC) is the legal office responsible for enforcing fair housing and civil rights laws, including the Fair Housing Act. Plaintiffs are attorneys who worked in OFH on FHA matters. Plaintiffs' work advising investigators, issuing investigatory subpoenas, drafting and issuing charges of discrimination, prosecuting charges before administrative law judges, and ensuring FHA compliance agency-wide was critical to HUD's enforcement efforts and advancing everyone's right to be free from housing discrimination.

4. Unfortunately, following the change in presidential administration in 2025, agency leaders set out to engage in a campaign of retribution against Plaintiffs related to their work.

Specifically, the agency targeted individual attorneys within OFH by involuntarily reassigning them to different divisions where they could no longer work to enforce the FHA.

5. Facts uncovered after Plaintiffs' original complaint demonstrate that while priorities may have shifted because of the new administration, Plaintiffs were targeted not only because of office restructuring (which was, at least to some extent, merely pretext), but because of past work they had done in seeking to fulfill their fair housing mission and mandate. It was not just that they did fair housing work, it was the specific fair housing work that they did (or were perceived as doing).

6. In recent testimony, one OGC official involved in the transfer decisions acknowledged that, in fact, there was a lot of fair housing work to do. The agency just did not want *these* employees to do it. According to her, "Fair Housing actually got a significant amount of focus initially," but it was "***probably not the kind that some of them wanted***." As to the impending changes to OFH's work, that official surmised that this "***was not what some of them would have wanted to happen***." This assumption about Plaintiffs was plainly made based on Plaintiffs' previous fair housing work. Because Plaintiffs did their job during the previous administration, including on cases that may have been aimed more specifically at helping protect the rights of individuals the current administration has opposed, they were presumed as not willing to continue fair housing work under the new administration.

7. The Assistant Secretary for Fair Housing and Equal Opportunity, Craig Trainor, made this connection explicit. He publicly criticized the fair housing work Plaintiffs had done during prior administrations, casting them derogatively as "sly bureaucrats." In his view, HUD's fair housing employees had been "pursu[ing] dubious ideological crusades" and "self–indulgent cases." This attitude was the primary motivator for punishing Plaintiffs.

8. This was, in fact, not a fair characterization of Plaintiffs. Some Plaintiffs served their country doing fair housing work during the first Trump Administration, and all were ready to continue. After all, OFH's Fair Housing Act enforcement workload is statutorily obligated and mostly driven by complaints filed by members of the public alleging claims of housing discrimination. But Plaintiffs were nevertheless retaliated against as punishment for their prior work defending civil rights.

9. Further, agency leadership on multiple occasions not only changed HUD's litigating positions—something that happens with some regularity—but also signaled displeasure with Plaintiffs for taking those prior litigating positions. These instances, close in time to the transfers, support an inference that Plaintiffs were punished for an unlawful retaliatory purpose.

10. The Fair Housing Act does not allow HUD to retaliate against employees for prior work advancing fair housing. Under the FHA's interference provision, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of" their fair housing rights. 42 U.S.C. § 3617.

11. That is exactly what agency officials have done here. Because Plaintiffs assisted complainants and others in asserting and vindicating their rights under the FHA, HUD leadership involuntarily reassigned them from the jobs they were hired to do. While agency officials have claimed that the reassignments were necessary to address staffing shortages elsewhere in the agency, or for other benign staffing reasons, those justifications are pretext for the real motivation behind the adverse action: unlawful animus towards the people who carried out Fair Housing Act enforcement work that the new Administration did not like. The agency's inconsistent explanations and shifting stories demonstrate as much. While the agency has significant authority

to shift priorities and personnel, as with any landlord or employer, otherwise valid exercises of authority become illegal when exercised for a discriminatory or retaliatory purpose.

12. Plaintiffs now find themselves in the unfamiliar position of seeking to vindicate their own rights under the Fair Housing Act. Plaintiffs ask this Court to declare that their reassignments are unlawful and reinstate Plaintiffs to their positions in the Office of Fair Housing, so they can get back to work delivering on the promise of fair housing for all.

**PARTIES**

13. Plaintiff Palmer Heenan is an individual who resides in Arlington, VA. At the time of the events alleged herein, he was employed by HUD in the Office of General Counsel.

14. Plaintiff Paul Osadebe is an individual who resides in Washington, DC. At the time of the events alleged herein, he was employed by HUD in the Office of General Counsel.

15. Plaintiff Julia Dykstra is an individual who resides in Washington, DC. At the time of the events alleged herein, she was employed by HUD in the Office of General Counsel.

16. Plaintiff Ashley Vazquez is an individual who resides in Washington, DC. She is employed by HUD in the Office of General Counsel.

17. Plaintiff Iris Maute-Gibson is an individual who resides in Washington, DC. She is employed by HUD in the Office of General Counsel.

18. Defendant U.S. Department of Housing and Urban Development (HUD) is an executive department of the United States government. *See* 42 U.S.C. § 3532.

19. Defendant Scott Turner is the Secretary of HUD, the highest-level official in the Department. He is sued in his official capacity.

## JURISDICTION AND VENUE

20. Jurisdiction in this Court is proper under 28 U.S.C. § 1343(a)(4), because this lawsuit is a "civil action authorized by law" to "secure equitable or other relief under any Act of Congress providing for the protection of civil rights," namely, the Fair Housing Act.

21. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Fair Housing Act.

22. Venue is proper in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because the Defendants include an agency of the United States that resides in this District; and under 28 U.S.C. § 1391(e)(1)(C) because four of the Plaintiffs reside in this District (Mr. Osadebe, Ms. Dykstra, Ms. Vazquez, and Ms. Maute-Gibson), and no real property is involved in the action.

23. Sovereign immunity is waived by 5 U.S.C. § 702.

## BACKGROUND

### I. The Fair Housing Act and HUD's Office of Fair Housing

24. Although *de jure* racial segregation was declared unconstitutional more than a century ago, "its vestiges remain today, intertwined with the country's economic and social life." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 528 (2015). In 1968, President Johnson's Kerner Commission determined, after "extensive factfinding," that "residential segregation and unequal housing and economic conditions" continued to afflict families across American cities, so much so that the Commission feared our society was "moving toward two societies, one black, one white—separate and unequal." *Id.* at 529 (citation omitted). To address "this deepening racial division," the Commission recommended

"a comprehensive and enforceable open-occupancy law" to prohibit discrimination "in the sale or rental of any housing." *Id.* at 529–30 (citation and alteration omitted).

25. In the days following the assassination of Dr. Martin Luther King, Jr., Congress responded by adopting the Fair Housing Act, which broadly declared that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Pub. L. No. 90-284, title VIII, § 801, 82 Stat. 81 (Apr. 11, 1968). In the words of President Johnson, the law "proclaims that fair housing for all – all human beings who live in this country – is now a part of the American way of life."[2]

26. To achieve that lofty goal, Congress outlawed discrimination in various aspects of housing on the basis of "race, color, religion, or national origin." § 804, 82 Stat. at 83.

27. Perhaps anticipating that some would oppose enforcement of the FHA's guarantees, Congress also included a broad anti-retaliation provision in that law. In what is now Section 3617, Congress provided: "It shall be unlawful to coerce, intimidate, threaten, or interfere with ***any person*** in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or ***on account of his having aided or encouraged any other person*** in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617 (emphasis added). In adopting this provision, one legislator explained: "We need legislation to prevent interference with those pursuing their own civil rights or attempting to educate others about their rights." 114 Cong. Rec. 9608 (Apr. 10, 1968) (Statement of Rep. Brown).

28. As it reads today, the FHA prohibits, among other things, "refus[ing] to sell or rent after the making of a bona fide offer," "discriminat[ing] against any person in the terms, conditions,

---

[2] https://www.presidency.ucsb.edu/documents/remarks-upon-signing-the-civil-rights-act.

or privileges of sale or rental of a dwelling," and "discriminat[ing] against any person" in "making available" or "in the terms and conditions" of "residential real estate-related transactions." 42 U.S.C. §§ 3604, 3605. The FHA was amended in 1988 to include protections against discrimination based on sex, disability, and familial status. *See* 42 U.S.C. § 3604.

29. Congress has provided for robust enforcement of the FHA through both administrative and judicial means. On the administrative side, Congress bestowed on HUD both the "authority" and the "responsibility" for "administering" the FHA. 42 U.S.C. § 3608. Congress also directed that HUD "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of" the Act. 42 U.S.C. § 3608(e)(5).

30. In providing for administrative enforcement of the FHA, Congress laid out a detailed scheme by which HUD must abide. In particular, HUD "shall make an investigation" of complaints that allege discriminatory housing practices, "shall . . . determine based on the facts whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur," and, where reasonable cause is found to exist, "shall . . . immediately issue a charge on behalf of the aggrieved person, for further proceedings" before the agency. 42 U.S.C. § 3610. Once a charge has been filed, HUD "shall provide an opportunity for a hearing on the record" before an administrative law judge. 42 U.S.C. § 3612(b).

31. HUD has adopted further regulations that govern how the agency discharges its statutory enforcement obligations. The Office of Fair Housing and Equal Opportunity (FHEO) is the investigatory body responsible for, among other things, enforcing the Fair Housing Act. *See* Consolidated Delegation of Authority for the Office of Fair Housing and Equal Opportunity, 76 Fed. Reg. 73984 (Nov. 29, 2011). FHEO does so by processing and investigating complaints of

housing discrimination, performing compliance reviews, reviewing and commenting on proposed rules, guidance, and policy documents related to fair housing, and working with Congress on potential fair housing legislation. *See* 24 C.F.R. subtitle B, Ch. 1, Pt. 103 (setting forth mandatory complaint and enforcement procedures that the agency must follow).

32. HUD regulations and delegations of authority impose specific enforcement-related duties on the agency's General Counsel, such as approving subpoenas to be issued as part of the agency's investigations, concurring with reasonable-cause determinations, issuing formal charges of discrimination, and prosecuting charges of discrimination in administrative hearings. *See* 24 C.F.R. §§ 103.200(a)(3), 103.215(b), 103.400(a)(2)(i), 103.410(c), 180.305(a).

33. Within the Office of General Counsel (OGC), the Office of Fair Housing (OFH) carries out work pursuant to the FHA. OFH is one of nine Divisions of OGC headquartered in Washington, DC, and OFH is the only office at HUD headquarters responsible for affirmative fair housing work.

34. HUD OGC also includes Regional Counsel offices across the country. Regional staff are generalist attorneys who handle a wide variety of matters, including both affirmative and defensive litigation, as well as regulatory and advisory work. While FHA enforcement is included among regional counsel's various responsibilities, fair housing matters make up only a small proportion of the work done by regional offices, and OFH is the only HUD headquarters office that enforces the FHA. As the agency's fair housing specialists, OFH is responsible for all novel and complex FHA cases nationwide, and regional attorneys are required to refer these cases to OFH. Each region is also assigned an OFH attorney to advise on FHA-related matters. Additionally, OFH attorneys, including Plaintiffs, serve as the agency-wide point of contact for their respective fair housing-related subject matter expertise.

35. As part of its work, OFH advises and supports FHEO to enforce the FHA and to ensure that HUD and grantees comply with fair housing requirements. Attorneys in OFH also serve as fair housing subject matter experts for others across the agency. In this role, OFH advises regional attorneys on their fair housing matters, trains investigators and regional attorneys, compiles toolkits, and drafts guidance documents and fair housing regulations. OFH also serves as fair housing counsel to all of HUD to ensure compliance with the FHA and other civil rights laws.

36. Within OFH, the Enforcement Division is the legal office responsible for affirmative enforcement of the FHA. The Compliance Division is primarily responsible for enforcement of other civil rights laws that apply to HUD grantees and advising the agency to ensure that HUD's programs comply with civil rights laws, including the FHA; in recent years, however, the Compliance Division has become more involved in affirmative FHA enforcement because many complaints allege violations of multiple civil rights laws, including the FHA. The Compliance Division additionally works with and advises FHEO to develop and conduct civil rights-related investigations, including under the FHA, relating to grantees' programs and activities.

37. Because of HUD's mandatory obligations under the FHA and governing regulations, OFH's enforcement workload is driven by the number of complaints that are filed with the agency, ***not*** by the varying priorities of different administrations.

## II. Plaintiffs' Work at the Office of Fair Housing

38. Plaintiffs—five attorneys who used to work in OFH—have spent most or all of their HUD careers enforcing the FHA.

39. Plaintiff **Palmer Heenan** joined HUD and OFH's Enforcement Division in October 2023, where he worked until his termination in September 2025. During his time at OFH, Mr. Heenan was responsible for charging complaints of discrimination, assisting in the litigation of matters before HUD's administrative law judges, issuing investigatory subpoenas, issuing subpoenas for depositions, assisting in the conciliation of cases, conducting dozens of witness interviews, providing legal advice to program offices throughout HUD with respect to their Fair Housing Act compliance obligations, and creating internal and external guidance documents to make sure both HUD and external parties, like housing providers, can accurately navigate their obligations under the FHA. Mr. Heenan's supervisors and senior OGC officials were aware of his work enforcing the FHA.

40. Plaintiff **Paul Osadebe** joined HUD and OFH's Enforcement Division in March 2021, where he worked until his termination in September 2025. During his time at OFH, Mr. Osadebe investigated complaints of housing discrimination, drafted charges of discrimination, drafted and defended regulations and agency actions related to civil rights, and worked with Congress on new laws addressing civil rights. He also represented fair housing complainants at certain stages of proceedings. Mr. Osadebe's supervisors and senior OGC officials were aware of his work enforcing the FHA.

41. Plaintiff **Julia Dykstra** joined OFH's Enforcement Division in May 2020, where she worked until her reassignment to the Office of Litigation in October 2025 and subsequent resignation in November 2025. During her time at OFH, she, among other things, drafted a regulation interpreting the FHA and defended it in litigation, investigated claims of discrimination, issued charges of discrimination, assisted in conciliation of FHA complaints, drafted and issued investigatory subpoenas, advised FHEO on investigations under the FHA, worked with the Civil

Rights Division at the Department of Justice on multiple amicus briefs interpreting the Fair Housing Act, drafted guidance under the FHA, and created toolkits for investigators for novel and complex cases. Ms. Dykstra's supervisors and senior OGC officials were aware of her work enforcing the FHA.

42. Plaintiff **Ashley Vazquez** joined HUD through the legal honors program in 2022. She began working on FHA enforcement matters during her legal honors rotations to the litigation division of the Office of Regional Counsel for Region IV, to OFH's Enforcement division, and to OFH's compliance division. Her performance review for that year reflected that she "routinely encouraged applying a Fair Housing and Civil Rights lens to areas where that perspective wasn't front of mind. Ms. Vazquez expressed strong interest in working exclusively on fair housing matters and requested that one of the OGC officials involved in the challenged reassignments place Ms. Vazquez in OFH at the end of the honors program. This request was granted, and Ms. Vazquez relocated from Georgia to Washington, DC to work in OFH's compliance division in 2023. She worked in OFH until her reassignment to the Ethics Law Division in the Office of Ethics and Personnel Law in October 2025. During her time in OFH, Ms. Vazquez has worked on multijurisdictional cases that involve an FHA claim alongside a compliance authority, most frequently cases involving the Violence Against Women Act (VAWA) and FHA. Ms. Vasquez also advised on how to administer agency programs and activities in a manner that would affirmatively further the FHA. Ms. Vasquez's supervisors and senior OGC officials were aware of her work enforcing the FHA and rendering such advice.

43. Plaintiff Iris Maute-Gibson joined HUD through the legal honors program in 2022. She began working on FHA matters during her legal honors rotations to OFH's Enforcement division and the OGC Front Office. Ms. Maute-Gibson expressed in her application to HUD and

in regular check-in meetings with one of the OGC officials involved in the challenged reassignments, who supervised legal honors attorneys during the 14-month program, that she was exclusively seeking final placement in OFH at the end of the honors program. This request was granted, and Ms. Maute-Gibson began to work in OFH in 2023. She worked in OFH until her reassignment to the Ethics Law Division in the Office of Ethics and Personnel Law in October 2025. During her time in OFH, Ms. Maute-Gibson investigated of claims of discrimination under the FHA and compliance authorities, including claims of discrimination based on race and national origin; facilitated negotiation and conciliation with Complainants and Respondents on FHA claims; reviewed charges of discrimination for legal sufficiency, drafted investigatory subpoenas; interviewed dozens of witnesses; advised FHEO on FHA investigatory procedure and substantive legal questions under the FHA; and assisted the Civil Rights Division at the Department of Justice on multiple occasions in drafting amicus briefs interpreting the FHA. Ms. Maute-Gibson's supervisors and senior OGC officials were aware of her work enforcing the FHA.

44. Supervisors and OGC officials were aware that, as OFH attorneys, Plaintiffs' workload primarily consisted of affirmative fair housing enforcement and that Plaintiffs sought out, and were committed to, focusing on this work because of their views and values. These officials were aware of Plaintiffs' FHA-related responsibilities based on, among other things: organization charts, office titles, job titles, position descriptions, direct interactions with OFH staff, delegations of authority, briefings by the Associate General Counsel for Fair Housing, bi-weekly reporting shared with OGC leadership regarding ongoing casework, internal reporting systems, requests to recruit and retain law students and legal honors attorneys by promoting OFH work, and the annual performance review process, which included detailed descriptions of Plaintiffs' work, including on FHA enforcement matters.

45. Each Plaintiff was also at HUD during the Biden Administration, and did some work during that time that the current administration disapproves of. Among other things, Mr. Heenan and Ms. Dykstra led a years-long investigation into, and eventual charge of discrimination against, a large homeowners' association that repeatedly adopted rules limiting renting to holders of HUD's Section 8 Housing Choice Vouchers, which subsidizes the housing costs of poor, elderly, and disabled people. After referring the charge to DOJ pursuant to their statutory obligation, *see* 42 U.S.C. § 3612(o), the presidential administration changed, and HUD rescinded the referral of the charge.[3] Mr. Heenan worked on several years-long investigations into design and construction cases regarding compliance with the FHA's accessibility requirements. HUD, and, specifically, Assistant Secretary Trainor, has recently issued guidance that contravenes long-standing precent regarding those cases.[4] Mr. Heenan also worked on a fair lending case during the Biden administration that HUD decided to dismiss after the case was pending before an Administrative Law Judge. Mr. Osadebe and Ms. Dykstra were two of the main attorneys involved in OFH's disparate impact and discriminatory effects work, including writing the 2023 regulation reinstating the agency's prior disparate-impact rules and successfully defending that position in federal court. HUD has since proposed rescinding these regulations. Mr. Osadebe and Ms. Dykstra also participated in an interagency initiative geared toward addressing racial and ethnic bias in home valuations, and earned an agency-wide award for this work. Mr. Osadebe and Ms. Vasquez also participated in numerous disparate impact matters of national concern, such as mixed status families and undocumented tenants, and each of them received an agency-wide award for

[3] https://www.propublica.org/article/trump-hud-texas-housing-discrimination-cases-dallas-houston.
[4] https://www.hud.gov/sites/default/files/PA/documents/AS-Trainors-Guidance-on-the-Statute-of-Limitations-for-Design-and-Construction-Claims.pdf.

this work. Ms. Dykstra, Ms. Vasquez, and Ms. Maute-Gibson worked on a significant amount of environmental justice fair housing work. Ms. Vasquez and Ms. Maute-Gibson worked on cases alleging discrimination based on race and national origin, including patterns and practice of segregation, affirmative marketing to populations with limited English proficiency, discriminatory residency preferences in public housing, and the use of criminal history records data in housing. Ms. Maute-Gibson served as fair housing counsel for the year-long development of HUD's 2025 Notice of Funding Opportunity (NOFO) template that ensured both HUD and grant recipients complied with their FHA obligations, including not to discriminate on the basis of sexual orientation or gender identity. Since the change in administration, all NOFOs using this template have since been pulled down, and this template is no longer being used. Mr. Osadebe worked on implementing and defending HUD's policy of accepting and investigating complaints of discrimination because of sexual orientation or gender identity and helped apply those protections under Title IX guidance.

46. Beginning shortly after January 20, 2025, OFH attorneys were subject to a strict gag order that prohibited them from engaging in any "external communications" without political leadership approval for each individual matter. That approval has been granted only rarely, and requests often lingered for months without action. The gag order was conveyed verbally by political leadership, with no written clarification or guidance and OFH tried repeatedly and unsuccessfully to clarify the scope of the restriction and get permission for timely communications with DOJ and with parties during conciliations. At the time of these events, OGC officials interpreted this directive to mean that OFH is prohibited from communicating with any party to an investigation or any federal agency, including the Department of Justice. As a result of this directive, OFH attorneys were limited in their abilities to provide legal advice on matters for which

they would typically consult in the regular course of business. The gag order was highly unusual and, on information and belief, was instituted to interfere with Plaintiffs' ability to carry out their statutory enforcement duties and, in turn, make it easier to retaliate against Plaintiffs and others for their past work and experience.

47. Throughout February and March, Plaintiffs became aware of potential downsizing efforts and potential Reductions in Force (RIFs) at HUD and OGC. Plaintiffs and other employees faced growing pressure to resign their jobs through the Office of Personnel Management's "deferred resignation programs." Many probationary employees who did not accept deferred resignation were fired *en masse*, including three attorneys at OFH. HUD employees received several emails from the agency's HR department that suggested or implied they could be impacted by upcoming layoffs. One such email instructed employees to check the accuracy of their employee records in advance of impending RIFs. Other concerning emails included offers to provide staff trainings about applying for other jobs. Several emails and FAQ meetings discussed the possibility of impending RIFs.

48. Plaintiffs believe that OFH was especially targeted because of who comprised that office. In mid-February, a spreadsheet that had been provided to senior agency leadership began circulating among HUD staff, which showed RIF targets for various agency offices as directed by the Trump Administration's newly-created Department of Government Efficiency (DOGE). According to that spreadsheet, FHEO—the investigatory office responsible for FHA enforcement and OFH's client office—would be cut by 77%.[5]

---

[5] https://apnews.com/article/doge-hud-trump-turner-affordable-housing-musk-0176c8539fa9b5959198c351c97b8652.

49. Agency leadership originally intended to separate everyone in OFH by implementing a RIF limited to OFH specifically, but those plans ran into roadblocks. Agency officials were advised that (1) any RIF would have to apply across all of OGC, rather than to OFH alone, (2) it would be unlawful to conduct a so-called "box RIF" for the purpose of removing OFH attorneys, and (3), in any case, many OFH attorneys would have sufficient seniority to remain with the agency even with a RIF.

50. Having been advised that an OFH-specific RIF would not work, OGC officials looked for other ways to target OFH attorneys, and specifically, the OFH attorneys who historically performed fair housing work the new Administration did not agree with. OGC officials considered eliminating OFH by moving "all of the program enforcement work to the field."

51. Unable to eliminate OFH altogether, OGC officials instead opted to use involuntary reassignments to achieve their goal of preventing these specific attorneys from continuing to enforce the Fair Housing Act.

52. Even as these involuntary reassignments began, HUD officials sought to isolate OFH, including Plaintiffs, by cutting their roles with respect to other agency activities. In May 2025, OFH was removed from HUD's internal clearance process, through which OFH had served for decades as civil rights counsel to the agency, including reviewing proposed policy issuances, advising program offices and agency leadership of legal risks raised under the FHA and other civil rights authorities, and assisting in developing policy to implement HUD's FHA obligations. Throughout this same period, managers in other parts of HUD repeatedly directed their staff, based on verbal guidance from leadership, not to seek assistance from or consult with OFH or FHEO, despite many years of productive collaboration in the past. And for almost a year, FHEO was limited in its ability to consult with OFH attorneys, including Plaintiffs, while no such limitation

was imposed on FHEO's interaction with the regional offices. In addition, an OGC official instructed overburdened counsel in regional offices to stop referring cases to OFH or asking OFH for assistance. This OGC official also instructed OFH to stop offering assistance on regional office cases. Neither instruction was given in writing.

53. Last fall, political leadership in FHEO released new guidance regarding investigatory procedures and a retraction of dozens of existing guidance documents, all without consulting OFH. This was done despite OFH normally taking a significant role in developing or retracting any guidance—indeed, some of the guidance FHEO purported to withdraw was developed over many years through careful collaboration between FHEO and OFH.

54. One OFH attorney supervisor who was involuntarily reassigned has since rejoined OFH to backfill a role after another OFH supervisor resigned. During this time, she has continued to face targeting for her prior affiliation with and positions in OFH. Supervisors in OFH oversee and/or are involved in all of the fair housing cases of the line attorneys they manage, including those from program offices or the regional offices. Earlier this year, however, an attorney on this supervisor's team received instruction from FHEO to exclude the supervisor from a matter that the attorney she supervises and FHEO were partnering on.

### A. The Staffing Explanation is Pretext

55. At various times, Defendants have maintained that these were ordinary staffing decisions, but circumstances demonstrate that this justification was pretext. Indeed, the highest OGC official in OFH does not believe that a need for attorneys in the other OGC offices was the primary reason for Plaintiffs' reassignments, as discussions around cutting OFH attorneys began

before the alleged staffing needs existed. This is consistent with the administration's practice of finding legal justifications to eliminate workers and offices they perceive as DEI related.[6]

56. On May 28, 2025, Plaintiff Ashley Vazquez met with an OGC official individually to discuss possible reassignments. During that meeting, the OGC official stated that work-sharing to address OGC needs would not be approved because OFH was too big and needed to be "right-sized." The OGC official informed Ms. Vazquez that she was free to transfer to *any other OGC office* in the country—including those that had not lost significant, if any, staff—if she was willing to move and pay for her own relocation costs.

57. On or around May 29, 2025, Plaintiff Iris Maute-Gibson met with an OGC official individually to discuss possible reassignments. During that meeting, the OGC official stated that OFH attorneys had been selected to address staffing needs across OGC because fair housing is not going to be a priority of this administration, and OFH would not have as much work to do (a claim that, as discussed elsewhere in the complaint, was pretextual). The OGC official further stated that leadership had directed that OGC fill the positions administratively rather than either hiring new attorneys to replace those who had resigned or already been fired or offering opportunities for those staff to return. The OGC official provided Ms. Maute-Gibson with many options of OGC offices to volunteer to be reassigned to, beyond those that had initially been designated as needing staff. At this meeting and in a follow-up email, Ms. Maute-Gibson described her current OFH workload to the OGC official, highlighting an increased caseload due to reduced capacity of FHEO and regional counsel, including losing all of her FHEO and regional counsel colleagues on two matters. Ms. Maute-Gibson further explained the difficult position of having to choose between

[6] *See, e.g.*, https://www.washingtonpost.com/nation/2025/02/28/doge-trump-civil-rights-office-closing-eeoc/.

her dedication to HUD and federal employment and their civil rights career, and that if reassigned, she would feel obligated to leave HUD, which would not help solve the staffing needs of other OGC offices. Instead, Ms. Maute-Gibson personally offered to volunteer for long-term work-sharing or a term-limited full-time rotational assignment to another OGC office. The OGC official said neither would be possible and acknowledged knowing that many people in OFH would leave HUD to go to civil rights organizations if involuntarily reassigned. OFH's Associate General Counsel also relayed this understanding to OGC officials.

58. On May 29, 2025, an HR official in OGC scheduled a meeting for the next day entitled "OGC Skills Gap." The meeting invitation included line attorneys from OFH and the Office of Program Enforcement (OPE).

59. On June 4, 2025, the "OGC Skills Gap" meeting was held. OFH attorneys were told that, to fill staffing needs, OGC was offering attorneys in OFH and OPE the opportunity to be voluntarily reassigned to a list of other divisions that allegedly had staffing needs. For each division on the list, OGC officials stated that there was a specific number of attorney slots that supposedly needed to be filled. OFH supervisors had not previously been informed of these numbers or exactly how many staff attorneys agency leadership intended to reassign. OFH attorneys were told that, if not enough people volunteered by June 13, OGC officials would conduct involuntary reassignments. At no point in determining how many attorneys to transfer did agency leadership identify a particular number of attorneys necessary to fully staff OFH and fulfil HUD's statutory mandate, despite that several OFH attorneys raised concerns about their casework and increased workloads.

60. On June 9, 2025, OFH attorneys, including Plaintiffs, with the support of the then-Deputy Assistant General Counsel for Fair Housing Compliance, emailed OGC officials to

propose a work-sharing plan to meet what OGC officials had described as gaps in coverage, as an alternative to involuntary reassignments in the event there were not enough volunteers. The proposal suggested term-limited rotational assignments in addition to attorneys taking on certain matters for other offices while remaining in OFH. Both work-sharing agreements and temporary rotations are common arrangements throughout OGC to meet staffing needs as they arise.

61. On June 12, 2025, an OGC official rejected the alternative proposal, stating that office leadership believed asking for volunteers was the best option at that time. The official did not respond to follow-up questions OFH attorneys had sent in writing about the voluntary reassignment process.

62. Only one attorney from OFH volunteered to transfer, and his transfer was approved to an office that was not one of the original options definitively conveyed by OGC officials as having staffing gaps at the June 4 meeting. The office to which that attorney was transferred indicated they were unaware they would be receiving additional staff through the reassignments.

63. One OPE attorney who volunteered to transfer to one of the offices conveyed by OGC officials as needing staff was not reassigned. As of the time of this filing, that attorney is still at OPE.

64. On June 23, 2025, OGC officials verbally conveyed to the Associate General Counsel for Fair Housing that ten line attorneys—including Plaintiffs—would be involuntarily transferred out of OFH. On June 23, 2025, OGC officials also conveyed that two supervisors in OFH (the Deputy Assistant General Counsel for Fair Housing Enforcement and the Deputy Assistant General Counsel for Fair Housing Compliance) would be demoted to trial attorneys and transferred out of OFH. As far as Plaintiffs are aware, this was the first time that OGC officials ever suggested that supervisors were being considered for reassignment.

65. Later that day, in response to the proposed involuntary reassignments, one of the deputies slated for transfer sent emails to OGC leadership and other OGC managers outlining his legal, programmatic, and practical concerns regarding the proposal. In the email to OGC leadership, the deputy explained his view that the attorneys selected for transfer had been targeted in retaliation for their work on fair housing matters, and that OFH had been specifically targeted for reduction because fair housing-related work is not in favor with current political leadership. Less than one week later, the deputy was placed on administrative leave, and he was subsequently terminated on the basis of those emails.

66. OGC officials did not involuntarily reassign attorneys from any offices other than OFH and OPE, even though several other OGC divisions had also lost relatively few staff in recent months.

67. On information and belief, OPE, the only other office subject to involuntary reassignments, was included in the reassignments primarily to deflect from decisionmakers' unlawful motivation under the FHA. OFH was included on the original May 21 calendar invite regarding reassignments, but OPE was not.

68. The number of staff that were ultimately reassigned is more than OGC officials initially indicated would be necessary to address staffing needs. For example, the Office of Ethics and Appeals initially requested two to three attorneys, partially informed by the need to perform a function that has since been offloaded to another office. Two OGC employees from outside OFH volunteered to be transferred to Ethics, yet two additional attorneys from OFH were still transferred. Similarly, the Office of Litigation initially requested four to five attorneys, but that office received eight additional staff, including five involuntary transfers from OFH. And one

OFH attorney was involuntarily transferred to an office that was not identified as having a staffing need. OFH supervisors were shocked at the number of attorneys that OGC decided to reassign.

69. The reassignments were not based on Plaintiffs' particular skills and experience. In all or most cases, regional attorneys at OGC already do the type of work done by the offices to which Plaintiffs and their colleagues in OFH were or have been reassigned, and those attorneys could have more easily absorbed this work given their extensive experience in those areas. Plaintiffs and their colleagues in OFH are experts in fair housing and civil rights law, which is a unique and highly specialized field. Individual OFH attorneys have expertise and historical knowledge in certain areas of fair housing and civil rights law that will be lost and cannot be replaced if they are removed from their OFH positions. Their practice is also primarily comprised of affirmative enforcement, which is materially different work than the types of defensive litigation, ethics reviews, and personnel matters that Plaintiffs and their colleagues were expected to carry out once reassigned. OGC staff in HUD's regional offices, however, already worked on and had expertise in defensive litigation, ethics, and personnel matters, and thus would have been better suited to that work than Plaintiffs. Because Plaintiffs and their colleagues had little to no experience in the areas and fields to which they were or were supposed to be transferred, they required substantial training and supervision to match the expertise already held by regional attorneys. OGC officials nevertheless ordered that Plaintiffs and their colleagues in OFH be reassigned to address needs in other OGC divisions, rather than redistribute that work among already-trained attorneys without regard to the needs of OFH.

70. OGC officials never tried to fill the positions to which Plaintiffs and their colleagues in OFH have been involuntarily reassigned by advertising those positions across OGC to solicit volunteers from other divisions, or by seeking an exemption from the hiring freeze that

would have allowed OGC to hire additional attorneys for these positions. On information and belief, other parts of HUD and other federal agencies requested and/or received permission to hire additional personnel during the hiring freeze.

71. In the Office of Litigation, one of the divisions to which Plaintiffs were transferred, former employees who had been fired in their probationary terms or accepted deferred resignation were willing to return and continue carrying out that office's work. OGC leadership did not allow any of these attorneys to return to address the purported staff shortage, choosing to involuntarily reassign Plaintiffs instead, knowing that they would likely choose to leave the department.

72. OGC officials rejected a detailed alternative proposal offered by Plaintiffs and their colleagues that would have allowed OFH staff to help other OGC divisions address critical needs, while also continuing to carry out their fair housing work at the same time. The types of work-sharing and detail arrangements that OFH attorneys proposed are used within OGC and elsewhere in the agency. In fact, multiple OFH attorneys had previously completed part-time details, including to other agencies and to fill emergent HUD staffing gaps, during which they successfully managed both their OFH workload and their detail assignments. In the process of carrying out the reassignments, an OGC official told one of the OFH supervisors set to be reassigned that she could start working in her reassigned position before her transfer date, acknowledging that work-sharing was possible for the very work at issue. Managers in some of the offices to which Plaintiffs have been reassigned have indicated that they would have been open to work-sharing arrangements to address staff shortages. OGC officials did not offer any reasoned or concrete explanation as to why they rejected the proposal or did not believe it would be effective in meeting their purported needs.

73. Despite OGC officials' insistence that Plaintiffs' reassignments were necessary to address significant and time sensitive staffing shortages in the receiving offices, Plaintiffs have often found themselves with little to no work to do in their reassigned positions, beginning shortly after their reassignment and continuing to date. All of the OFH attorneys who were transferred to the Office of Litigation have either been terminated or resigned. Upon information and belief, HUD has not transferred any additional attorneys to fill those positions. At the same time, HUD has hired in offices that were not deemed to have a critical need and to which no one was involuntarily transferred, like procurement.

74. Ultimately, any option that involved the transferred attorneys staying at HUD and assisting with fair housing work was rejected, while any option that involved the transferred attorneys ceasing fair housing work was accepted, regardless of whether that resulted in going to an office without an identified need or leaving the agency altogether.

**B. Plaintiffs Were Targeted Because of Their Work Advancing Fair Housing Rights**

75. On information and belief, Plaintiffs were targeted for involuntary reassignment because agency leadership wished to punish them for their prior work enforcing the FHA, which was protected activity. As fair housing attorneys, Plaintiffs necessarily assisted, aided, and/or encouraged other people in the exercise or enjoyment of their fair housing rights. The reassignments were motivated by an unlawful intent to interfere with Plaintiffs' ability to advance fair housing rights.

76. Statements by OGC officials and the way the reassignments were carried out show that (1) the agency's proffered justification was not credible and (2) the reasons given for the reassignments were pretext for decisionmakers' unlawful motivation.

77. OGC officials have repeatedly stated that the reassignments were necessary because "fair housing is not a priority" of this Administration and current agency leadership. OGC

officials also stated that, because fair housing is not a current priority, there would not be as much fair housing enforcement work to do going forward. But at the time new agency leadership, including the then-Acting General Counsel, began discussing staffing changes with OGC officials, the new Administration "had not really laid out their priorities." As such, at times, OGC officials had to "distinguish[] between" OGC's priorities and the Administration's.

78. And there was no shortage of work at OGC. OGC officials stated that they "wanted to keep all of the staff [they] had," that they "were trying to keep everyone," and that "[l]osing more staff does nothing to help OGC."

79. Even before Plaintiffs' reassignments, OFH faced a significant backlog of statutorily mandated enforcement work. Multiple regional counsel offices were left with no attorneys or only a single junior attorney after the deferred resignation programs and probationary worker terminations. Because OGC's regional offices have lost so many staff in recent months, especially on the litigation side, OFH was receiving increased requests from regional counsel to assist on fair housing matters and OFH attorneys, including Plaintiffs, affirmatively offered to help overburdened regional counsel. Indeed, one region lost so much staff that an OGC official offered an OFH attorney to partner on a hearing assigned to that region. OFH attorneys took on this extra work because of their commitment to this work—not to "shore up their workload." OFH had also been carrying increased workloads in light of significant staff shortages at FHEO. Despite statements about administration priorities and allegations of a pause on all fair housing enforcement actions, the number of investigations and complaints that statutorily must be processed—which determines the workload for OFH—has not decreased. For these reasons, one OGC decisionmaker had previously deemed Ms. Vasquez and Ms. Maute-Gibson to hold "mission critical positions."

80. Even as OGC officials suggested that OFH attorneys did not have enough work to justify the office's staffing levels, one OGC decisionmaker agreed that she is "not super familiar" with the details of OFH's work allocation and that she has "not been as involved in fair housing litigation and enforcement."

81. In addition, at the beginning of the administration, OFH had been managing new workstreams arising out of the new Administration's priorities, including implementation of Executive Orders, assistance with defensive litigation, and review of applications for fair housing initiative program grants that were submitted after the Administration amended the solicitation for applications consistent with its priorities.

82. On information and belief, none of the offices to which Plaintiffs and their colleagues have been or will be transferred have backlogs or capacity issues that are any more urgent or severe than at OFH. OFH attorneys have been told that, in executing the reassignments, OGC officials "were thinking of needs of all offices except OFH."

83. OGC officials themselves acknowledged that OFH's work would continue but would, at least in part, vary in kind from Plaintiffs' work at OFH. And they seemed to believe that this new work would not be amenable to Plaintiffs. One OGC official stated that "Fair Housing actually got a significant amount of focus initially," but it was "***probably not the kind that some of them wanted***." As to the impending changes to OFH's work, that official surmised that this "***was not what some of them would have wanted to happen***." In line with this animus toward Plaintiffs, this official also stated that "just because" one office's work is not "getting more resources and more attention doesn't meant it stops"; "[i]t just means you're not going to be, like, the cash cow getting all the extra perks." In her view, some OFH attorneys were inappropriately focused on "advocat[ing] for a particular program" as opposed to "advocat[ing] for the secretary."

84. Assistant Secretary Trainor recently said the quiet part out loud. He publicly criticized the fair housing work of prior administrations, alleging that the work of "sly bureaucrats" "distorted the Fair Housing Act, created confusion, or violated its terms."[7] In his view, HUD's fair housing offices had been "pursu[ing] dubious ideological crusades" and "self–indulgent cases."[8] OFH and FHEO had, until this Administration, been acting more like a "social justice NGO" than "a law enforcement agency," but "under the leadership of President Trump and Secretary Turner, that dark era is over."[9]

85. Throughout this same time period, the Administration began shutting down Plaintiffs' cases using mechanisms and procedures Plaintiffs had never seen before. In multiple instances, the respective Plaintiff was warned by others at OFH about the risks of their involvement in the case, including the risk of retaliation. In a shift, the attorneys on these cases were not asked whether they would like to continue on the cases, nor were they consulted on immediate litigation decisions. The circumstances of these changes supported Plaintiffs' beliefs that they were ultimately transferred for their work on these and similar cases.

86. On more than one occasion, OGC officials have suggested that the reassignments might only be temporary, and that affected attorneys may be able to return to OFH in the future. Specifically, one OGC official indicated that OFH attorneys needed to be reassigned "until it was determined that the work was consistent with the new approach." These statements suggest that the problem was not the number of fair housing staff, but the work the fair housing staff had done.

---

[7] https://www.hud.gov/news/hud-no-26-063; https://fedsoc.org/events/civil-rights-in-the-second-trump-administration-a-whole-of-government-shift.
[8] https://fedsoc.org/events/civil-rights-in-the-second-trump-administration-a-whole-of-government-shift.
[9] *Id.*

## III. Plaintiffs' Reassignments and Harms

87. Plaintiff **Palmer Heenan** was orally informed on or about June 24, 2025, that his management team had received notice he was being moved to the Office of Litigation. Mr. Heenan did not receive written notice of his reassignment.

88. On July 3, 2025, Mr. Heenan's union was notified—in a letter backdated to July 1, 2025—that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Mr. Heenan did not receive written notice of his proposed reassignment.

89. On July 16, 2025, Mr. Heenan received an e-mail from an HR official that indicated the official had been tasked with assisting Mr. Heenan with a "voluntary reassignment" and requesting his resume. Mr. Heenan had not volunteered to be reassigned and still had not received written notice of his reassignment.

90. Mr. Heenan received written notice that he was being reassigned on or around September 15, 2025, with an effective date of October 5, 2025. In the formal written notification, Mr. Heenan was told that he must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

91. On information and belief, Defendants took this adverse action against Mr. Heenan because of his work prior enforcing the Fair Housing Act.

92. Mr. Heenan has been irreparably harmed by his reassignment. The new position to which Mr. Heenan was to be assigned was a new and different job from his prior role in OFH's Enforcement Division. Mr. Heenan did not possess knowledge about the substance of the new position, which he feared would have impacted his ability to obtain positive performance reviews and any benefits associated with such reviews.

93. Mr. Heenan has dedicated the majority of his legal career to advocacy for and on behalf of those whose civil rights have been violated. He has spent years acquiring both the

necessary knowledge and skill to be an effective civil rights attorney. He has taught numerous Continuing Legal Education Courses on civil rights enforcement. He has also lectured law school classes on civil rights and, in particular, the governmental role in the enforcement of civil rights laws. As a result of this reassignment, Mr. Heenan would no longer be able to do the civil rights work to which he has committed his professional career. Losing the opportunity to do that work materially disadvantages Mr. Heenan, his career, and his professional opportunities.

94. Given these concerns, Mr. Heenan authored a whistleblower report to Congress and filed this lawsuit. Mr. Heenan was then terminated from OFH for raising concerns about his and Plaintiffs' reassignments and other violations of law.

95. Plaintiff **Paul Osadebe** was orally informed on or about June 24, 2025, that his management team had received notice he was being moved to the Office of Litigation. Mr. Osadebe did not receive written notice of his reassignment.

96. On July 3, 2025, Mr. Osadebe's union was notified—in a letter backdated to July 1, 2025—that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Mr. Osadebe did not receive written notice of his proposed reassignment.

97. On July 16, 2025, Mr. Osadebe received an e-mail from an HR official that indicated the official had been tasked with assisting Mr. Osadebe with a "voluntary reassignment" and requesting his resume. Mr. Osadebe had not volunteered to be reassigned and still had not received written notice of his reassignment.

98. Mr. Osadebe received written notice that he was being reassigned on September 17, 2025,[10] with an effective date of October 5, 2025. In the formal written notification, Mr.

[10] The email was sent on September 16, 2025, but Mr. Osadebe's tour of duty had ended for the day, so he did not receive it until September 17, 2025.

Osadebe was told that he must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

99. On information and belief, Defendants took this action against Mr. Osadebe because of his work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decision makers were aware.

100. Mr. Osadebe has been irreparably harmed by his reassignment. Due to values Mr. Osadebe has held dear since before even entering college, Mr. Osadebe's career goal and reason for becoming a lawyer was to work on impactful civil rights litigation. Mr. Osadebe left his family and friends in Texas to move across the country to Washington D.C. to pursue opportunities to engage in affirmative civil rights litigation. All of Mr. Osadebe's legal experience has been focused on affirmative public interest litigation on behalf of individuals and communities. Mr. Osadebe has avoided any job with significant defensive litigation responsibilities because such work would conflict with his values. Mr. Osadebe would not have become a lawyer to perform civil rights work and would have chosen a different career entirely if he knew he would be asked to perform defensive litigation against vulnerable individuals and communities. The new position to which Mr. Osadebe was to be assigned was a new and different job from his prior role in OFH's Enforcement Division. As a result of his reassignment, Mr. Osadebe would not have been able to do the civil rights work to which he has committed his professional career. Losing the opportunity to do that work is an adverse action that materially disadvantages Mr. Osadebe, his career, and his professional opportunities.

101. Mr. Osadebe also suffered fear about how he would be evaluated doing work he is unfamiliar with in a new office, the type of training he would receive to perform this unfamiliar work, concern about being forced to restart his career with a different and unwanted focus several

years in, and internal conflict about being expected to perform defensive litigation work that conflicts with his values. Due to the stress surrounding his reassignment, Mr. Osadebe sought increased mental health treatment and even sought treatment from an urgent care facility and the emergency room for likely symptoms of panic attacks caused by the stress.

102. Given these concerns, Mr. Osadebe authored a whistleblower report to Congress and filed this lawsuit. Mr. Osadebe was terminated from OFH for raising concerns about his and Plaintiffs' reassignments and other violations of law.

103. Plaintiff **Julia Dykstra** was orally informed on or about June 24, 2025, that her management team had received notice she was being moved to the Office of Litigation.

104. On July 3, 2025, Ms. Dykstra's union—in a letter backdated to July 1, 2025—that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Ms. Dykstra did not receive written notice of her proposed reassignment.

105. On July 16, 2025, Ms. Dykstra received an e-mail from an HR official that indicated the official had been tasked with assisting Ms. Dykstra with a "voluntary reassignment" and requesting her resume. Ms. Dykstra had not volunteered to be reassigned and still had not received written notice of her reassignment.

106. Ms. Dykstra received written notice of her reassignment on September 17, 2025,[11] with an effective date of October 5, 2025. In the formal written notification, Ms. Dykstra was told that she must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

[11] The email was sent on September 16, 2025, but Ms. Dykstra's tour of duty had ended for the day, so she did not receive it until September 17, 2025.

107. On information and belief, Defendants took this action against Ms. Dykstra because of her work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

108. Ms. Dykstra has been irreparably harmed by this reassignment. Ms. Dykstra went to law school specifically to pursue a career doing affirmative civil rights work, having been inspired by her undergraduate coursework where she studied, among other things, inequality in access to housing. Virtually all of Ms. Dykstra's internships in law school and post-graduate positions prior to joining HUD were positions doing affirmative civil rights work. She has dedicated years acquiring the necessary skills and knowledge to be an effective affirmative civil rights lawyer. As a result of this reassignment, Ms. Dykstra has been irreparably harmed because she was no longer able to perform the work that she spent years training to do and will instead be placed in a position where she is effectively a beginner. Losing this opportunity materially disadvantages her in her career and she was concerned that her performance reviews, and any associated benefits, would be lower because she did not have experience in her reassigned role. Finally, she also has experienced increased anxiety about being forced to conduct work that conflicts with her values. Ms. Dysktra ultimately felt compelled to leave the federal government as a result of her involuntary reassignment.

109. Plaintiff **Ashley Vazquez** was informed on or about June 24, 2025, that her management team had received notice she was being moved to the Office of Ethics and Appeals.

110. On July 3, 2025, Ms. Vazquez's union—in a letter backdated to July 1, 2025—was notified that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Ms. Vazquez did not receive written notice of her proposed reassignment.

111. On July 16, 2025, Ms. Vazquez received an e-mail from an HR official that indicated the official had been tasked with assisting Ms. Vazquez with a "voluntary reassignment" and requesting her resume. Ms. Vazquez had not volunteered to be reassigned and still had not received written notice of her reassignment.

112. Ms. Vazquez received written notice of her reassignment on September 15, 2025, with an effective date of October 5, 2025. In the formal written notification, Ms. Vazquez was told that she must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

113. On information and belief, Defendants took this adverse action against Ms. Vazquez because of her work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

114. Ms. Vazquez has been irreparably harmed by this reassignment. Ms. Vazquez was a dues-paying member of the union AFGE Council 222, Local 476. As result of this reassignment, she lost her status in the bargaining unit. She lost the benefits of her union membership, which include numerous procedural rights, substantive protections, and financial benefits.

115. Ms. Vazquez's career will be irreparably damaged by this reassignment. Ms. Vazquez chose to attend a particular law school in order to gain tangible experience related to systemic discrimination associated with historic patterns of segregation. Based on her extensive civil rights enforcement experience, Ms. Vazquez believes that the federal government has a unique ability and responsibility to address systemic discrimination through civil rights laws, and that HUD's tools for enforcing civil rights are stronger than any other agency due to the strength of the Fair Housing Act. Ms. Vazquez's intent when applying to HUD's legal honors program was to work on FHA and other civil rights enforcement. She moved twice in two years to new

cities that she had no connection to in order to do this work, leaving behind family and friends and incurring significant financial costs.

116. During her time in OFH, Ms. Vazquez worked on multijurisdictional cases involving the intersection of the FHA with VAWA, Title VI, and Section 504. In these cases, she drafted FHA charges, negotiated with parties to encourage fair settlements, issued subpoenas, and drafted settlement agreements. Ms. Vazquez's Compliance role afforded additional opportunities to investigate widespread discrimination and issue letters of finding, and to advise on program compliance with civil rights laws, resulting in HUD programs being less likely to discriminate. This reassignment has prevented her from continuing to build upon those experiences, stunted her career growth, and prevented her from becoming a subject matter expert in the type of law she went to law school to pursue. The Office of Ethics and Appeals is a completely different type of law than what Ms. Vazquez had been practicing. Ms. Vasquez received a lower performance score than she historically received as a result of her being in a new and different job, which she fears might impact her ability to transfer back to OFH if the opportunity were to arise. Cutting short Ms. Vazquez's opportunity to continue building litigation skills will also adversely affect her opportunities to find meaningful civil rights work outside the government.

117. Ms. Vazquez has suffered significant anguish over having to abandon her cases. Under significant stress, Ms. Vazquez lost sleep and worked additional hours to maximize her impact on her cases before she was reassigned. Ms. Vazquez's religious beliefs require her to engage in the type of work she had been doing at OFH. As such, she sought religious counsel and devoted significant personal time to reflecting on the teaching of her faith and trying to stop her reassignment from proceeding and, since then, to mitigate the harms resulting from her reassignment.

118. Plaintiff **Iris Maute-Gibson** was informed on or about June 24, 2025, that her management team had received notice she was being moved to the Office of Ethics and Appeals.

119. On July 3, 2025, Ms. Maute-Gibson's union—in a letter backdated to July 1, 2025—was notified that management was proposing involuntary reassignments, with an effective date of July 28, 2025. Ms. Maute-Gibson did not receive written notice of her proposed reassignment.

120. On July 16, 2025, Ms. Maute-Gibson received an e-mail from an HR official that indicated the official had been tasked with assisting Ms. Maute-Gibson with a "voluntary reassignment" and requesting her resume. Ms. Maute-Gibson had not volunteered to be reassigned and still had not received written notice of her reassignment.

121. Ms. Maute-Gibson received written notice of her reassignment on or around September 15, 2025, with an effective date of October 5, 2025. In the formal written notification, Ms. Maute-Gibson was told that she must complete the "Statement of Acknowledgement and Acceptance" of the reassignment or be "subject to removal from the Federal service."

122. On information and belief, Defendants took this adverse action against Ms. Maute-Gibson because of her work at OFH enforcing the Fair Housing Act, of which senior officials and relevant decisionmakers were aware.

123. Ms. Maute-Gibson has been irreparably harmed by this reassignment. Ms. Maute-Gibson was a dues-paying member of the union AFGE Council 222, Local 476. As result of this reassignment, she lost her status in the bargaining unit. She lost the benefits of her union membership, which include numerous procedural rights, substantive protections, and financial benefits.

124. Ms. Maute-Gibson moved to Washington, DC and went to law school specifically to pursue a career doing affirmative civil rights work at the federal government, after a prior decade-long career in social justice. Virtually all of Ms. Maute-Gibson's advanced legal courses and internships in law school centered on building substantive civil rights expertise and litigation skills. She has dedicated years acquiring the necessary skills and knowledge to be an effective affirmative civil rights lawyer. As a result of this reassignment, Ms. Maute-Gibson has been irreparably harmed because after spending her first year and half as an attorney rotating to different OGC offices before beginning her legal career in affirmative civil rights enforcement, she was stripped of this opportunity to perform the work that she spent years training to do and was instead placed in a position with both a different substantive law and type of practice. She was forced to choose between her dedication to federal service and career progression during a consequential period of her legal career.

125. The new position to which Ms. Maute-Gibson was to be assigned was a new and different job from her prior role in OFH's Enforcement Division. Ms. Maute-Gibson did not possess knowledge about the substance of the law, and had already learned through her legal honors rotations that her skillset better aligned with litigation rather than transactional work. As a result, despite dedicating effort she felt was commensurate with her efforts that warranted an "Outstanding" rating in her first three annual reviews, Ms. Maute-Gibson received negative notes in her most recent performance reviews noting that she was still developing subject matter expertise necessary to perform at that rating level independently.

126. Ms. Maute-Gibson also experience personal harms as a result of the adverse actions, including expended time and energy in working to advance her casework as much as possible before being forced to abandon it, a decision to delay family planning, uncertainty about

remaining in Washington, D.C. where her family settled, and documented physical and mental health harms.

127. Plaintiffs' unlawful reassignments have also caused and continue to cause additional harm by chilling the advancement of fair housing rights. Victims of housing discrimination will suffer when their complaints are not timely and properly addressed by HUD. If agency officials are permitted to take adverse action against Plaintiffs based on their work enforcing the FHA, then employees across the country—both public and private—will be more reluctant to accept positions or assignments that advance fair housing, for fear that they could be punished for doing so. Moreover, victims of housing discrimination under the FHA will be less likely to file claims if they believe the agency charged with reviewing those claims is free to interfere with fair housing enforcement and itself violate the FHA.

## CLAIMS

### COUNT 1: VIOLATION OF THE FAIR HOUSING ACT – 42 U.S.C. § 3617 (ON BEHALF OF EACH PLAINTIFF; AS TO ALL DEFENDANTS)

128. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

129. Plaintiffs bring this claim pursuant to 42 U.S.C. § 3613(a)(1)(A).

130. 42 U.S.C. § 3617 provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." As HUD regulations recognize, this provision of the FHA prohibits "[t]hreatening an employee . . . with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of" certain protected characteristics. 24 C.F.R. § 100.400(c)(3). It further prohibits "[r]etaliating against any person

because that person has . . . participated in any manner in a proceeding under the Fair Housing Act. *Id.* § 100.400(c)(5).

131. Defendants, through OGC officials, coerced, intimidated, threatened and/or interfered with Plaintiffs' employment at OGC because of Plaintiffs' work aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA.

132. Plaintiffs reviewed, processed, investigated, conciliated, charged, managed, and/or resolved complainants' claims of housing discrimination under the Fair Housing Act. Plaintiffs also were responsible for participating in administrative proceedings at HUD under the Fair Housing Act to resolve charges of discrimination. In addition, Plaintiffs consulted with other offices at HUD and drafted and reviewed guidance, policy proposals, and other agency materials to ensure that the agency did not violate people's fair housing rights under the FHA.

133. Defendants, through OGC officials, were aware of Plaintiffs' activities aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA.

134. As a result of Plaintiffs' work aiding, assisting, and/or encouraging other people in the exercise or enjoyment of their fair housing rights under the FHA, Defendants, through OGC officials, coerced, intimidated, threatened, and/or interfered with Plaintiffs' employment at OGC by pressuring them to resign, coercing them to transfer to other offices, and when none of that worked, involuntarily reassigning Plaintiffs to offices outside of OFH and requiring them to accept the reassignments under threat of removal from federal service.

135. Plaintiffs' involuntary reassignments are an adverse action because they required Plaintiffs to transfer offices and do work that is meaningfully different from the civil rights-related work that they joined HUD to do. The reassignments would dissuade a reasonable person from

joining OFH or working on fair housing enforcement matters, for fear that they likewise will be targeted for involuntary reassignment or other adverse action.

136. Plaintiffs have suffered and will continue to suffer irreparable harm absent an injunction.

137. Plaintiffs attempted to address their concerns with management and other OGC officials, but Defendants have nevertheless proceeded with the involuntary reassignments. Plaintiffs fear further retaliation as a result of their efforts to oppose Defendants' unlawful actions.

**COUNT 2: DECLARATORY JUDGMENT ACT**
**(ON BEHALF OF EACH PLAINTIFF; AS TO ALL DEFENDANTS)**

138. Plaintiffs reincorporate by reference the allegations in paragraphs 1–123.

139. Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202. There is an actual controversy within this Court's jurisdiction, and a declaration of rights is necessary to remedy continuing harm resulting from Plaintiffs' unlawful reassignments.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs request that the Court award the following relief:

a. Grant injunctive relief, pursuant to 42 U.S.C. § 3613(c)(1), ordering Defendants to reinstate Plaintiffs to the positions, titles, and job descriptions they held in the Office of Fair Housing as of June 15, 2025;

b. Grant a declaratory judgment and any further necessary or proper relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202 that Plaintiffs' involuntary reassignments were and are unlawful;

c. Award Plaintiffs reasonable attorney's fees and costs as provided in 42 U.S.C. § 3613(c)(2);

d. Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

e. Grant such other relief as the Court may deem just and proper.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Clayton L. Bailey*
Clayton L. Bailey (DC Bar No. 1644867)
Margaret (Emmy) Wydman (DC Bar No. 90007646)
**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 571-7840
cbailey@civilservicellp.com